IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DORIAN FRANK O'KELLEY, )
 )
    Petitioner, )
 )
v. ) CASE NO. CV415-104
 )
WARDEN, Georgia Diagnostic )
Prison, )
 )
    Respondent. )
 )

## O R D E R

In 2005, Petitioner Dorian Frank O'Kelley was convicted and sentenced to death by the Superior Court of Chatham County for the murders of Susan Pittman and her thirteen-year-old daughter, Kimberly Pittman. After the completion of his direct appeal and state habeas court proceedings, Petitioner filed a petition for habeas corpus in this Court, pursuant to 28 U.S.C. § 2254, challenging his conviction and death sentence on a number of grounds. Petitioner also filed the instant Motion for Leave to Conduct Discovery. (Doc. 61.) Petitioner contends that discovery is necessary for the full and proper development of evidence and the presentation of his habeas case. After careful consideration, Petitioner's motion is **DENIED**.[1]

---

[1] Accordingly, Respondent's Motion Requesting Ruling on Petitioner's Motion for Discovery (Doc. 69) is **DISMISSED AS MOOT**.

# BACKGROUND

I. <u>FACTUAL HISTORY</u>

The facts of this case were set forth by the Supreme Court of Georgia:

> [S]hortly before midnight on April 10, 2002, O'Kelley and his co-defendant, Darryl Stinski, were observed at a convenience store by two Chatham County police officers. The officers noticed the defendants because they were dressed in black clothing, they carried a black duffle bag that appeared empty, and Stinski had several facial and ear piercings. Shortly after O'Kelley and Stinski left the store, the officers responded to a burglar alarm at a residence within walking distance of the store and discovered a broken window there. The occupant of the residence, who was not home at the time, testified at trial that she returned to find that someone had apparently tried to kick in her back door and had broken a window and bent the curtain rod inside the home. O'Kelley admitted in his first statement to police that he and Stinski went to a residence in order to commit a theft therein on the night in question but fled after the alarm went off.
>
> A few hours later, at approximately 5:30 a.m. on April 11, the same police officers were leaving the convenience store when they spotted a fire in the distance. Rushing to the scene, they found the Pittman residence engulfed in flames. This home was in close proximity to the residence which had been burglarized earlier. In the headlights of the police car, one of the officers again observed O'Kelley and Stinski, this time standing in a wooded area across the street from the burning house. However, they had disappeared by the time the officers exited the vehicle. Once the fire was extinguished, officials discovered the remains of the victims.
>
> That evening, O'Kelley and Stinski brought a duffle bag to the mobile home where Stinski was staying, and O'Kelley told the group of people present that he and Stinski had stolen items from automobiles in the neighborhood. He also confided in one member of

the group that he had burglarized and set fire to the Pittman residence, and he claimed to have slit Ms. Pittman's throat and to have raped Kimberly. O'Kelley then removed from his wallet a tooth in a ziplock bag and stated that he had "busted it out of the little girl's mouth." After O'Kelley and Stinski left the mobile home, the group opened the duffle bag and discovered several items, including compact discs marked with Kimberly's initials and prescription pill bottles containing oxycodone with Ms. Pittman's name and address on the labels. A group member phoned the police and advised them of the bag's contents and O'Kelley's comments. After the contents of the bag were identified by a family member as belonging to the victims, O'Kelley and Stinski were arrested, and a human tooth later determined through DNA evidence to belong to Kimberly was found inside O'Kelley's wallet.

In his second statement to police, O'Kelley confessed to killing Ms. Pittman by repeatedly beating and stabbing her, to beating and stabbing Kimberly, to setting the Pittman residence on fire while Kimberly was still alive, and to taking numerous items from the residence. O'Kelley told police that items stolen from the home and from automobiles in the neighborhood were located in the attic of his house and that he had discarded the clothing and shoes that he was wearing during the murders in a garbage bag on top of an abandoned mobile home near his house. Police located these items as O'Kelley described. Blood on the clothing was identified as Ms. Pittman's, and blood on the shoes was identified as that of both victims.

Four witnesses testified that, early on the day following the murders, they discovered that someone had broken into and removed personal belongings from their automobiles parked in O'Kelley's neighborhood. O'Kelley's fingerprint was found inside one of these vehicles, and the witnesses identified their stolen property from items recovered by the police from O'Kelley's attic.

O'Kelley v. Georgia, 284 Ga. 758, 759-60, 670 S.E.2d 388, 392-93 (2008).

II. PROCEDURAL HISTORY

Petitioner was charged with two counts of malice murder, two counts each of burglary and arson in the first degree, one count of cruelty to children, one count of possession of a controlled substance, one count of possession of a controlled substance with intent to distribute, and five counts of entering an automobile with intent to commit theft. Id. at 758. Petitioner's trial began on October 21, 2005, and he was found guilty on November 3, 2005 of all charges in the indictment with the exception of possession of a controlled substance with intent to distribute. (Doc. 33, Attach. 5 at 15-16.) Five days later, Petitioner was sentenced to death for the murders of Susan Pittman and her daughter. (Doc. 16, Attach. 19 at 2-5.) The jury found, beyond a reasonable doubt, the existence of six statutory aggravating factors;

(1) The murders were committed while Petitioner was engaged in the commission of a burglary.
(2) The murders were committed while Petitioner was engaged in the commission of arson in the first degree.
(3) The murders were outrageously or wantonly vile, horrible, or inhuman in that they involved torture to the victims before death.
(4) The murders were outrageously or wantonly vile, horrible, or inhuman in that they involved depravity of the mind of Petitioner.
(5) The murders were outrageously or wantonly vile, horrible, or inhuman in that they involved aggravated battery to the victims before death.

4

> (6) The murder of Kimberly Pittman was committed while Petitioner was engaged in the commission of another capital felony, the murder of Susan Pittman.

(Doc. 16, Attach. 19 at 2-4.)

On December 5, 2005, Petitioner filed a motion for a new trial, which he amended on March 6, 2007. (Doc. 16, Attach. 19 at 11-12; Doc. 16, Attach. 22 at 5-15; Doc. 16, Attach. 23 at 1.) On January 8, 2008, the trial court denied Petitioner's amended motion. (Doc. 21, Attach. 2 at 5-15; Doc. 21, Attach. 3 at 1-8.) The Georgia Supreme Court affirmed Petitioner's convictions and death sentences, although it reversed the sentences for the two first degree arson counts because those counts should have been merged. O'Kelley, 284 Ga. at 760-61. On October 5, 2009, a petition for writ of certiorari in the United States Supreme Court was denied. O'Kelley v. Hall, 558 U.S. 840, rehearing denied, 558 U.S. 1064 (2009).

Accordingly, Petitioner filed a state habeas corpus petition in the Superior Court of Butts County on September 7, 2010. (Doc. 35, Attach. 9.) On April 26, 2011, Petitioner filed an amended petition. (Doc. 36, Attach. 19.) The court conducted evidentiary hearings on August 27-29, 2012 and January 9, 2013. (Doc. 38, Attach. 1 through Doc. 50, Attach. 9.) On September 27, 2013, the state habeas court entered an order denying relief. (Doc. 52, Attach. 8.) On January 27, 2014, Petitioner

5

filed an application for a certificate of probable cause to appeal the denial of habeas corpus relief. (Doc. 53, Attach. 2.) On March 30, 2015, the Georgia Supreme Court denied the application. (Doc. 53, Attach. 6.) Further attempts to appeal were similarly unavailing. See O'Kelley v. Chatman, ___ U.S. ___, 136 S. Ct. 408 (2015).

After filing a 28 U.S.C. § 2254 petition in this Court, Petitioner filed the instant Motion for Leave to Conduct Discovery. (Doc. 61.) Petitioner requests that the Court permit him to conduct discovery under Rule 6 of the Rules Governing Cases Brought Under 28 U.S.C. § 2254. Specifically, Petitioner seeks discovery relevant to Petitioner's second claim—that misconduct by the prosecution and other state agents deprived Petitioner of his constitutional rights—and fourth claim—that the trial court deprived petitioner of a fair trial and reliable sentencing. (Doc. 1 at 2; Doc. 68 at 3.) Petitioner asks for leave of Court to obtain all grand jury records and files relating to health or educational records that might have a mitigating effect on Petitioner's sentence, and all grand jury records and files relating to the testimony of Larry Gray. (Doc. 61 at 13-16.) Petitioner also makes a general request for any additional grand jury evidence that may be discoverable pursuant to Brady. (Id. at 17.) Respondent objects to this discovery request contending that Petitioner has failed to exhaust this

6

claim. (Doc. 64.) In addition, Respondent argues that Petitioner has not established due diligence or good cause for granting discovery, as required by Rule 6(a) of the Rules Governing § 2254 Cases as interpreted in light of the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which govern federal habeas corpus proceedings. (Id.)

**ANALYSIS**

I. STANDARDS GOVERNING DISCOVERY IN FEDERAL HABEAS CORPUS CASES

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Under AEDPA, if a habeas petitioner has failed to develop the factual basis for his claims in state court proceedings as a result of his own lack of diligence, he must satisfy the stringent conditions of 28 U.S.C. § 2254(e)(2) before the district court should hold an evidentiary hearing.[2] Isaacs v.

---

[2] Section 2254(e)(2) states that

> [i]f the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

Head, 300 F.3d 1232, 1249 (11th Cir. 2002) ("The discovery provisions of § 2254(e)(2) only apply if the petitioner was not reasonably diligent in trying to develop the factual record while in state court."). " 'Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of information available at the time, to investigate and pursue claims in state court.' " Id. (quoting Williams v. Taylor, 529 U.S. 420, 435 (2000)).

Where a petitioner has been diligent, Rule 6(a) permits discovery upon a showing of good cause. "In interpreting the 'good cause' portions of this rule, the Supreme Court noted that 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.' " Isaacs, 300 F.3d at 1248 (quoting Bracy, 520 U.S. at 908-09). A

---

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

petitioner must set forth specific allegations of fact, as opposed to conclusory assertions, because Rule 6 "does not authorize fishing expeditions." See Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994).

Regardless of whether a petitioner has been diligent or shown good cause, this Court may not review an unexhausted claim absent a showing of cause and actual prejudice. 28 U.S.C. 2254(b)(1)(A); Wainwright v. Sykes, 433 U.S. 72, 87 (1977). In order to exhaust a state remedy, a petitioner must "fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)) (alterations and internal quotation marks omitted). Federal claims must be presented "to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right." Pearson v. Sec'y, Dep't of Corr., 273 F. App'x 847, 849-50 (11th Cir. 2008) (citing Duncan, 513 U.S. at 365-66). Notably, "[e]xhaustion is not satisfied 'merely' if the petitioner presents the state court with 'all the facts necessary to support the claim' or even if a 'somewhat similar state-law claim was made.'" Id. at 850 (quoting Kelley v. Sec'y for the Dep't of Corr., 377 F.3d 1317, 1344 (11th Cir. 2004)). Accordingly, petitioners are required to "present their

claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation." Hunt v. Comm'r, Ala. Dep't of Corr., 666 F.3d 708 (11th Cir. 2012) (citing Kelley, 377 F.3d at 1344-45). A claim must be presented to the state court "such that they are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim.'" Kelley, 377 F.3d at 1344 (quoting Picard, 404 U.S. at 277).

In this case, Petitioner requests permission to obtain transcripts, minutes, and exhibits of the grand jury proceedings. (Doc. 61 at 13.) Specifically, Petitioner requests any documentation relating to the testimony of Larry Gray; any mitigating records that were presented to the grand jury regarding Petitioner's background, mental health, and employment; and any other impeachment evidence that may have been presented to the grand jury. (Id. at 13-17.) According to Petitioner, this information is critical to a Brady claim filed as a part of his § 2254 petition.[3] Respondent argues that

---

[3] The Supreme Court held in Brady v. Maryland, 373 U.S. 83, 87 (1963), that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." Thus, the evidence in a Brady violation "must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must

Petitioner's requests should be denied because Petitioner has failed to properly exhaust his claim in the state habeas proceedings. (Doc. 61 at 1.) Respondent also argues that Petitioner has neither exercised reasonable diligence in developing the factual basis for his claims nor has he shown good cause for granting discovery. (Id.)

II. EXHAUSTION

In this case, the Brady claims presented regarding Mr. Gray's testimony, the potentially mitigating educational and health records, and any other exculpatory information presented to the grand jury were not exhausted. Petitioner presented a general claim of Brady violations in both his initial and amended state habeas petition. (Doc. 35, Attach. 9; Doc. 36, Attach. 19.) Nothing in these petitions referenced any potential exculpatory evidence contained in the grand jury proceedings. Petitioner did raise a more specific Brady claim in his post-hearing habeas brief. However, that Brady claim centered on the prosecution's failure to disclose benefits or promises made to a different state witness. (Doc. 51, Attach. 20 at 56.)

---

have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). The prejudice prong is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). To do so, a court evaluates each undisclosed item and then makes a determination about their "cumulative effect." Kyles v. Whitley, 514 U.S. 419, 436-37.

11

Accordingly, Petitioner failed to raise a <u>Brady</u> claim related to the grand jury proceedings in any of the three briefs raising claims for habeas relief.

Importantly, there was nothing precluding Petitioner from arguing that his <u>Brady</u> rights were violated by the nondisclosure of the grand jury proceedings. Indeed, Petitioner had at least some information that could have supported such a claim. Specifically, Petitioner had a witness who testified at the state habeas hearing that Larry Gray did not actually hear Petitioner confess to sexually assaulting Kimberly Pittman. (Doc. 38, Attach. 2 at 118-122.) Likewise, Petitioner did make general requests for discovery of the grand jury transcripts and specifically requested information that may have been presented regarding Petitioner's mental health. (Doc. 35, Attach. 12; Doc. 35, Attach. 18; Doc. 36, Attach. 22.) Nevertheless, Petitioner did not provide any information indicating that the mental health records provided to the grand jury were different from those presented to the habeas court or were records to which Petitioner lacked access. Accordingly, the highest state court was unable to determine if Petitioner's rights were violated by deliberate suppression of this evidence. Because the <u>Brady</u> claims for which Petitioner now requests discovery were never squarely presented to the state court for review, the Court concludes that they are unexhausted. Accordingly, Petitioner is

not entitled to discovery on these issues.[4] Moreover, because the Court has concluded that Petitioner failed to exhaust the Brady claim he now raises based on the grand jury proceedings, the Court declines to address the issue of in camera review.

III. DISCOVERY

Even if Petitioner had exhausted his Brady claims, he would not be entitled to conduct the requested discovery. As an initial matter, Petitioner was not diligent in seeking the records he requests now. First, Petitioner did not request the disclosure of Larry Gray's grand jury testimony at any prior time. Second, while Petitioner did request the disclosure of his own mental health records presented to the grand jury, Petitioner has not indicated he attempted to find these documents-his own medical and work records-on his own. Finally, while Petitioner requests a transcript of the grand jury proceedings, Petitioner provided no evidence that a transcript exists.

Moreover, Petitioner has not shown good cause, or that he meets the requirements for disclosure of grand jury information. "In order to obtain grand jury testimony, a defendant must show a particularized need, sufficient to justify the revelation of generally secret grand jury proceedings." Miller v. Wainwright,

---

[4] The Court notes that Petitioner does not argue that this lack of exhaustion is excused by a showing of cause and actual prejudice. See Wainwright v. Sykes, 433 U.S. 72, 87 (1977).

13

798 F.2d 426 (11th Cir. 1986), vacated and remanded sub nom. Miller v. Dugger, 480 U.S. 901 (1987), reinstated, 820 F.2d 1135 (11th Cir. 1987); see also Douglas Oil Co. of Cal. v. Petrol Stops Nw., 441 U.S. 211, 222 (1979) ("Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed."). As an initial matter, Petitioner has failed to provide any information beyond his own speculation that Larry Gray's grand jury testimony differed from the testimony he gave at trial. Unlike Miller, 798 F.2d at 429 (11th Cir. 1986), where the court granted discovery of grand jury testimony because witnesses had given contradicting testimony, here there is no evidence of contradiction. See also Hopkinson v. Shillinger, 866 F.2d 1185 (10th Cir. 1989) (recognizing that Miller granted review due to inconsistent testimony), overruled on other grounds as recognized by Wallin v. Miller, ___ F. App'x ___, 2016 WL 4742205 (10th Cir. Sept. 9, 2016). In fact, Larry Gray's testimony has remained consistent throughout Petitioner's trial and various appeals. Next, the Court is unable to conclude that Petitioner has shown good cause to seek his own mental health records because Petitioner has provided no information indicating that he was unable to access

14

such information on his own. Moreover, Petitioner never argued that the mental health records available at his habeas appeal differed from those available at trial, or those presented to the grand jury. Finally, Petitioner has provided no indication, beyond his own concerns, that there is any exculpatory information contained within the grand jury records. Absent some evidence that such exculpatory information exists, the Court will not allow a "fishing expedition" to occur via a motion for discovery. See Ward, 21 F.3d at 1367.

**CONCLUSION**

For the foregoing reasons, the Court concludes that Petitioner has not exhausted his Brady claim based on the grand jury proceedings, has not been diligent, or shown good cause for discovery. Finally, the Court concludes that Petitioner has not shown a particularized need sufficient to overcome the secrecy of the grand jury. Accordingly, Petitioner's motion (Doc. 61) is **DENIED**.

SO ORDERED this 2ND day of February 2017.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA