IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DORIAN FRANK O'KELLEY,                    )
                                          )
        Petitioner,                       )
                                          )
v.                                        )        CASE NO. CV415-104
                                          )
WARDEN, Georgia Diagnostic                )
Prison,                                   )
                                          )
        Respondent.                       )
                                          )

## O R D E R

Before the Court is Petitioner Dorian Frank O'Kelley's
Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc.
1.) After careful consideration of the parties' briefings (Docs.
109, 111, 112), Petitioner's petition (Doc. 1) is **DENIED**.[1] The
Clerk of Court is **DIRECTED** to close this case.

### BACKGROUND[2]

I.   UNDERLYING CRIME

The facts of Petitioner's underlying criminal case were set
forth by the Supreme Court of Georgia:

> [S]hortly before midnight on April 10, 2002, O'Kelley
> and his co-defendant, Darryl Stinski, were observed at

---

[1] Accordingly, Respondent's Motion Requesting Ruling on
Petitioner's Petition for Writ of Habeas Corpus (Doc. 123) is
**DISMISSED AS MOOT.**
[2] The factual findings of both the state habeas court and Supreme
Court of Georgia are presumed to be correct unless they are
rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1);
Rolling v. Crosby, 438 F.3d 1296, 1301 (11th Cir. 2006) (per
curiam).

a convenience store by two Chatham County police officers. The officers noticed the defendants because they were dressed in black clothing, they carried a black duffle bag that appeared empty, and Stinski had several facial and ear piercings. Shortly after O'Kelley and Stinski left the store, the officers responded to a burglar alarm at a residence within walking distance of the store and discovered a broken window there. The occupant of the residence, who was not home at the time, testified at trial that she returned to find that someone had apparently tried to kick in her back door and had broken a window and bent the curtain rod inside the home. O'Kelley admitted in his first statement to police that he and Stinski went to a residence in order to commit a theft therein on the night in question but fled after the alarm went off.

A few hours later, at approximately 5:30 a.m. on April 11, the same police officers were leaving the convenience store when they spotted a fire in the distance. Rushing to the scene, they found the Pittman residence engulfed in flames. This home was in close proximity to the residence which had been burglarized earlier. In the headlights of the police car, one of the officers again observed O'Kelley and Stinski, this time standing in a wooded area across the street from the burning house. However, they had disappeared by the time the officers exited the vehicle. Once the fire was extinguished, officials discovered the remains of the victims.

That evening, O'Kelley and Stinski brought a duffle bag to the mobile home where Stinski was staying, and O'Kelley told the group of people present that he and Stinski had stolen items from automobiles in the neighborhood. He also confided in one member of the group that he had burglarized and set fire to the Pittman residence, and he claimed to have slit Ms. [Susan] Pittman's throat and to have raped Kimberly [Pittman]. O'Kelley then removed from his wallet a tooth in a ziplock bag and stated that he had "busted it out of the little girl's mouth." After O'Kelley and Stinski left the mobile home, the group opened the duffle bag and discovered several items, including compact discs marked with Kimberly's initials and prescription pill bottles containing oxycodone with Ms. Pittman's name and address on the labels. A group member phoned the police and

2

advised them of the bag's contents and O'Kelley's comments. After the contents of the bag were identified by a family member as belonging to the victims, O'Kelley and Stinski were arrested, and a human tooth later determined through DNA evidence to belong to Kimberly was found inside O'Kelley's wallet.

In his second statement to police, O'Kelley confessed to killing Ms. Pittman by repeatedly beating and stabbing her, to beating and stabbing Kimberly, to setting the Pittman residence on fire while Kimberly was still alive, and to taking numerous items from the residence. O'Kelley told police that items stolen from the home and from automobiles in the neighborhood were located in the attic of his house and that he had discarded the clothing and shoes that he was wearing during the murders in a garbage bag on top of an abandoned mobile home near his house. Police located these items as O'Kelley described. Blood on the clothing was identified as Ms. Pittman's, and blood on the shoes was identified as that of both victims.

Four witnesses testified that, early on the day following the murders, they discovered that someone had broken into and removed personal belongings from their automobiles parked in O'Kelley's neighborhood. O'Kelley's fingerprint was found inside one of these vehicles, and the witnesses identified their stolen property from items recovered by the police from O'Kelley's attic.

O'Kelley v. State, 284 Ga. 758, 759-60, 670 S.E.2d 388, 392-93

(2008).

## II.  PRETRIAL PROCEEDINGS

Petitioner was arrested on April 12, 2002. (Doc. 32, Attach. 3 at 19.) On June 5, 2002, Petitioner was indicted in Chatham County, Georgia, for two counts of malice murder, two counts of burglary, one count of cruelty to children in the first degree, two counts of arson in the first degree, five counts of entering

3

an automobile, and one count of possession of a controlled substance with intent to distribute. (Doc. 11, Attach. 1 at 42-46.) The prosecution filed a notice of intent to seek the death penalty on June 17, 2002. (Id. at 52-53.) Due to Petitioner's indigent status, the trial judge appointed attorneys Michael Edwards and Steven Beauvais to represent Petitioner.[3] (Doc. 11, Attach. 1 at 20; Doc. 11, Attach. 11 at 76.) Brian L. Daly also assisted with Petitioner's legal defense, first in a volunteer capacity and later as a court-appointed investigator. (Doc. 11, Attach. 12 at 9-10, 50; Doc. 39, Attach. 4 at 263-64.) For purposes of this order, the Court will refer to Petitioner's three attorneys collectively as "trial counsel."

Petitioner's mental condition and symptoms varied during his pretrial incarceration. On April 24, 2002, Dr. R.M. Manzo noted that Petitioner had a depressive/psychotic disorder not otherwise specified ("NOS") and recorded the presence of psychosis, suicidal intent, and serious impulsivity. (Doc. 39, Attach. 6 at 28.) On April 26, 2004, Dr. Robert Stockfisch reported that Petitioner had a mood/psychotic disorder NOS. (Id. at 226.) On July 26, 2004, Dr. Stockfisch referred Petitioner to "medical service for complaints [consistent with] temporal lobe seizure [disorder.]" (Id. at 260.)

---

[3] Richard Darden was initially appointed to represent Petitioner but was permitted to withdraw in March 2003. (Doc. 11, Attach. 19 at 37; Doc. 49, Attach. 18 at 15-43.)

As a result of the variability of his mental condition, Petitioner's medications, including prescriptions for antipsychotic drugs and antidepressants, were frequently adjusted as his symptoms changed. (E.g., id. at 28, 60, 95, 135, 142, 219, 260, 284, 310.)

Petitioner's behavior also varied greatly. On one instance, Petitioner was reported taking the stuffing out of his mattress to "create[e] his world[,]" and on another, he had to be placed in a restraint chair after attempting to flood his cell and then hang himself. (Id. at 61, 244.) Petitioner attempted suicide multiple times while awaiting trial, once on April 22, 2002, and later on July 7, 2004. (Id. at 17-20, 244.) On several occasions in July 2004, Petitioner also attempted to cut himself and expressed suicidal intentions. (Id. at 244, 247, 249, 252.) In March 2005, Dr. Stockfisch reported that Petitioner appeared psychiatrically stable on his regimen at that time. (Id. at 294.) However, as Petitioner's trial approached, he reported increased anxiety. (Id. at 284, 310.) As a result, Dr. Stockfisch recommended that Petitioner should be closely monitored. (Id. at 294.)

III. VOIR DIRE

Initial juror qualification began on October 21, 2005, and Petitioner and trial counsel faced long hours throughout jury selection. (E.g., Doc. 24, Attach. 23 at 1-3; Doc. 30, Attach. 1 at 3.) On October 24, 2005, during individual voir dire, trial

counsel notified the trial judge that Petitioner was being treated with medication, and the trial judge made arrangements for Petitioner to timely receive his doses on the days they worked irregular hours. (Doc. 26, Attach. 1 at 1; Doc. 26, Attach. 3 at 25-26; Doc. 26, Attach. 4 at 10-11.)

By Friday, October 28, 2005, trial counsel told the trial judge that they were exhausted. (Doc. 30, Attach. 1 at 3.) Trial counsel also informed the trial judge that Petitioner was similarly affected; he was not accustomed to the pace and was "having a difficult time with the process[.]" (Id.) They explained Petitioner was "drained" and "not getting any sleep." (Id.) Later that afternoon, during an ex parte hearing outside of Petitioner's presence, trial counsel alerted the trial judge that they had "grave concerns about [Petitioner's] wellbeing and welfare[,]" and that they were "extremely concerned about his state of mind and his wellbeing[.]" (Doc. 49, Attach. 18 at 153.) Trial counsel asked the trial judge to direct jail staff to ensure Petitioner was closely monitored. (Id. at 153-54.) Trial counsel also explained Petitioner's absence from the hearing was due to concerns about preserving trust between him and the defense team. (Id.) After the trial judge expressed concern over Petitioner's absence, Petitioner was brought into the courtroom, and he waived his right to be present for "ex parte discussions" from "time to time," although no further description was given about what those

discussions would concern. (Id. at 154-57.) After waiving his presence, Petitioner was again removed from the courtroom, and the trial judge explained an individual, presumably from the jail, was coming to discuss supervision of Petitioner because the trial judge "want[ed] [Petitioner] under constant watch." (Id. at 157-58.) Trial counsel hoped to avoid having Petitioner placed in isolation but were interested in Petitioner receiving regularly scheduled checks. (Id. at 158.) They also asked the Court to consider "a completion of the psych eval[uation] . . ." and to "arrange to have the psychiatrist stop in as a routine procedure, given the type of case." (Id.) The trial judge agreed, expressing that he "want[ed] a psychiatrist, not a psychologist." (Id.) The trial judge then made a call where he instructed jail staff that Petitioner needed "to be under constant watch" and evaluated by the jail psychiatrist, Dr. Stockfisch, immediately. (Id. at 160-61.) Later that day, during another ex parte discussion, the trial judge alerted trial counsel that jail personnel had informed him Petitioner could not be evaluated until Monday, October 31, 2005. (Id. at 167.)

The next day, Saturday, October 29, 2005, individual voir dire continued. (Doc. 31, Attach. 1 at 1.) During another ex parte discussion without Petitioner present, the trial judge wanted to have a "conversation about [Petitioner's] state[]" since he could not be evaluated until Monday. (Doc. 49, Attach. 18 at 167.) The

7

trial judge expressed that Petitioner appeared to him to be stable, cooperative, and able to communicate with trial counsel. (Id.) The trial judge inquired whether trial counsel wanted Petitioner to be examined "just to be on the safe side," which they confirmed was the case. (Id.) Since Dr. Stockfisch could not evaluate Petitioner until Monday, trial counsel proposed and the trial judge agreed the psychologist trial counsel had utilized for trial, who already had a relationship with Petitioner, would conduct a preliminary evaluation. (Id. at 167-69.)

Trial counsel took notes regarding what Dr. Daniel Grant conveyed about his evaluation of Petitioner. Trial counsel noted Petitioner was evaluated as being "acutely suicidal" but did not want to admit it; he was focused on his family and how bad it was for them; and he was "struggling with his wish to die for his crime" as well as "his desire to not be a bad person[.]" (Doc. 39, Attach. 9 at 52.) Petitioner was not sleeping, he was pacing, and he was having nightmares when he did sleep. (Id.) Trial counsel annotated that Petitioner was "on verge of psychotic break > thinks he will just shut down." (Id.) Trial counsel indicated Dr. Grant thought "Prozac [was] not necessarily [the] right medicine because it has an energizing quality that is moving him toward manic state[,]" and that Petitioner needed something to sleep. (Id.) Trial counsel noted Dr. Grant's suggested medications. (Id.)

8

On October 31, 2005, the trial judge held another ex parte
hearing outside of Petitioner's presence as voir dire continued.
(Doc. 31, Attach. 4 at 1, 13; Doc. 49, Attach. 18 at 170.) Trial
counsel conveyed to the trial judge that the psychologist had met
with Petitioner and indicated "there was some expression of some
suicidal ideation, but . . . did not believe . . . the situation
was dire[.]" (Doc. 49, Attach. 18 at 171.) Although the
psychologist did not believe a medication adjustment was
necessary, he expressed the importance of Petitioner getting sleep
and suggested a mild medication to help him do so. (Id.) Trial
counsel were wary of making any significant adjustment to
Petitioner's medication that would require a period of
acclimation. (Id.) The trial judge made the following inquiry:

> **The Court:** As far as being able to communicate with
> counsel, has he been able to do that without any problem,
> to be able to tell you what his – his impressions are,
> and to be able to assist you in his defense. Is that
> right?
>
> **Mr. Edwards:** Yes, sir. I -- I -- I don't -- I have not
> seen or experienced any difficulty in that fashion, and
> neither have Mr. Beauvais and Mr. Daly. Correct?
>
> **Mr. Daly:** Correct.

(Id. at 171-72.) Nevertheless, "[o]ut of an abundance of caution,"
the trial judge asked Dr. Arnold Tillinger, a psychiatrist he had
known for number of years, to give an assessment as well. (Id. at
172.) In response, trial counsel reiterated that the
psychologist's primary concern was to ensure Petitioner was

9

sleeping "because of the stress of the trial and long days[,]" since the sleep deprivation only aggravated Petitioner's other issues. (<u>Id.</u> at 173.) After some discussion regarding scheduling, the trial judge and trial counsel resolved to have Dr. Tillinger evaluate Petitioner later that day after the jury was selected. (<u>Id.</u> at 172-75.)

After the jury was selected, Dr. Tillinger examined Petitioner to determine whether he was competent to stand trial, understood the nature of the proceedings, and could assist counsel with his defense. (Doc. 31, Attach. 9 at 35-36; Doc. 50, Attach. 1 at 195.) Dr. Tillinger submitted a handwritten report to the trial judge in which he wrote that he examined Petitioner at the courthouse at 5:00 p.m., no records were made available to him, and his conclusions were based solely on his interview of Petitioner. (Doc. 50, Attach. 1 at 197.) Dr. Tillinger opined that Petitioner was competent at that time to stand trial and assist his attorneys in preparing and presenting his defense. (<u>Id.</u>) Dr. Tillinger noted Petitioner was experiencing symptoms of depression including suicidal thoughts and wishes. (<u>Id.</u>) Dr. Tillinger recommended additional medication to Dr. Stockfisch, who agreed to call in new medication that night. (<u>Id.</u>)

IV.   <u>GUILT PHASE OF TRIAL</u>

On November 1, 2005, before the guilt phase of Petitioner's trial began, the trial judge asked Petitioner for permission to

10

speak with trial counsel outside of his presence regarding Dr. Tillinger's review, and Petitioner acquiesced. (Doc. 31, Attach. 11 at 1, 4.) Thereafter, the trial judge informed trial counsel that Dr. Tillinger had determined Petitioner was competent to stand trial and that nothing would prevent him from assisting counsel in his defense, despite noting Petitioner's previously observed suicidal intentions. (Id. at 4–5.)

The trial judge also conveyed that Dr. Tillinger had suggested a medication adjustment for Petitioner, which Dr. Stockfisch had already prescribed. (Id.) Trial counsel, in turn, updated the trial judge regarding the medication adjustment. (Id. at 5.) Although the medication helped Petitioner sleep, it made him want to continue sleeping. (Id.) Therefore, Petitioner "refused the new medication this morning[.]" (Id.) Trial counsel concurred with Petitioner's refusal to "take that medication during the day[,]" since they were concerned about him sleeping in court and being able to appreciate and understand the proceedings. (Id. at 5–6.) Trial counsel requested Dr. Tillinger's phone number to "make sure [their] concerns were known to them." (Id. at 6.)

Thereafter, the guilt phase of trial began. (Id. at 12.) Among other pieces of evidence, the State played Petitioner's tape-recorded interviews with police. (Doc. 32, Attach. 6 at 53–69; Doc. 32, Attach. 7 at 1–7, 11–28.) In addition to other witnesses, the State also presented John Allen "Trent" Owens, Petitioner's

neighbor and friend to whom he confessed about the crimes. (Doc. 32, Attach. 1 at 41-70.) Additionally, the State had Officer Robert Von Loewenfeldt read a letter Petitioner wrote to fellow inmate Christopher Bowen describing the crimes in graphic detail. (Doc. 33, Attach. 1 at 67-69; Doc. 33, Attach. 2 at 1-20.) The Supreme Court of Georgia summarized these critical pieces of evidence:

> According to O'Kelley's statement to police, while "[c]omplete[ly] sober," he and Stinski turned off the power to the Pittmans' house and broke into the home sometime after midnight, where, by the light of a flashlight, O'Kelley beat his own neighbor with a cane as she lay asleep in bed while her young daughter, guarded by Stinski, listened, terrified, in the next room. When "[Ms. Pittman] wouldn't die," O'Kelley sent Stinski outside with Kimberly to turn the power back on so he could see to kill her. O'Kelley admitted "stabb[ing] Ms. Pittman repeatedly with a knife retrieved from the Pittmans' kitchen, cut[ting] at her [as s]he tried to fight back . . . [and as she] ask[ed him], 'Why? Why?'" O'Kelley told the police that there was "[a] lot of stabbing, cutting, hitting, and fighting for about an hour" before he finally slit Ms. Pittman's throat to make her die. After O'Kelley had murdered her mother, Stinski took Kimberly upstairs and tied her up, and O'Kelley "sat there on the bed and . . . smoked one of" Ms. Pittman's cigarettes before washing the blood off himself in the bathroom. Then he drank a ginger ale he found in the kitchen to calm his nausea and went "around the house collecting stuff, throwing stuff in the bags." Eventually deciding to kill Kimberly together, O'Kelley and Stinski beat her in the head with a baseball bat, stabbed her repeatedly, threw bricks at her, and slit her throat as the child, clad only in a shirt, kneeled helplessly on her knees. Finally, knowing that "[Kimberly] was still alive and breathing when [they] left the room" but that "[s]he was just unable to move[,]" O'Kelley helped set the Pittman residence on fire, leaving her to burn alive. The evidence at trial showed that O'Kelley bragged about his crimes to a friend, claiming to have raped Kimberly, calling it "special" and "just for him," and showing off like a

> trophy the tooth he knocked out of Kimberly's mouth. The evidence further showed that, after his arrest and incarceration, O'Kelley boastfully detailed in a twenty-four page letter to a fellow inmate his part in Kimberly's torture and murder.

O'Kelley, 284 Ga. at 770-71, 670 S.E.2d at 399-400.

In the defense's opening statement, trial counsel explained that they aimed during the first phase of trial to give the jury a guide for the second phase of trial as to why the crimes happened. (Doc. 31, Attach. 12 at 6-7.) For example, trial counsel began to elicit information about Petitioner's home life by highlighting that his brothers were home alone at 3:30 a.m. when he was arrested and that the house was in disarray. (Doc. 32, Attach. 4 at 3, 8-9.) Mr. Owens and Larry Gray, whose nickname was "Secret Squirrel," also testified about how Petitioner introduced the idea of an "insanity party," which was purportedly the countdown to the day that he said he would be declared legally insane. (Doc. 32, Attach. 1 at 67-70, 72; Doc. 32, Attach. 2 at 23-24.) Trial counsel highlighted how this was an odd request. (Doc. 32, Attach. 2 at 4, 23-24.) Trial counsel also attempted to show the letter to Mr. Bowen was a "complete fabrication[,]" and that much of Petitioner's confessions to police and friends was an exaggeration of the actual events. (Doc. 33, Attach. 4 at 4-5.) When cross-examining the medical examiner who conducted the victims' autopsies, trial counsel highlighted discrepancies between Petitioner's

descriptions of the crimes in his letter to Mr. Bowen and the physical evidence. (E.g., Doc. 32, Attach. 8 at 20, 42-43, 45.)

Before hearing closing arguments at the end of the guilt phase, the trial judge questioned Petitioner to ensure he understood his rights and decision not to testify. (Doc. 33, Attach. 2 at 33-34.) Petitioner responded to the trial judge's questions. (Id.) The trial judge also had Petitioner take the stand and respond to a similar question under oath. (Doc. 33, Attach. 3 at 1-2.)

On November 3, 2005, the jury found Petitioner guilty of two counts of malice murder, two counts of burglary, one count of cruelty to children, two counts of arson in the first degree, and five counts of entering an automobile. (Doc. 13, Attach. 10 at 15; Doc. 13, Attach. 11 at 1-3.) The jury found Petitioner not guilty of possession of a controlled substance with intent to distribute but guilty of the lesser included offense of possession of a controlled substance. (Doc. 13, Attach. 11 at 2.)

## V.   SENTENCING PHASE OF TRIAL

At the start of the sentencing phase, Petitioner opted against wearing civilian clothing. (Doc. 33, Attach. 6 at 4-6.) The trial judge cautioned Petitioner that he thought dressing in a jail uniform conveyed "a very bad impression" and urged Petitioner to reconsider. (Id. at 4-5.) After conferring with counsel, Petitioner responded that he had "discussed this decision with

14

[his] attorneys[,]" understood that he had "been convicted of murder[,]" and expressed his preference to wear his jail uniform from then forward. (Id. at 5.) After the trial judge indicated Petitioner had no right to appear in prison clothes, trial counsel urged the trial judge to allow Petitioner to wear what he felt was most comfortable given the stress he faced as the individual being sentenced. (Id. at 5-6.) Ultimately, the trial judge permitted Petitioner to forgo civilian clothes, noting that Petitioner made the choice "on his own[.]" (Id. at 6.)

After that exchange, the sentencing phase began. Trial counsel called 22 witnesses to testify during the sentencing phase of trial. Trial counsel called mitigation investigator Linda Richardson, child protective services ("CPS") case workers, Petitioner's former mental health providers and teachers, attorneys that interacted with Petitioner's family, and his father and brothers. Because Petitioner claims his trial counsel were ineffective and should have investigated and presented more evidence about his mental health and background, the Court will recount what trial counsel presented in some detail.

A.   <u>Mitigation Investigator</u>

Ms. Richardson testified as an expert in the field of social work and preparation of psychosocial histories. (Doc. 33, Attach. 8 at 1.) Trial counsel retained Ms. Richardson, who was local to the area, as a substitute mitigation investigator for Jeff Yungman

15

and Paige Tarr. (Doc. 49, Attach. 18 at 97; Doc. 50, Attach. 1 at
126.) Ms. Richardson was a retired 20-year employee of the
Department of Family and Children Services ("DFACS") and licensed
clinical social worker. (Doc. 33, Attach. 7 at 40-41, 45-46.) At
the time of Petitioner's trial, Ms. Richardson performed
psychosocial history assessments for DFACS on a contract-basis.
(Id. at 40, 47-48.) Ms. Richardson explained conducting a
psychosocial history of an individual was like "writing a biography
of that family" and "would include everything from the time that
they were born up until the time you were working with them." (Id.
at 48-49.) Ms. Richardson was involved in investigating thousands
of child abuse cases during her time with DFACS and had testified
in court for work between 100-125 times. (Id. at 44-45, 49-50.)

    Ms. Richardson compiled a psychosocial history on Petitioner.
(Doc. 33, Attach. 8 at 2.) To perform this role, she interviewed
31 different people - 11 of them twice - although she never met
Petitioner. (Id. at 1, 4.) She also reviewed divorce records,
school records, psychiatric hospital records, and CPS records.
(Id. at 4-6.)

    Ms. Richardson identified three distinct time periods in
Petitioner's life: his time growing up in Texas; his time after he
moved back to Georgia; and what was happening in the time period
around the trial. (Id. at 3.) Ms. Richardson conveyed that
Petitioner was born in 1981 to John O'Kelley and Carolyn English,

16

who were divorced by 1984. (<u>Id.</u> at 9, 11.) Petitioner's father had a history of depression and a suicide attempt. (<u>Id.</u> at 10.) Petitioner's mother had a hard life growing up, and her struggles continued after Petitioner's birth. (<u>Id.</u> at 9.) Petitioner's mother suffered from depression and anxiety. (<u>Id.</u> at 30.) After divorcing his father, Petitioner's mother frequently moved the family, including moves from the Atlanta area to Savannah and eventually to Dallas, Texas, after she married Lawrence Gilbert Cosson ("Petitioner's stepfather") in 1986, with whom she had Petitioner's brother Lawrence Gilbert Cosson, II ("Gilbert"). (<u>Id.</u> at 16-20.)

Ms. Richardson discussed the physical abuse, sexual abuse, and neglect that Petitioner suffered at the hands of his family members. In August 1983, Petitioner's mother left a 20-month-old Petitioner and other children in a locked car for two hours when she was visiting an attorney's office. (<u>Id.</u> at 11-13.) Police and EMS were called, Petitioner had to be taken to the hospital, and Petitioner's mother was charged with reckless conduct. (<u>Id.</u> at 12.) When Petitioner was six years old, Petitioner and his family resided at a battered women's shelter in Texas called "The Family Place" because Petitioner's stepfather physically abused Petitioner's mother and verbally, physically, and sexually abused Petitioner. (<u>Id.</u> at 19-21, 24-25, 35.) Reading a letter from The Family Place, Ms. Richardson recounted that Petitioner's

17

stepfather "used ridicule and over-disciplined" Petitioner, "involved him in parental arguments, . . . spanked him several times daily, sometimes shook him, deliberately stepped on his hands with [leather] shoes when he was playing[,] . . . isolated him[,] and put him in his room for extended periods of time." (Id. at 24.) Petitioner exhibited "out of control, inappropriate" behavior, hit other children, and touched peers and staff in a sexual manner. (Id.) Ms. Richardson explained that Petitioner's behavior led workers at The Family Place to believe that Petitioner had been sexually abused by his stepfather. (Id. at 26.) Later, CPS referrals were made regarding sexual abuse to Petitioner and neglect of Gilbert. (Doc. 33, Attach. 9 at 13-14.)

Ms. Richardson also described the early onset of Petitioner's intellectual disabilities. Petitioner attended school at White Rock Elementary in Dallas, where he was frequently absent. (Doc. 33, Attach. 8 at 49-50.) On top of his absences, he had a "very difficult time in first grade[,]" was referred for special education, had learning disabilities, and ultimately had to repeat the first grade. (Id.) Petitioner was forced to frequently change schools and remained in special education classes. (Doc. 33, Attach. 9 at 1-7.) With no one other than Petitioner's mother to take him to school, he continued to accumulate a high number of absences. (Id.) According to Ms. Richardson, Petitioner's absenteeism continued into junior high school. (Id. at 12.)

18

Ms. Richardson further introduced the jury to Petitioner's psychiatric issues. After a brief stint back in Georgia, Petitioner's mother again moved the family to Texas in 1994 and began a relationship with Ronnie Smith, a man with a criminal record and the father of Petitioner's youngest brother, Ronnie Simon Smith ("Simon"). (Doc. 33, Attach. 9 at 7-9; Doc. 14, Attach. 13 at 12.) Ms. Richardson testified that Petitioner, who was only 13 years old at the time, attempted to hang himself in front of Gilbert and was hospitalized at Harris Methodist Springwood ("Springwood"), a psychiatric hospital, between November and December 1994. (Doc. 33, Attach. 9 at 10-11.) After another suicide attempt less than two years later, Petitioner was hospitalized at Presbyterian Hospital of Plano in the Seay Behavioral Health Center from September 8, 1996, until October 3, 1996. (Id. at 13.)

B.    Child Protective Services Case Workers

Trial counsel presented testimony of two CPS workers who had interactions with Petitioner and his family in Texas and Georgia. Susan Connelly was the CPS caseworker assigned to Petitioner's family in 1994 and 1995 in Dallas to investigate physical and sexual abuse of Petitioner and physical neglect of Gilbert. (Doc. 33, Attach. 10 at 29-30, 32-33.) Ms. Connelly's November 1994 investigation corresponded with Petitioner's 1994 psychiatric hospitalization in Springwood. (Id. at 32-33.) Ms. Connelly testified she received reports that Petitioner's stepfather "made

19

him have anal intercourse with him" and "would humiliate him by putting food down his underwear." (Id. at 32.) Ms. Connelly described Gilbert's appearance as dirty and unkempt, and she had received reports he frequently had no lunch or lunch money. (Id. at 35-36.) Gilbert also reported to Ms. Connelly that the home was filthy and lacked electricity, and there was rotting food. (Id. at 34.) In February 1995, Ms. Connelly again received reports about physical neglect, including that Gilbert had chronic, untreated lice. (Id. at 39-40, 42.) In May 1995, Ms. Connelly received reports of sibling abuse by Petitioner. (Id. at 44.) When she spoke to Gilbert, he reported again that they did not have electricity, the house was dirty, the food in the house was stinking, and they were unsupervised to the extent that they were able to break into an abandoned building. (Id. at 45-46.) He also reported to her that Petitioner was the one in the household who had to do "everything." (Id. at 45.) Ms. Connelly testified that Petitioner's mother never responded to attempts to contact her and eventually the CPS case was closed. (Id. at 37-38, 41, 49.)

Paulette Griffin was a CPS worker in Georgia who investigated Petitioner's mother after Petitioner's arrest in 2002. (Id. at 64, 66.) Ms. Griffin gathered information concerning the hygiene of both of Petitioner's brothers. (Doc. 33, Attach. 11 at 4.) Ms. Griffin testified that Gilbert had been kicked out of school for hygiene issues, and Simon had issues with lice. (Id. at 4, 6.) Ms.

20

Griffin explained that Simon reported he and his siblings could not sleep in the beds in the home because they were infested with fleas, which Ms. Griffin confirmed when she conducted a home visit. (Id. at 3, 17.) Ms. Griffin testified that there was neglect in the home. (Id. at 31.) Trial counsel introduced pictures of Ms. Griffin's inspection of the home, and she described that she saw overflowing trash, exposed electrical wires, extension cords running near wet clothing, and started "feeling itchy" just being in the home. (Id. at 11–12, 14, 15, 20.) Ms. Griffin also testified that Petitioner was the primary caretaker. (Id. at 31.)

   C.   Mental Health Treatment

   Trial counsel presented several mental health professionals who treated Petitioner during his psychiatric hospitalizations in Texas and Georgia, teachers who intervened to have Petitioner placed in a school for emotionally disturbed children, and teachers and providers who interacted with him while he was at that school. Charles Nabors worked as an adolescent therapist and treated Petitioner at Springwood in Texas in 1994. (Doc. 33, Attach. 11 at 41, 43-44.) Mr. Nabors testified that Petitioner was referred to Springwood from a runaway shelter after he tried to hang himself with his shoelaces at 13 years old. (Id. at 43, 50, 53.) Mr. Nabors explained that Petitioner's case was memorable because of Petitioner's "acting out" and his mother's lack of involvement in his care. (Id. at 48, 56.) Mr. Nabors recalled that Petitioner

would bang his head against the walls, attempted to stab himself
in the leg with a pen, and was "in and out of seclusion and
restraints[.]" (Id. at 51-52.) According to Mr. Nabors, Petitioner
eventually divulged that he was sexually abused by his stepfather
and resisted being placed in restraints because it "reminded him
of being tied down by his stepfather when he [was] sexually
abused[.]" (Id. at 52-53.) Mr. Nabors testified there were times
when Petitioner expressed guilt and shame for being abused,
explaining this was common for victims. (Id. at 68.) Mr. Nabors
also explained it was "very common" for young victims of abuse to
wait to report it until later in life because "[t]hey're usually
so riddled with guilt, feeling ashamed, they don't know who to
turn to[.]" (Id. at 68.) Mr. Nabors further testified that
Petitioner reported "command hallucinations, where he was being
told to do something and was saying that he was hearing the voice
of his stepfather[.]" (Id. at 53.) Mr. Nabors stated that Dr.
Ronald Rebal, Petitioner's attending psychiatrist at Springwood
who had since passed away, diagnosed him at discharge with major
depression, single episode; nicotine dependence; and borderline
personality disorder. (Doc. 33, Attach. 11 at 59, 69; Doc. 33,
Attach. 12 at 1.)

Next, Gary Lee Goldsmith testified about his involvement with
Petitioner's treatment as a counselor therapist at Springwood.
(Doc. 33, Attach. 12 at 9-10.) Mr. Goldsmith testified that he

22

observed a "partnering dynamic" between Petitioner and his mother during a group counseling session. (Id. at 12-13.) During the session, Mr. Goldsmith recalled that mother and son participated "very little" within the group and talked with each other instead. (Id. at 13.) Mr. Goldsmith explained this was the "kind of communication you would see between two adolescents[,]" and it was "[v]ery rarely the kind of communication that [he] would see in a multi-family group between a parent and a child." (Id. at 14.) Mr. Goldsmith indicated their interaction seemed "overly bonded" and "inappropriate." (Id.) Based on Mr. Goldsmith's earlier graduate work, Petitioner and his mother's dynamic left Mr. Goldsmith with the impression there was "emotional incest" in the relationship. (Id. at 14-15.) Mr. Goldsmith explained there are different types of communication in families, and the type of communication between the two adults that includes a level of equality, intensity, and intimacy is called "partnering." (Id. at 15-16.) Mr. Goldsmith testified emotional incest occurs when something happens between the two parental figures in the relationship and one parent looks for partnering communication usually with the oldest child of the opposite sex. (Id.) When that happens, Mr. Goldsmith explained, it has a "terribly disruptive" effect primarily on the child because the child gets a level of adult intensity, equality, and intimacy that the child cannot handle. (Id. at 16-17.) When questioned by the trial judge, Mr. Goldsmith testified that the concept of

23

emotional incest is "within the mainstream of psychological thought[.]" (Id. at 19-20.)

Dr. Dan Steinfink was a psychiatrist who treated Petitioner during his psychiatric hospitalization at Presbyterian Hospital of Plano in the Seay Behavioral Health Center in Texas in September 1996. (Id. at 26-28.) Dr. Steinfink testified that he diagnosed Petitioner with bipolar mid disorder, sometimes called manic depressive illness. (Id. at 30, 35.) Dr. Steinfink testified that he did not find Petitioner to have a stable home life and advised against him returning to his mother's care. (Id. at 31.) As a result, Dr. Steinfink planned to discharge Petitioner to his father in Georgia. (Id. at 32.) Dr. Steinfink testified that Petitioner's mother did not participate in multi-family group sessions and that it was unusual to have uninvolved relatives. (Id. at 33.) On cross examination, the State highlighted Petitioner's involvement with satanic cults and drinking animal blood. (Id. at 34.)

Petitioner's father testified that he had only seen Petitioner five or six times after divorcing Petitioner's mother before Petitioner came to live with him upon leaving Presbyterian Hospital in October 1996. (Id. at 38, 42.) In the month that Petitioner lived with him, Petitioner's father never successfully obtained Petitioner's previous school records, never took him to see a physician, and never secured any medication for him before he sent Petitioner to live with his mother in Savannah on November

24

4, 1996. (Id. at 41.) After hearing his father's testimony, "[t]he jury withdrew from the courtroom at 6:08 p.m., and [Petitioner] began to cry audibly." (Id. at 50.) After Petitioner left the courtroom, trial counsel reported he was "balled up on the floor" and "shaking." (Id. at 51.) The trial judge then adjourned for the day. (Id. at 52.)

The following day, Dr. Arnold Negrin, a psychiatrist, testified about Petitioner's treatment at Charter Hospital, a psychiatric hospital in Savannah, Georgia. (Doc. 34, Attach. 1 at 5-6.) Dr. Negrin treated Petitioner on three separate occasions, and he agreed that during this period, Petitioner "was tormented by some thought disorder[.]" (Id. at 9, 36.) Dr. Negrin testified he first treated a 15-year-old Petitioner from November 4, 1996, through November 26, 1996, when Petitioner received both inpatient and partial hospitalization treatment for verbalized thoughts of self-harm. (Id. at 10, 18-19.) At the time of Petitioner's admission, Dr. Negrin diagnosed Petitioner with bipolar disorder and noted he presented with psychotic features and suicidal thoughts. (Id. at 10-11.) Dr. Negrin explained a Global Level of Function or "GAS" score is a number from one to one hundred used to rate a person's present level of functioning. (Id. at 13.) Dr. Negrin testified that at that time, Petitioner's score was ten and indicated that on the adult scale, which Petitioner was on the cusp of, a person with that score has a "persistent danger of

severely hurting self or others," an "inability to maintain
personal hygiene," or a "serious suicidal act with clear
expectation of death." (Id. at 14-16, 18.) Dr. Negrin testified
Petitioner's diagnosis at discharge was bipolar disorder mixed
which meant "he'd had some manic episodes[,] bizarre thoughts, and
that also could include some psychotic symptoms[.]" (Id. at 19.)

Dr. Negrin testified he next treated Petitioner from February
2, 1997, until February 11, 1997, when Petitioner was involuntarily
committed after being found wandering in the woods. (Id. at 19-
20, 24.) Dr. Negrin confirmed it was on this hospitalization that
Petitioner told a police officer who took him to the emergency
room, "Just give me your gun and I'll kill myself now." (Id. at
26.) At that time, Dr. Negrin explained that Petitioner's GAS was
20, which was essentially the same as his last hospitalization,
but "he was more psychotic, as opposed to just depressed and
suicidal." (Id. at 20-21, 29.) Meaning, "he was delusional, . . .
hallucinating, [and] feared that somebody was after him." (Id. at
29.) Dr. Negrin confirmed that other patients reported that
Petitioner had made homicidal threats against his mother. (Id. at
30.) Dr. Negrin recounted how "placement outside the home was
discussed[]" with Petitioner's mother, and she "made some bizarre
statements about incest in the home, grandparents, and whether
that could have made him crazy." (Id. at 22.)

Dr. Negrin's third encounter with Petitioner at Charter Hospital occurred a little over a year later from March 30, 1998, until April 7, 1998, when Petitioner attempted to overdose after breaking up with his girlfriend because he "hear[d] too many voices and he just want[ed] to die." (Doc. 34, Attach. 1 at 26-27; Doc. 15, Attach. 23 at 7.) Dr. Negrin also confirmed that Petitioner had been "talking about wanting to take a gun to school and shoot everyone there and then shoot himself[.]" (Doc. 34, Attach. 1 at 33.) Dr. Negrin testified Petitioner's GAS of 35-40, which was at discharge, indicated "impairment in reality testing or communication, major impairment in several areas, such as work, school, family relations, judgment, thinking, moods." (Doc. 34, Attach. 1 at 26-27; Doc. 15, Attach. 23 at 7-8.)

Elaine Glenn testified next. Ms. Glenn was Petitioner's teacher at Wilder Middle School in 1997, and she referred him to be evaluated for special education after he shared "writings of a disturbing nature" and was not doing his academic work.[4] (Doc. 34, Attach. 1 at 41-44, 46-48.) Ms. Glenn testified that she thought Petitioner "was coming to [her] as an adult, knowing that there was something not right about [the writings], but not knowing what

---

[4] Petitioner's trial counsel also called several other teachers who were involved with Petitioner's referral from Wilder Middle School and placement in Coastal Georgia Comprehensive Academy, including Eric Neidlinger and Linda Bennett. (Doc. 34, Attach. 1 at 53, 59; Doc. 34, Attach. 2 at 14, 28.)

to do." (Id. at 44.) Ms. Glenn testified about the Emotionally
Behaviorally Disturbed ("EBD") Crisis Placement recommended for
Petitioner. (Id. at 47-48.) Ms. Glenn explained Petitioner was
placed in "a very restrictive environment, in a very quick amount
of time[.]" (Id. at 48.) She testified that he was referred to
Coastal Georgia Center,[5] which they previously called "Psycho Ed,"
and that it is "a [separate] school specifically for seriously
emotionally disturbed people." (Id.) On cross examination, Ms.
Glenn testified that Petitioner's writings were satanic in nature
and violent and that Petitioner reminded her of Charles Manson.
(Id. at 50-51.)

Elizabeth Eaton was the social worker at Coastal Georgia who
compiled a social history report of Petitioner's life after his
referral from Wilder Middle School in February 1997. (Id. at 67,
68-69, 71.) Ms. Eaton obtained information about Petitioner's
background from his mother and learned about her history as well.
(Id. at 69, 72.) Ms. Eaton testified that Petitioner's mother
reported that she had "difficulty . . . growing up and coping[,]"
and her father was an alcoholic. (Doc. 34, Attach. 1 at 72; Doc.
34, Attach. 2 at 1.) Ms. Eaton further testified that Petitioner's
mother had multiple difficult marriages that could be abusive and
three children. (Doc. 34, Attach. 1 at 72; Doc. 34, Attach. 2 at

---

[5] Coastal Georgia Comprehensive Academy is the full name of the
school. (Doc. 15, Attach. 28 at 3.)

28

1.) Ms. Eaton recounted that Petitioner had little contact with his father after his parent's divorce and that "his birth father was not anxious for them to be involved with him." (Doc. 34, Attach. 2 at 3.) Ms. Eaton testified that Petitioner's first stepfather sexually abused him, and his second stepfather had been released from prison for rape and armed robbery. (Id. at 2, 6.) Ms. Eaton testified that Petitioner's family moved a lot and was homeless and lived in shelters at times. (Id. at 2, 4.) Ms. Eaton felt Petitioner's mother had limited coping skills, "had a pretty difficult life, had made poor choices probably as a child, which continued even more so after she became an adult, and that she was probably barely able to take care of herself, and certainly not much able to take care of an ailing parent or three children." (Id. at 7-8.)

Trial counsel also presented William Albertson, one of Petitioner's teachers, and Lisa Jarriel, the program manager for the adolescent program at Coastal Georgia. Mr. Albertson testified about Petitioner's "severe learning disability" affecting his reading and writing skills. (Id. at 16.) Despite this, Mr. Albertson stated that Petitioner's mother wanted Petitioner to pursue a regular diploma instead of a special education diploma. (Id. at 18-19.) Mr. Albertson believed Petitioner's chronic absenteeism would have hindered this effort. (Id. at 19-20.) Mr. Albertson testified that Petitioner's mother often kept him out of

school to take care of his younger brothers. (Id. at 21.) Ms. Jarriel agreed that at Coastal Georgia, "academics [were] what [they] did between crises." (Id. at 31.) The State questioned Ms. Jarriel about a psychiatric evaluation performed by Dr. Larry Ackerman on November 8, 1999. (Id. at 36, 38.) Ms. Jarriel read Dr. Ackerman's finding from his report:

> [A]t the present time[, Petitioner] does not show any evidence of psycho-pathology. There may be some underlying LD problems that will be determined by psychological testing. At the present time, there is no indication to continue the placement in this restrictive environment and [Petitioner] should be returned to regular education.

(Id. at 39.)

Next, Dr. Daniel Nagelberg, a clinical psychologist, testified about the psychological evaluation he performed of Petitioner in April 1998 after he was referred by Dr. Negrin during Petitioner's third admission at Charter Hospital. (Doc. 34, Attach. 2 at 47-48; Doc. 34, Attach. 3 at 1.) As part of Dr. Nagelberg's evaluation, he saw Petitioner twice and reviewed his history and background. (Doc. 34, Attach. 3 at 1-3.) Dr. Nagelberg also performed several tests, including the WAIS-R Wechsler Adult Intelligence Scale, Wide Range Achievement Test, Revision 3, and MMPI Minnesota Multiphasic Personality Inventory, and a mental status exam to evaluate Petitioner's thinking, mood, affect, and ability to solve problems and reason. (Id. at 1-2.)

According to Dr. Nagelberg, "[i]t was quite evident" Petitioner was a "very bizarre" individual, which was a term he did not use often, and actively psychotic at the time of his evaluation. (Id. at 4, 12.) Petitioner reported hearing voices to Dr. Nagelburg:

> [He] told me that at the time that he was hearing intermittently, on and off, a total of 11 different voices, including his own, so that there were his voice plus 10 other voices, and he had names for them, and it was more than just hearing the voices. He identified each of these by name with a different personality. For example, he had a male personality or voice called Exodus, who was the active part. He had a voice or a personality by the name of Xavier, the playful part in him; Dragstar (phonetic), who he didn't want to say the name out loud, because he thought that that particular personality would take over, and Dragstar was the inner rage within him, as he described it. And he told me that he had five different female voices or personalities, called Jupiter, Phoenix, Apocalypse, the Black, and Angel. So having that conversation with somebody, yes, indeed, I thought that was rather bizarre.

(Id. at 4-5.) Dr. Nagelberg testified that Petitioner reported he was physically and sexually abused by his stepfather and that "the man had performed anal penetration on him[.]" (Id. at 5-6.) Dr. Nagelburg explained it was not unusual for young boys to deny being raped by a family member because "they're afraid they're going to be harmed in some way" for talking about it. (Id. at 6.)

According to Dr. Nagelberg, Petitioner was on a fifth-grade reading level, third-grade spelling level, and fourth-grade arithmetic level when he was 16 years old and should have been in the 10th grade. (Id. at 6-7.) Dr. Nagelberg stated the MMPI, which

encompassed    personality    and    emotional    testing,    revealed
"significant psychopathology." (Id. at 7-8.) The "scales" on which
Petitioner  showed  the  highest  elevations  were  associated  with
paranoid  thinking;  depression;  angry  impulses  and  acting  out
behavior; and unusual, if not bizarre or psychotic, thinking. (Id.
at 8.) Dr. Nagelberg testified that Petitioner showed two areas of
deficit    in    cognitive    functioning:    (1)    difficulty    with
concentration and attention and (2) academic achievement. (Id. at
9.) Dr. Nagelberg thought Petitioner's test scores were consistent
with  attention  deficit  hyperactivity  disorder  and  a  specific
learning disability. (Id.)

Finally,  Dr.  Nagelberg  testified  he  felt  Petitioner  "was
displaying  evidence  of  a  psychotic  disorder[,]"  specifically
evidence of schizophrenia or pre-schizophrenia, "because you do
not typically see an acute onset of schizophrenia until one gets
into their late teens or early 20s, sometimes even late 20s." (Id.
at 9-10.) To meet the criteria for a diagnosis of schizophrenia,
Dr. Nagelberg explained that "you have to have an initial psychotic
break[.]" (Id. at 10.) Dr. Nagelberg stated that "symptoms in
childhood and adolescents may be different than the symptoms in
adulthood," but adolescents tend to show "prodromal symptoms[,]"
which are "symptoms that occur before the actual onset of the
illness itself[.]" (Id.) Dr. Nagelburg also thought Petitioner
showed evidence of a delusional disorder. (Id.)

32

When trial counsel asked whether Dr. Nagelberg would be surprised to learn that Petitioner was discharged April 7, 1998, the day after he submitted his report on April 6, 1998, he announced: "Surprise me? It's unfortunately part of the medical system." (Id. at 13.) Dr. Nagelberg explained, "I think everybody knows that it boils down to what the insurance benefits were at the time, and if he was discharged, this may indicate that the insurance company did not allow further stay." (Id. at 14.) Dr. Nagelberg also stated he would have been "surprised" to learn that Petitioner received a clean bill of mental health in 1999. (Id.) Dr. Nagelburg made clear: "[I]f there was a clean bill of health a year after I had seen him, that either there was some sort of divine intervention or he was not fully assessed." (Id. at 15.)

Referring back to Petitioner's hospitalization at Charter Hospital during 1997, Julia Collins testified about her observations of Petitioner and his mother during family counseling. (Id. at 23-24.) Ms. Collins testified that after Petitioner and his mother started discussing some sort of boarding school, he went over to her, put her head in his hands, and started cooing "Mother, mother" to her, and "when [they] went to leave the session, he kissed his mom on the mouth[,]" which Ms. Collins found to be unusual. (Id. at 24-26.) Ms. Collins described the kiss as "long enough that it was odd to [her.]" (Id. at 26.)

33

Joan Dane-Kellogg, a clinical social worker with Dr. Negrin, also testified about her treatment of Petitioner on an outpatient basis in both 1996 and 1997. (Id. at 33-34.) Ms. Dane-Kellogg testified that on April 10, 1997,

> [Petitioner] described to [her] that he had problems with his temper, that he had blackouts with anger, that he would zone off. . . . And then catch himself. Sometimes he would have suicidal thoughts. He had a sense that there were other people inside of him. He described it as a war. He described some of the names he had given to some of the parts inside his head.

(Id. at 39.) During his second session, on May 21, 1997, Ms. Dane-Kellogg explained that they began exploring "the dissociative episode that he was having, the voices in his head, [and] the names that he gave to each of the voices." (Id. at 40.) She testified that Petitioner described four voices, one of which was "very angry" and wanted "to take over [his] body." (Id. at 40-41.) Ms. Dane-Kellogg recounted that Petitioner later described the fourth voice taking him to a room to watch his stepfather molest him in a dream. (Id. at 41.) Ms. Dane-Kellogg testified that in June of 1997, Petitioner described "the experience of blacking out, waking up somewhere else, [and not] know[ing] what happened." (Id. at 42.) Ms. Dane-Kellogg also testified about problems she had following up with Petitioner's mother about his attendance at sessions and medication management. (Id. at 45-47.)

34

D.   <u>Attorneys</u>

Charles Grimm served as Petitioner's mother's lawyer in her divorce from Petitioner's stepfather. (Doc. 33, Attach. 10 at 4, 10.) Mr. Grimm recalled Petitioner's mother's odd behavior during the divorce proceedings, including the fact that the major dispute was over an 8 x 10 glamour photo of her. (<u>Id.</u> at 8.) Mr. Grimm further testified that "Mr. Cosson was an extremely angry, controlling man, and [Petitioner's mother] was clearly afraid of him[.]" (<u>Id.</u> at 9.) Mr. Grimm recalled that Petitioner's mother made allegations of physical, mental, and sexual abuse against her and sexual abuse against Petitioner. (<u>Id.</u> at 11-13, 24.) Mr. Grimm also testified that he was able to secure a protective order against Petitioner's stepfather from the court with a finding of family violence. (<u>Id.</u> at 11-12.)

Later, trial counsel presented Diane McLeod as a witness. (Doc. 34, Attach. 4 at 4.) Petitioner's mother took out four unruly and delinquent child petitions against Gilbert in juvenile court, and Ms. McLeod served as his lawyer on at least one occasion. (<u>Id.</u> at 5, 8.) Ms. McLeod reported Petitioner's mother called the police regarding Gilbert "on several occasions," and during one investigation, police learned that Petitioner's mother referred to Gilbert as "fat bastard," slapped him, and hit him. (<u>Id.</u> at 6.) In fact, during a hearing in juvenile court, Petitioner's mother admitted to striking Gilbert across the face several times. (<u>Id.</u>

at 10.) During her interactions with Gilbert, Ms. McLeod also learned Petitioner's mother kept Gilbert's father's mail from him. (Id. at 7.) Ms. McLeod testified the court later dismissed all of the charges against Gilbert. (Id.) Ms. McLeod testified that Gilbert was "not the same child" after he went to live with his father. (Id. at 12.) On cross examination, the State highlighted that regarding Gilbert there "seemed to be no mistreatment by [his] father," the man trial counsel alleged sexually abused Petitioner. (Id. at 16.)

E.   Family Members

Trial counsel's final witnesses were Petitioner's brothers. Gilbert testified that he remembered moving around frequently and living in hotels at times. (Doc. 34, Attach. 4 at 19.) Gilbert recalled Petitioner being the "man of the house" and taking care of him and his younger brother, including doing the cooking and cleaning. (Id. at 20-21.) Gilbert described his mother as being "very abusive" and explained that the police were frequently called. (Id. at 21-22.) He also testified that he recalled Petitioner and his mother's husband Ronnie having one physical altercation, that his mother did not intervene, and Petitioner began leaving home regularly after that. (Id. at 18-19.) Simon, who was nine years old at the time of the trial, read a statement describing the way Petitioner was "like his father" and asked the jury to let him live. (Id. at 27-29.)

F.   <u>Closing Arguments and Deliberations</u>

After Petitioner presented his case in mitigation, counsel for both sides made their closing arguments. (Doc. 34, Attach. 5 at 20-51; Doc. 34, Attach. 6 at 1-39.) The next day, November 8, 2005, the jury resumed deliberations. (Doc. 34, Attach. 7 at 7.) That morning, the jury sent a question, asking "What was [Petitioner] doing from '98 to 2001 or 2002? Can we know?" (<u>Id.</u> at 9.) The trial judge responded that he could not answer and they had to recall what the evidence was on the issue. (<u>Id.</u>) Around noon, the jury recommended the death sentence for the murders of Susan and Kimberly Pittman, finding 11 aggravating circumstances across the two murders. (Doc. 34, Attach. 7 at 10; Doc. 16, Attach. 19 at 2-4.) The jury found beyond a reasonable doubt that Ms. Pittman's murder "was committed while the defendant was engaged in the commission of a burglary" and "arson in the first degree," and "was outrageously or wantonly vile, horrible, or inhuman in that it involved torture to the victim before death[,]" "involved depravity of mind of the defendant[,]" and "involved an aggravated battery to the victim before death." (Doc. 16, Attach. 19 at 2.) The jury also found beyond a reasonable doubt that Kimberly's murder "was committed while the defendant was engaged in the commission of another capital felony (the murder of Susan Pittman)[,]" "the commission of a burglary[,]" and "arson in the first degree," and "was outrageously or wantonly vile, horrible,

37

or inhuman in that it involved torture to the victim before death[,]" "involved depravity of mind of the defendant[,]" and "involved an aggravated battery to the victim before death." (Id. at 3-4.)

VI. <u>MOTION FOR NEW TRIAL</u>

Petitioner filed a motion for new trial, which was later supplemented. (Doc. 16, Attach. 19 at 11; Doc. 16, Attach. 22 at 5.) In December 2005, after he was transferred to the Georgia Diagnostic and Classification Prison following his sentence, Petitioner attempted suicide. (Doc. 109 at 172; Doc. 41, Attach. 7 at 50.) Before Petitioner's evidentiary hearing for his motion, Petitioner's counsel moved ex parte on February 12, 2007, for a continuance. (Doc. 16, Attach. 21 at 13-14.) Trial counsel notified the Court that Petitioner had twice attempted suicide, which had raised "grave concerns about [Petitioner's] present competence" and more time was needed to complete the evaluation of Petitioner. (Id.) During the evidentiary hearing, Petitioner's trial counsel, speaking about the ex parte matter, notified the trial court they looked into that issue and were not going to pursue it based on the reports they received. (Doc. 34, Attach. 8 at 3-4.) Petitioner's motion for new trial was denied. (Doc. 21, Attach. 3 at 8.) The Georgia Supreme Court then affirmed Petitioner's

convictions in part and death sentences on November 3, 2008.[6] O'Kelley, 284 Ga. at 758, 670 S.E.2d at 391-92. The United States Supreme Court denied Petitioner's petition for writ of certiorari on October 5, 2009. O'Kelley v. Hall, 558 U.S. 840, 130 S. Ct. 94 (Mem), 175 L. Ed. 2d 64 (2009).

## VII. STATE HABEAS PETITION

On September 2, 2010, Petitioner filed a state habeas corpus petition in the Superior Court of Butts County, Georgia, arguing among other things, that his trial counsel were ineffective during trial. (Doc. 35, Attach. 9 at 3, 7-8.) On April 26, 2011, Petitioner filed an amended petition, also arguing, among other things, that his trial counsel were ineffective at trial. (Doc. 36, Attach. 19 at 3-13, 32.) Over three days in August 2012 and one day in January 2013, the state habeas court held a hearing on Petitioner's claims. (Docs. 38-46, 48-50, Attach. 9.)

At the evidentiary hearings, Petitioner presented the live testimony of 14 witnesses, including Mr. Edwards, Mr. Beauvais, and Mr. Daly.[7] (Doc. 38, Attach. 1 at 7-8.) Petitioner also

---

[6] The Georgia Supreme Court found "[t]he trial court erred in imposing two consecutive twenty-year sentences for the single first degree arson offense" and directed the trial court to "strike the sentence imposed on Count 6." O'Kelley, 284 Ga. at 761, 670 S.E.2d at 393.

[7] Several witnesses testified regarding the propriety of Petitioner's habeas counsel's efforts when talking to Mr. Gray and the circumstances surrounding Mr. Bowen's testimony. (Doc. 38, Attach. 1 at 24-58; Doc. 38, Attach. 4 at 7-40.)

presented numerous affidavits, school records, medical records, institutional medical and mental health records from before and after trial, filings and exhibits from trial, as well as trial counsel's files. The Court will summarize the relevant witness's live testimony and affidavit testimony in order to properly evaluate Petitioner's claim that his trial counsel were ineffective.

Petitioner's brother Gilbert testified at the state habeas evidentiary hearing about their mother's neglectful, unpredictable, and abusive behavior throughout his and Petitioner's childhood. (Doc. 38, Attach. 1 at 128-214.) Gilbert recalled that while they lived in Texas and after they moved to Georgia, they were often missing the necessities. (Id. at 138, 157-58.) He indicated that his mother was consistently absent, that Petitioner walked him to school, made his breakfast, and dressed him for school, and that he and Petitioner cleaned the house. (Id. at 141-42, 154.) According to Gilbert, his mother did not encourage him to go to school and interfered with Petitioner's efforts to study for his GED. (Id. at 183-84.) Gilbert testified his mother abused drugs and alcohol and did so with his and Petitioner's friends. (Id. at 158-59, 163.) Gilbert also recalled it was not uncommon to find his mother having sex with someone, that it was a daily part of life, and she was not ashamed of it. (Id. at 165.) He stated that she frequently changed religions, was

40

paranoid that the government was watching her, and believed aliens had placed probes inside her. (Id. at 176-77.) Gilbert testified that while they were living in Dallas, Texas, when he was no more than six years old, his mother attacked Petitioner with a hockey stick she bought for Gilbert as a toy, leaving him unconscious. (Id. at 132-34.) Gilbert remembered that blood was everywhere, and he did not recall Petitioner receiving medical treatment. (Id.) Gilbert also recounted an incident when his mother hit him with a flyswatter when he mispronounced letters while she was helping him with his homework. (Id. at 140-41.) Gilbert testified that he was contacted by Petitioner's attorneys at the time of the trial when he was 18 years old and would have testified to everything he said at the state habeas evidentiary hearing, but he believed they did not ask him anything of substance. (Id. at 190-91.)

Virginia Norman ("Ginger") elaborated further at the state habeas evidentiary hearing about Petitioner's mother's behavior, and she also discussed her relationship with Petitioner. (Doc. 38, Attach. 2 at 71-151.) Ginger explained that Petitioner had an odd relationship with his mother, who had a fluctuating mood, and that she treated him more like a companion. (Id. at 97, 100.) She remembered that Petitioner's mother would ask him to massage her back, legs, feet, and shoulders and that other people were present. (Id. at 98-99.) Ginger also testified that Petitioner told her his mother tried to kiss him, although she did not witness that. (Id.

41

at 98.) She recalled Petitioner's mother did drugs with their group of friends and was sexually involved with people they knew. (Id. at 100-05.) She also explained that Petitioner's mother believed the CIA was after her and she had been probed in the arm by aliens. (Id. at 107-08.)

Ginger also testified about her observations of Petitioner's behavior over the years. Ginger knew Petitioner before she left Savannah in approximately November 1999 and after she returned in October 2001. (Id. at 81-82, 84, 130.) Ginger was sent to a Department of Juvenile Justice facility for girls for shoplifting, truancy, and running away and then to a hospital-like facility after she was expelled from the first facility. (Id. at 134-38.) Ginger testified she used drugs, including marijuana and cocaine, before and after she returned to Savannah and that she used drugs with Petitioner a few times. (Id. at 141-43.) At that time and after she returned, however, she explained that Petitioner had other personalities, including Drag Star, Phoenix, and others, and he would change depending on the personality. (Id. at 85-87.) She remembered occasions where he would have memory lapses, shake, pass out, and have headaches and that he commented on the smell of burning rubber before these episodes. (Id. at 88-92.) Ginger also recalled Petitioner talking to himself and acting out scenes that were not there. (Id. at 90.) After Ginger returned to Savannah, she explained that Petitioner's hygiene deteriorated, he became

42

more aggressive, and he did odd things. (Id. at 109-12.) For example, he would store opened food in his pockets, and he insisted she take animal pictures down before he entered her home. (Id.)

After the crimes, Ginger explained she rode with Petitioner's mother to meet with trial counsel regarding Petitioner's purported confession to their friends. (Id. at 119-22.) She only talked with trial counsel for about 20 minutes, and they did not ask her or any of Petitioner's other friends about his life. (Id. at 122.) Ginger stated she would have testified at Petitioner's trial about her recollection of Petitioner. (Id. at 123.)

Lawrence Varian, Petitioner's first grade teacher at White Rock Elementary School, elaborated about Petitioner's mother's behavior while Petitioner was in his class as well as Petitioner's challenges in school. (Doc. 38, Attach. 1 at 58-127.) He described Petitioner's mother's involvement as inconsistent and noted that Petitioner had 37 absences throughout the school year, which was high. (Id. at 94, 107.) Mr. Varian described when Petitioner's mother invited him to attend Petitioner's birthday, but she made no preparations and no other attendees ever arrived. (Id. at 109-13.) He also testified about Petitioner's difficulties with academics and social skills. Mr. Varian described referring Petitioner for testing and the subsequent decisions to place him in special education and ultimately to hold him back. (Id. at 69, 92-95.) Mr. Varian recounted an incident where he broke up an

43

argument involving Petitioner. (Id. at 81-82.) When Mr. Varian took Petitioner's hand, Petitioner bit him repeatedly and said, "'I can break your bones,' not in an angry, in sort of a matter of fact tone of voice[.]" (Id.) He also recalled a time he could not get Petitioner to stop marching around the classroom saying "yay-yay parades" and a teacher from the "emotionally disturbed class" came and had to gently maneuver him to the ground. (Id. at 84-85.)

Petitioner also presented the live testimony of Dr. Carolyn Elizabeth Hodges, the director of outreach counseling and incest recovery at The Family Place in Texas with a Ph.D. in social work. (Doc. 38, Attach. 2 at 9-69, 9-10.) Dr. Hodges reviewed background records but did not evaluate Petitioner and had no personal knowledge of Petitioner, his mother, stepfather, or brother as she did not work at the shelter when he lived there. (Id. at 39, 60-62.) Dr. Hodges commented on the abuse Petitioner suffered at the hands of his stepfather that was documented in a letter from The Family Place and how such abuse can impact a person. (Id. at 16-18, 42-44, 50.) She described the physical and verbal abuse that Petitioner endured as "horrendous," noting he was subject to constant ridicule, overly disciplined, spanked up to six times a day, shaken, and forced to participate in parental arguments. (Id. at 18.) Dr. Hodges testified that records revealed Petitioner's stepfather began sexually abusing him at age six, although she clarified, "[o]r really incest; it was his stepfather. So, [the]

44

incest started when he was six and continued." (Id. at 39.) Dr. Hodges believed documentation that Petitioner had a limited understanding of boundaries, evidenced by grabbing the buttocks of staff, kissing his peers, and goosing his peers, indicated "some inappropriate sexual behaviors [had] gone on" and that he had been taught offensive behavior was actually playful. (Id. at 29, 30, 32.) Reviewing one of Petitioner's school records, Dr. Hodges noted that Petitioner's mother released records from the Southwest Family Institute. (Id. at 36.) Dr. Hodges explained the name was actually Southwest Cares, and it was an incest recovery association. (Id.)

Additionally, Petitioner presented the live testimony of three mental health experts. First, Dr. Donna Schwartz-Watts was tendered as an expert in psychiatry and forensic psychiatry. (Doc. 38, Attach. 1 at 216-90, 219.) Dr. Schwartz-Watts interviewed Petitioner, performed a mental status examination, and performed a brief neurological evaluation. (Id. at 222.) Dr. Schwartz-Watts testified that her "main information" came from her clinical evaluation of Petitioner and the things that he told her he was thinking around that period of time. (Id. at 260.) She also reviewed Petitioner's school, medical, police, and psychiatric records; affidavits and statements of various individuals; a transcript of Petitioner's trial; and a video recording of

Petitioner's television interview immediately after the murders. (Doc. 38, Attach. 1 at 220-21; Doc. 38, Attach. 8 at 151-53.)

Dr. Schwartz-Watts opined that Petitioner suffers from schizoaffective disorder, bipolar type, and that he was affected by this mental illness at the time of his crimes.[8] (Doc. 38, Attach. 1 at 229; Doc. 38, Attach. 8 at 152.) She described that there are periods of time when Petitioner has symptoms of one or both illnesses or can function totally normally because symptoms of this disorder can ebb and flow. (Doc. 38, Attach. 1 at 279, 248.) Dr. Schwartz-Watts testified that Petitioner's history was replete with symptoms of a psychotic disorder, particularly noting his psychiatric hospitalizations with reports of hallucinations. (Id. at 231-32, 234.) She recounted the various voices that Petitioner described and his numerous suicide attempts, which she believed were most likely in response to the sexual abuse and abuse he suffered. (Id. at 234-35.) Petitioner reported sexual abuse by his stepfather to Dr. Schwartz-Watts, but she did not recall Petitioner giving her any information about sexual abuse by his mother. (Id. at 263-64.) Dr. Schwartz-Watts also believed Dr. Ackerman's psychiatric evaluation when Petitioner was released from Coastal

---

[8] In her report, Dr. Schwartz-Watts also opined that Petitioner suffers from "Anxiety Not Otherwise Specified" and has "features of Obsessive Compulsive Disorder and Post Traumatic Stress Disorder" (Doc. 38, Attach. 8 at 152), but he did not meet the full diagnostic criteria for PTSD (Doc. 38, Attach. 1 at 237).

46

Georgia in 1999 was "cursory" but could be reconciled with her diagnosis because that was a period Petitioner was not acutely symptomatic. (Id. at 249, 250-51.)

According to Dr. Schwartz-Watts, there was evidence that Petitioner was decompensating again between late 1999 and 2002. (Id. at 253.) She explained that Petitioner's complaints of chest pains, irregular heartbeat, passing out, and feeling weak and exhausted when he was admitted to the Candler Hospital ER in 2000 were "indications, medically and psychiatrically and neurologically, that something[ was] wrong with him." (Id.) Dr. Schwartz-Watts also believed that Petitioner's reported symptoms of nausea, vomiting, drop attacks, night sweats, fatigue, blacking out, vertigo, and problems controlling his bladder at a 2001 visit to the Westside Urban Health Medical Clinic were "a red flag that perhaps his psychiatric illness [was] returning." (Id. at 251-52.) She explained depressed and psychotic people are particularly attentive to their bodies and report many symptoms, which are called somatic complaints. (Id. at 252.) She also explained black-out spells and incontinence can be indicative of seizure activity or other forms of cognitive impairment. (Id.) Petitioner's report of recently eating raw food in Japan also concerned Dr. Schwartz-Watts because it could indicate he lied, was psychotic, or was confabulating. (Id. at 252-53.) According to Dr. Schwartz-Watts, Ginger told her the "two things that [were] most important" in

47

developing her opinion that Petitioner was decompensating in the years between late 1999 and 2002. (Id. at 254.) Instances of Petitioner's bizarre behavior recounted by various witnesses in the time leading up to the arrest, including squatting outside of his mother's home, staring into the distance for hours at a time, paranoia about being watched, and talking to imagined people, were also red flags consistent with a psychotic thought process. (Id. at 253-54.)

Dr. Schwartz-Watts opined that Petitioner was experiencing a psychotic episode and was incapable of exercising sound judgment, good decision making, or impulse control at the time of the crimes. (Id. at 261, 264.) In labeling Petitioner as being schizoaffective at the time of the murders, she relied on his delusion that he was a serial killer, noting he reported "that those hallucinations had nothing to do with this crime" and did not command him to commit the crimes. (Id. at 276-78.) She further explained that a person can experience a psychotic episode and still know the difference between right and wrong and that there was "no question" Petitioner "[knew] right from wrong." (Id. at 261.)

Dr. Kristin Fiano, a clinical psychologist and neuropsychologist, assessed Petitioner's brain functioning from a behavioral standpoint by conducting a neuropsychological evaluation and limited interview. (Doc. 38, Attach. 2 at 152-200, 153, 155, 158-59.) Dr. Fiano explained that neuropsychologists

48

rely on tests to look at brain functioning from a behavioral standpoint rather than a neuroimaging standpoint. (Id. at 158.) As part of her evaluation, Dr. Fiano conducted several tests for each area of brain functioning and reviewed Petitioner's records and the raw data from Dr. Grant's neuropsychological evaluation. (Id. at 160-63.) The results of Dr. Fiano's evaluation indicated:

> [Petitioner's] overall cognitive abilities, conceptual level abilities are in the normal range, but there are some aspects of intelligence that were significantly lower, particularly working memory. Memory testing showed a mix of findings, with some scores being very strong and others showing significant impairment. Also impairments in terms of executive functioning and attention and concentration, as well as some aspects of verbal fluency.

(Id. at 164.) Executive functions, Dr. Fiano explained, "are comprised of things like being able to inhibit your impulses, planning and organizing, attention and concentration, working memory[,] . . . following through on tasks, initiating tasks on your own, and monitoring your behavior towards a goal." (Id. at 173-74.) Petitioner showed the most impairment in "working memory, attention, concentration, and the ability to inhibit a response[.]" (Id. at 174.) Working memory is the ability to hold information in short term memory while the brain is doing something with that information, which can affect a person's ability to multitask and recall information for a short time. (Id. at 175.) Dr. Fiano explained verbal fluency does not have very significant implications in isolation but could make it difficult to produce

49

words fluidly. (Id.) Dr. Fiano confirmed there were consistencies between her and Dr. Grant's findings. (Id. at 164.) Dr. Fiano noted a documented history of a learning disability and possible temporal lobe seizure disorder, although she acknowledged that seizure disorders are not diagnosed with neuropsychological testing. (Id. at 168, 171-72, 177.)

Dr. Mark Cunningham, a clinical and forensic psychologist, testified extensively on the factors related to Petitioner's "moral culpability." (Doc. 38, Attach. 4 at 41-245, 46.) Dr. Cunningham explained moral culpability relates to the question of what damaging factors, if any, are present in a person's life that affect a person's choices and decisions. (Id. at 47-48, 156-57.) In conducting his evaluation, Dr. Cunningham interviewed Petitioner five times over three days for 108 minutes, 98 minutes, 108 minutes, 103 minutes, and 195 minutes. (Id. at 49.) He also interviewed Petitioner's family, friends, teachers, and some mental health care providers, and he reviewed Petitioner's records along with the affidavits of several individuals. (Id. at 49-51.) As a result of his evaluation, Dr. Cunningham identified the presence of 36 adverse developmental factors, which are divided into neurodevelopmental, family and parenting, community, and disturbed trajectory categories, that collectively increased the risk and likelihood of psychological disorders, relationship dysfunction, disturbed sexuality, substance abuse, and/or criminal

50

violence in Petitioner's life. (Doc. 38, Attach. 4 at 57-58; Doc. 40, Attach. 10 at 38-39.) Dr. Cunningham opined that Petitioner was so predisposed to relate to others "in a maladapted, toxic, injurious, potentially violent sort of way" due to Petitioner's pervasive developmental disorder and history of neglect, abuse, and psychotic disorders that it was "almost inevitable" something was going to go badly. (Doc. 38, Attach. 4 at 182-85.)

Dr. Cunningham testified that the build-up and combination of several factors in the two years preceding the crimes, including Petitioner's failed attempts to establish a constructive life structure and the overwhelming role demands, emotional stressors, and lack of support system in Petitioner's life, precipitated the crimes. (Id. at 70-71, 76.) Petitioner's marriage was failing due to news of a pregnancy and difficulties keeping a job, and his mother was undermining his marriage and attempts at independence. (Id. at 71-72, 78-80.) According to Dr. Cunningham, Petitioner was also deteriorating during that time. His hygiene declined, his appetite decreased, and he sought medical treatment multiple times for chest pains, irregular heartbeat, passing out, and drop attacks, among other symptoms. (Id. at 93-94, 103-07.) His psychological symptoms also worsened. For example, in approximately January 2001, Maggie Dahlquist observed Petitioner having conversations when no one was there. (Id. at 108.) Between January and February 2002, Ginger saw Petitioner eat spoiled food,

51

and he made her remove pictures from the wall because he was scared of them. (Id. at 108-09.) In the six weeks leading up to the crimes, Petitioner became more bizarre and aggressive, responded to invisible stimuli, and had olfactory hallucinations. (Id. at 109-10, 116-17.) Mary Chappell, a relative and neighbor, also observed him squatting in his front yard and staring for long periods of time. (Id. at 117.) It was also during this time that he created his insanity countdown. (Id. at 114, 117.) Dr. Cunningham conveyed that Petitioner experienced auditory and command hallucinations repeating "rape, kill, destroy[, and] mayhem[,]" had thoughts of killing his wife and himself, and increased his use of alcohol and drugs at times during this period to self-medicate. (Id. at 79-81, 105, 119.) To make matters worse, Petitioner surrounded himself with dysfunctional peers, in particular Mr. Stinski. (Id. at 95-97, 113, 121.)

Dr. Cunningham testified that Petitioner's mother was also deteriorating during the time leading up to the crimes; she was neglecting the house, exhibiting delusions, doing drugs and having sexual intercourse with Petitioner's friends, and disregarding any concern for boundaries. (Id. at 82, 93.) Dr. Cunningham highlighted Petitioner's mother's longstanding psychotic symptoms and neglect. (Id. at 177-82.)

Particularly relevant to Petitioner's claims of ineffectiveness, Dr. Cunningham testified that Petitioner reported

that his mother attempted to resume a romantic relationship with
him during this time period. (Id. at 79.) On the subject of incest,
Dr. Cunningham testified that Petitioner reported his mother
"French kissed" him when he was nine and fourteen years old. (Id.
at 84.) Petitioner described that this eventually progressed to
mutual oral genital stimulation and full intercourse. (Id.) Dr.
Cunningham relayed that incest leaves a child sexually
traumatized, with a distorted view of sexuality due to the
conflicting feelings that can arise from the abuse, and that the
mothers involved in incest are usually psychotic. (Id. at 85–88.)
Dr. Cunningham explained the fact that Petitioner described
specific, limited interactions as a co-participant and that third
party peers and medical professionals observed Petitioner's
mother's sexual boundary issues lend credibility to Petitioner's
report. (Id. at 139–41.) Dr. Cunningham stated "[t]his [was] the
worst starting place that [he had] seen, out of a couple hundred
cases[,]" and that he had "rarely encountered full-blown
mother/son incest intercourse." (Id. at 184.) Dr. Cunningham
acknowledged that Petitioner's trial counsel elicited testimony
about an inappropriate relationship between Petitioner and his
mother but countered this suggestion was "a long way from a
recognition and appreciation of intercourse with his mom on a
recurrent basis." (Id. at 226–27.) Dr. Cunningham confirmed his
understanding was that "Petitioner never reported having sex with

his mother until [the] habeas proceeding[,]" and that he did not attempt to verify whether this occurred with Petitioner's mother or his brother. (Id. at 223-24, 227.)[9] Dr. Cunningham explained it was not unusual for people to reveal information to him for the first time after he spent time building rapport and they were less concerned disclosure could be used against them. (Id. at 241-43.)

Dr. Cunningham also identified eight psychological diagnoses and touched on their historical foundations. (Id. at 58.) These include schizoaffective disorder, post-traumatic stress disorder features, complex type; paraphilia, NOS; polysubstance abuse and dependence; pervasive developmental disorder, NOS, by history; and cognitive disorder, NOS. (Doc. 38, Attach. 4 at 58-68; Doc. 40, Attach. 10 at 41, 128.) He also noted indications of dissociative disorder and seizure disorder but more information was needed before confirming those diagnoses. (Doc. 38, Attach. 4 at 70; Doc. 40, Attach. 10 at 128.) In his review of Petitioner's psychiatric treatment and hospitalizations, he indicated Dr. Ackerman's assessment of Petitioner at Coastal Georgia was limited in scope and did not accurately reflect the full story of Petitioner's mental state. (Doc. 38, Attach. 4 at 150-54.)

---

[9] Although Dr. Cunningham stated that Dr. Schwartz-Watts documented this history from ages to 13 through 16 (Doc. 38, Attach. 4 at 84, 221), Dr. Schwartz-Watts testified she did not recall Petitioner reporting being sexually abused by his mother (Doc. 38, Attach. 1 at 264).

Petitioner also presented affidavit testimony from his family, friends, teachers, schoolmates, and healthcare providers. (Doc. 38, Attach. 8 at 62-117, 128-31.) In summary, the affidavit witnesses testified about the lack of parental support in any form in Petitioner's life. Petitioner was essentially abandoned by his father before he was two years old and left with Petitioner's mother, who Petitioner's father claimed was verbally and physically abusive towards him. (Id. at 68, 71-73.) When Petitioner briefly lived with his father after a psychiatric stay, he blamed Petitioner's mother for the lack of information about Petitioner's medication and educational needs. (Id. at 73.)

The affiants also testified to Petitioner's mother's neglect, her mental illness, the mental illness in her family, and her inappropriate behavior. Petitioner's mother's house was perpetually filthy, to such an extent that DFACS threatened to remove Petitioner's brothers following Petitioner's arrest. (Id. at 65.) There were times when the children did not have food or running water. (Id. at 62-64.) Petitioner's mother also had longstanding mental health issues. For example, Ernestina Erving treated Petitioner's mother at The Family Place and explained that she and other staff members had Petitioner's mother admitted to a local hospital for emergency psychiatric treatment during her stay. (Id. at 94.) Moreover, Petitioner's mother was often paranoid and would call the police and make reports about things that did

not occur. (Id. at 63, 71.) One affiant testified that mental
health issues ran on the maternal side of Petitioner's family. Ms.
Chappell, Petitioner's mother's relative who was sometimes
referred to as his aunt, testified by affidavit that Petitioner's
mother's cousin had schizophrenia and his daughter had been
diagnosed with bipolar disorder. (Id. at 62, 67.) There was also
evidence that Petitioner's mother lacked appropriate boundaries
around Petitioner and his friends. Ms. Dahlquist testified by
affidavit that Petitioner's mother did drugs with Petitioner's
friends and had sex with people around Petitioner's age. (Id. at
76.)

Several of Petitioner's healthcare providers remembered the
severity of Petitioner's mental illness and suicide attempts while
providing treatment during his psychiatric stays. (Id. at 89, 97-
98, 110-11.) Others, like Stephen Ryter, a play therapist who
worked with Petitioner at The Family Place, also confirmed it was
reported to them that Petitioner was sexually abused by his
stepfather and his behavior was consistent with a child who had
experienced sexual abuse trauma. (Id. at 100, 103-04.)

The affiants also discussed the interactions they had with
Petitioner over the years. As a young child, Petitioner had
difficulty interacting with his peers. (Id. at 103.) Several of
his friends, however, recalled Petitioner's kind actions to them.
(Id. at 75, 82.) They also recognized that his appearance and

behavior changed in the months leading up to the crimes. (Id. at 64-65.) Late in 2001, Ms. Dahlquist averred that Petitioner would have conversations with people who were not there. (Id. at 77.) Ms. Chappell recalled Petitioner squatting in the front yard days in a row for long periods of time a few weeks or months before the crimes. (Id. at 64-65.) Melissa West, a schoolmate of Petitioner's at Coastal Georgia, testified by affidavit that Petitioner called her the Wednesday before the crimes saying he wanted to die because he could not be with his wife. (Id. at 79.)

Dr. Daniel Grant, the psychologist who evaluated Petitioner's mental health and background at trial after Dr. James Maish needed to be removed, averred that he "was never given a specific consultation question" when trial counsel retained him in the summer of 2005. (Id. at 113-14.) Dr. Grant stated his "standard practice when evaluating defendants is to conduct a clinical interview and a battery of psychological tests which screen for gross neurological and psychological impairments," which he did in Petitioner's case. (Id. at 114.) Dr. Grant averred:

> The neuropsychological testing that I conducted showed signs of impairments in the frontal and temporal lobes of [Petitioner's] brain. The damage manifested as impairments in the functioning of the temporal and frontal lobes, including problems with flexibility of thinking; the ability to move from one situation, activity, or aspect of a problem to another; problem solving; concentration; memory and recall of large chunks of semantically related information; and planning and organization.

(Id. at 114-15.) He believed these impairments were longstanding. (Id. at 115.) Dr. Grant's impression was that Petitioner had "a longstanding major mood disorder with psychotic features and/or a thought disorder which may fit within the schizoaffective diagnostic category." (Id.) Dr. Grant averred he was "[u]ltimately . . . asked to address the issue of [Petitioner's] likelihood of successful prison adaptability[,]" which constituted the focus of his report. (Id. at 116.) He stated he did not analyze or interpret his neuropsychological findings to any degree in his report. (Id.)

The state habeas court ultimately denied Petitioner's petition on September 25, 2013. (Doc. 52, Attach. 8.) Further attempts to appeal were similarly unavailing. O'Kelley v. Chatman, 577 U.S. 961, 136 S. Ct. 408 (Mem), 193 L. Ed. 2d 324 (2015).

VIII.   FEDERAL HABEAS PETITION

On April 23, 2015, Petitioner filed a 28 U.S.C. § 2254 petition in this Court. (Doc. 1.) In his petition, Petitioner raised nine general claims for relief. (Id. at 2-3.) After filing his habeas petition, Petitioner filed a Motion for Leave to Conduct Discovery (Doc. 61) and Motion for an Evidentiary Hearing (Doc. 82). After thorough review, the Court denied both of Petitioner's requests. (Docs. 73, 86.)

On April 23, 2018, Petitioner filed his Brief on Procedural Default, Exhaustion, and Miscarriage of Justice. (Doc. 87.) On April 2, 2019, the Court determined that for purposes of his

58

upcoming merits brief, Petitioner would not be permitted to brief any claim raised in Claim II, Claim III, Claim IV, Claim V, Claim VI, Claim VII, Claim VIII, or Claim IX. (Doc. 104 at 66.) The Court further found that Petitioner would not be permitted to brief many of his claims related to Claim I — which generally covered his ineffective assistance of counsel claim. (Id. at 14, 23-27, 29-30.) The Court only permitted Petitioner to brief his claims related to his trial counsel's failure to investigate and present evidence related to his background and mental health, including Petitioner's claims that his trial counsel failed to properly utilize mental health experts at trial. (Id. at 32-35.)

On May 17, 2019, Petitioner filed his Brief in Support of Petition for Writ of Habeas Corpus. (Doc. 109.) While Petitioner did not raise a substantive competency claim in his state habeas proceedings, on direct appeal to the Georgia Supreme Court, or in his federal habeas petition, Petitioner also briefed the merits of his claim that he was tried while incompetent. (Doc. 109 at 158-78; Doc. 113 at 13.) Respondent filed a response brief on June 17, 2019. (Doc. 111.) Therein, Respondent agreed that the substantive competency claim was reviewable by the Court. (Id. at 105.) Petitioner filed a reply brief on July 2, 2019. (Doc. 112.) After briefing on the merits, Petitioner requested leave to amend his petition to add the substantive claim that he was tried while incompetent (Doc. 113 at 13), and the Court granted his request

59

(Doc. 122 at 18-19). Petitioner's petition is now ripe for review on the merits.

## ANALYSIS

In his briefing, Petitioner argues that his trial counsel were ineffective and that he was tried while incompetent. (Doc. 109 at 48, 158.) The Court will set out the legal standards for each claim and address Petitioner's arguments in turn.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner asserts that his trial counsel were ineffective during the sentencing phase of trial.[10] (Doc. 109 at 48.) Petitioner argues his trial counsel unreasonably failed to investigate and present evidence (1) that Petitioner suffered from schizoaffective disorder and organic brain dysfunction and how the conditions impaired his functioning at the time of the crimes; and (2) of Petitioner's childhood and background, including evidence of sexual abuse by his mother and other severe abuse and neglect. (Id. at 51, 87.) First, the Court will explain the general standard of review for state habeas decisions. Then, the Court will describe the specific legal standard applicable to ineffective assistance of counsel claims and discuss each of Petitioner's claims.

---

[10] Petitioner makes a passing reference to ineffective assistance of appellate counsel in a section heading of his brief. (Doc. 109 at 48.) However, Petitioner does not argue how his appellate counsel were ineffective or otherwise address this claim in the substance of his brief. Accordingly, the Court finds this claim has been abandoned and requires no further discussion.

A.   <u>Standard of Review</u>

"[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy, 'a bulwark against convictions that violate "fundamental fairness." ' " <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 633, 113 S. Ct. 1710, 1719, 123 L. Ed. 2d 353 (1993) (quoting <u>Engle v. Isaac</u>, 456 U.S. 107, 126, 102 S. Ct. 1558, 1571, 71 L. Ed. 2d 783 (1982)). "Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." <u>Id.</u> at 634, 113 S. Ct. at 1719 (alteration in original) (quoting <u>Fay v. Noia</u>, 372 U.S. 391, 440-41, 83 S. Ct. 822, 850, 9 L. Ed. 2d 837 (1963)). The notion that habeas relief is an extraordinary remedy is "especially true when federal courts are asked to engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254." <u>McWhorther v. Dunn</u>, No. 4:13-CV-02150-RDP, 2019 WL 277385, at *11 (N.D. Ala. Jan. 22, 2019).

A district court's review of a petitioner's claims that were considered on the merits by a state court is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). <u>See</u> <u>Payne v. Allen</u>, 539 F.3d 1297, 1312 (11th Cir. 2008). Pursuant to AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)   resulted in a decision that was contrary to, or
      involved an unreasonable application of, clearly
      established Federal law, as determined by the
      Supreme Court of the United States; or

(2)   resulted in a decision that was based on an
      unreasonable determination of the facts in light of
      the evidence presented in the State court
      proceeding.

28 U.S.C. § 2254(d). Under this provision, "AEDPA 'imposes a highly

deferential standard for evaluating state court rulings' and

'demands that state-court decisions be given the benefit of the

doubt.' " Bishop v. Warden, GDCP, 726 F.3d 1243, 1253 (11th Cir.

2013) (quoting Renico v. Lett, 559 U.S. 766, 773, 130 S. Ct. 1855,

1862, 176 L. Ed. 2d 678 (2010)). Accordingly, the Court must not

assess whether it "believes the state court's determination was

incorrect, but whether the determination was unreasonable—a

substantially higher threshold." Schriro v. Landrigan, 550 U.S.

465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007) (citing

Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495, 1522, 146

L. Ed. 2d 389 (2000)).

A state court decision is "contrary to . . . clearly

established Federal law" under § 2254(d)(1) "if the state court

arrives at a conclusion opposite to that reached by [the Supreme]

Court on a question of law or if the state court decides a case

differently than [the Supreme] Court has on a set of materially

indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S. Ct.

at 1523. A state court decision involves "an unreasonable

application of" clearly established federal law under § 2254(d)(2)
"if the state court identifies the correct governing legal
principle from [the Supreme] Court's decisions but unreasonably
applies that principle to the facts of the prisoner's case." Id.
Within this review, the "federal habeas court . . . should ask
whether the state court's application of clearly established
federal law was objectively unreasonable." Id. at 409, 120 S. Ct.
at 1521; see also Virginia v. LeBlanc, 582 U.S. 91, 94, 137 S. Ct.
1726, 1728, 198 L. Ed. 2d 186 (2017) ("In order for a state court's
decision to be an unreasonable application of this Court's case
law, the ruling must be 'objectively unreasonable, not merely
wrong; even clear error will not suffice.' " (quotation omitted)).
Generally, federal habeas relief is precluded "so long as
'fairminded jurists could disagree' on the correctness of the state
court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S.
Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (quoting Yarborough v.
Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d
938 (2004)). In other words, a habeas petitioner can obtain relief
only by establishing that no fair-minded jurist could agree with
the state court's decision. Woods v. Etherton, 578 U.S. 113, 117,
136 S. Ct. 1149, 1152, 194 L. Ed. 2d 333 (2016); Pope v. Sec'y,
Fla. Dep't of Corr., 752 F.3d 1254, 1262 (11th Cir. 2014).

When determining whether a state court decision is based on
an unreasonable determination of fact, this Court must presume

that the state court's factual findings are correct unless rebutted by clear and convincing evidence. Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005). In defining this standard, the Supreme Court has noted that "[t]he standard is demanding but not insatiable[.]" Id. "The Supreme Court has found state factual findings unreasonable under § 2254(d)(2) when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioner's factual claim, and when a state court's finding was clearly erroneous." Landers v. Warden, Att'y Gen. of Ala., 776 F.3d 1288, 1294 (11th Cir. 2015) (internal citations and quotation marks omitted).

B.    The Relevant State Court Decision

This Court's discussion focuses on the reasonableness of the state habeas court's final order. (Doc. 52, Attach. 8.) Although the state habeas court's decision is not the last state court adjudication on the merits, the Supreme Court of Georgia issued an unexplained, summary denial of Petitioner's certificate of probable cause to appeal. (Doc. 53, Attach. 6.) Because the Supreme Court of Georgia provided an unexplained opinion, this Court "presume[s] that the [Supreme Court of Georgia] adopted the same reasoning" as the state habeas court. Wilson v. Sellers, --- U.S. ----, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018). Therefore, this Court will " ' "look through" the unexplained decision' of the Supreme Court of Georgia to review the superior court's

decision as if it were the last state-court adjudication on the merits." Raulerson v. Warden, 928 F.3d 987, 996 (11th Cir. 2019) (quoting Wilson, 138 S. Ct. at 1192).

The Court also rejects Petitioner's argument that AEDPA deference should not apply because the state court adopted verbatim a proposed order Respondent prepared. (Doc. 109 at 22.) As Petitioner acknowledges, the Eleventh Circuit has held "a state court's verbatim adoption of the prosecution's proposed order is entitled to AEDPA deference as long as (1) both parties 'had the opportunity to present the state habeas court with their version of the facts' and (2) the adopted findings of fact are not 'clearly erroneous.' " Barksdale v. Att'y Gen. Ala., No. 20-10993-P, 2020 WL 9256555, at *18 (11th Cir. 2020) (first citing Rhode v. Hall, 582 F.3d 1273, 1282 (11th Cir. 2009); and then citing Jones v. GDCP Warden, 753 F.3d 1171, 1183 (11th Cir. 2014)). Here, both parties submitted proposed orders to the state habeas court. (Doc. 109 at 25.) When appropriate, the Court will address whether the record supports the state habeas court's findings of fact.

C.   Ineffective Assistance of Counsel Standard

The Supreme Court of the United States explained the standard for analyzing ineffective assistance claims in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In Strickland, the Supreme Court created a two-part test for establishing "[a] convicted defendant's claim that counsel's

assistance was so defective as to require a reversal of conviction or death sentence[.]" Id. at 687, 104 S. Ct. at 2064. "Unless a defendant makes both showings [of the two-part test], it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

Under the first prong of the two-part test, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064.

Under the second prong of the two-part test, the defendant must show that his counsel's deficient performance prejudiced the defense. Id. at 687, 104 S. Ct. at 2064. To establish prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "In the capital sentencing context, the prejudice inquiry asks whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Pye v. Warden, Ga. Diagnostic Prison, 50 F.4th 1025, 1041 (11th

Cir. 2022) (quotation omitted). "A reasonable probability means a substantial, not just conceivable, likelihood of a different result." Id. "When evaluating this probability, 'a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.' " Brownlee v. Haley, 306 F.3d 1043, 1060 (11th Cir. 2010) (quoting Strickland, 466 U.S. at 695, 104 S. Ct. at 2069). This requires that "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice." Wong v. Belmontes, 558 U.S. 15, 26, 130 S. Ct. 383, 390, 175 L. Ed. 2d 328 (2009). "In determining whether a reasonable probability of a different outcome exists, [the Court] presume[s] a reasonable decisionmaker." Raheem v. GDCP Warden, 995 F.3d 895, 924 (11th Cir. 2021) (citing Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998, 89 L. Ed. 2d 123 (1986)).

When instructing courts as to how to apply the two-part test in Strickland, the Supreme Court emphasized the that "[j]udicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. The Supreme Court noted that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful to conclude that a particular act or omission of counsel was unreasonable." Id. (citation omitted). Accordingly, courts must "not measure counsel against what we

imagine some hypothetical 'best' lawyer would do[.]" LeCroy v. United States, 739 F.3d 1297, 1313 (11th Cir. 2014). Rather, a court must consider whether "in light of all the circumstances, the identified acts or omissions [of the attorney] were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. Courts must conduct this analysis with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. at 689, 104 S. Ct. at 2065. Strategic decisions will amount to ineffective assistance "only if it was so patently unreasonable that no competent attorney would have chosen it." Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir. 1987) (quotation omitted).

In addition to the already deferential standard mandated by Strickland, this Court must also conduct its analysis of Petitioner's claims in light of the procedural posture of this case. As discussed by the Eleventh Circuit,

> it is important to keep in mind that in addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference-this one to a State court's decision-when we are considering whether to grant federal habeas relief from a State court's decision. Thus, [a petitioner] not only has to satisfy the elements of the Strickland standard, but he must also show that the State court applied Strickland to the facts of his case in an objectively unreasonable manner.

Williams v. Allen, 598 F.3d 778, 789 (11th Cir. 2010) (internal

quotation marks, alterations, and citations omitted).

D.   <u>Ineffective Assistance of Counsel Analysis</u>

Petitioner claims his trial counsel, Mr. Edwards, Mr. Beauvais, and Mr. Daly, provided constitutionally ineffective assistance by failing to adequately investigate and present evidence relating to Petitioner's mental health and abusive childhood. Within these categories, Petitioner generally identifies nine errors committed by trial counsel before and during the sentencing phase of trial that constituted deficient performance: trial counsel's failure to (1) retain a replacement mental health expert (Doc. 109 at 51, 59); (2) investigate the two-year period of time before the crimes (<u>id.</u> at 63); (3) present Petitioner's jail records (<u>id.</u> at 66-67); (4) present evidence of his neuropsychological impairments (<u>id.</u> at 69-70); (5) investigate and present evidence that Petitioner was the victim of incest by his mother (<u>id.</u> at 87); (6) retain a sexual trauma expert (<u>id.</u> at 91, 100); (7) reliably present evidence that Petitioner was sexually abused by his stepfather (<u>id.</u> at 93); (8) investigate and present evidence of the dysfunctional, abusive, and neglectful environment in which Petitioner was raised (<u>id.</u> at 108); and (9)

utilize experienced mitigation professionals (id. at 122).[11]

    1.   Mental Health

    Petitioner argues trial counsel unreasonably failed to investigate and present evidence that Petitioner suffered from schizoaffective disorder and organic brain dysfunction and that

---

[11] Despite Petitioner's assertion to the contrary (Doc. 109 at 16 n.7), Petitioner briefed claims not authorized by the Court's order on procedural default, cause and prejudice, and the fundamental miscarriage of justice, and the Court will identify those arguments when appropriate. First, Petitioner argues that trial counsel were ineffective for failing to investigate and present mitigating evidence to rebut the State's case in aggravation. (Id. at 149-58.) Specifically, Petitioner argues that trial counsel "would have been able to impeach Mr. Bowen's credibility as a witness and also cast doubt on whether [Petitioner] was solely responsible for the contents of" the letter the State introduced at trial "[h]ad trial counsel conducted [a] reasonable investigation into the State's most aggravating piece of evidence[.]" (Id. at 156.) In its order, the Court addressed Petitioner's ineffective assistance claim that:

> (q) Counsel failed to adequately investigate the circumstances surrounding the production of the letter turned over to the prosecution by Christopher Bowen and his testimony regarding said letter. Counsel failed to adequately cross-examine Christopher Bowen regarding the letter, particularly regarding its provenance and his role in its production. Counsel also failed to present mitigating psychological evidence addressing the letter's production and creation[.]

(Doc. 104 at 29.) The Court found that Petitioner had insufficiently pled and was not permitted to brief the merits of this claim. (Id. at 28-31.) The Court later denied Petitioner's request that the Court reconsider its ruling that Petitioner insufficiently pled this claim. (Doc. 122 at 6-7.) Accordingly, the Court declines to consider Petitioner's arguments about trial counsel's failure to investigate the origins of the letter, impeach Mr. Bowen's credibility, or present mitigating psychological evidence addressing the letter's production and creation.

these impairments affected him at the time of the crime. (Doc. 109
at 51.) Specifically, Petitioner contends that trial counsel
performed deficiently by failing to retain a mental health expert
to replace Dr. James Maish, investigate the "two-year gap," present
his jail records as evidence of his mental illness, and present
evidence of his neuropsychological impairments.[12] (Id. at 51, 54,
55, 56, 59, 63, 67, 69.) Petitioner contends these errors left

---

[12] Petitioner also argues the state habeas court "unreasonably
determined that trial counsel did not perform deficiently because
the expert testimony presented at [Petitioner's] state habeas
hearing was 'largely cumulative of that presented at trial.'"
(Doc. 109 at 65.) Specifically, the state habeas court found that
"trial counsel's sentencing phase presentation was reasonable."
(Doc. 52, Attach. 8 at 57.) After listing the evidence introduced
in the state habeas proceeding, including "evidence about
Petitioner's mental health diagnoses and treatment over time," the
state habeas court found "the evidence introduced in [the state
habeas] proceeding largely cumulative of that presented at trial."
(Id. at 58-59.) In doing so, the state habeas court relied on
Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1264 (11th
Cir. 2012), a case in which the Eleventh Circuit addressed the
prejudice analysis. Petitioner argues the state habeas court's
finding that the evidence presented in the state habeas proceedings
was cumulative is unreasonable because trial counsel presented no
expert evidence or evidence that Petitioner's mental health
problems continued after he left Coastal Georgia. (Doc. 109 at 59,
65-66 (citing Doc. 52, Attach. 8 at 58-59).) Petitioner makes a
nearly identical argument regarding prejudice, and the Court will
address Petitioner's argument more fully in the following section.
However, the Court notes the submission of additional, cumulative
evidence to that uncovered and presented at trial does not
demonstrate deficient performance. See Raheem, 995 F.3d at 922-23
(noting much of the background evidence the petitioner presented
at the state habeas proceedings was "cumulative" to that uncovered
and presented in the penalty phase when concluding the state habeas
court's determination that trial counsel were not deficient in
their mitigation presentation or investigation was not
unreasonable (citing Darling v. Sec'y, Dep't of Corr., 619 F.3d
1279, 1284 (11th Cir. 2010)).

trial counsel with a "hole" in their presentation where the "jury heard nothing about how [Petitioner's] major mental illness continued past 1999, how it was active in the time surrounding the crime and in the years leading up [to] it, and how it impacted his actions and behaviors related to the offense." (Id. at 56, 57.) Had trial counsel retained an appropriate expert, Petitioner contends they could have filled this gap in evidence and rebutted evidence that Petitioner was not mentally ill at the time of the crimes. (Id. at 57-58.)

Petitioner argues he was prejudiced due to these errors because the jury was left with the impression that any mental illness Petitioner had ended two years before the crimes and the State was able to argue Petitioner "knew right from wrong," he "was not psychotic," and he "knew what was going on." (Id. at 71, 74.) Petitioner contends there is a reasonable probability the jury would have recommended a life sentence had they heard all of the mental health evidence, as evidenced by the jury's question during trial about Petitioner's status between 1998 and 2002.[13] (Id. at 73, 75.)

---

[13] The Court acknowledges that Petitioner presented the affidavit testimony of a juror from his trial. (Doc. 38, Attach. 8 at 128-31.) Having learned of Petitioner's suicide attempts in the Chatham County Detention Center while awaiting trial, reviewed Dr. Cunningham's report, and read Mr. Bowen's statement, the juror declared that she would have voted to sentence Petitioner to life without parole. (Id. at 129-31.) The Court notes the prejudice inquiry under Strickland is objective and does "not depend on the

a.   <u>Mental Health Expert</u>

i.   <u>Deficiency</u>

The state habeas court rejected Petitioner's argument that trial counsel performed deficiently by failing to replace Dr. James Maish with a mental health expert. (Doc. 52, Attach. 8 at 88, 92.) Instead, the state habeas court found trial counsel replaced Dr. Maish with a "qualified mental health expert[,]" Dr. Grant and retained him "as a comprehensive mental health mitigation expert" to "conduct a complete mental health assessment of Petitioner[,] including a battery of testing." (<u>Id.</u> at 88, 92, 97.)

Petitioner contends the state habeas court's factual finding that trial counsel retained Dr. Grant as a replacement mental health expert to opine on anything other than prison adaptability is belied by the record. (Doc. 109 at 59-61.) Relying on <u>Ferrell v. Hall</u>, 640 F.3d 1199 (11th Cir. 2011), Petitioner argues the state habeas court unreasonably applied <u>Strickland</u> when concluding that trial counsel's retention of Dr. Grant to conduct a prison adaptability assessment was reasonable. (<u>Id.</u> at 61-63.)

First, considering the evidence in the record, Petitioner has not shown the state habeas court's factual finding regarding Dr. Grant was unreasonable or incorrect through clear and convincing

---

idiosyncrasies of the particular decisionmaker." <u>Sealey v. Warden, Ga. Diagnostic Prison</u>, 954 F.3d 1338, 1358 (11th Cir. 2020). Thus, the juror's testimony does not alter the Court's assessment.

evidence. The state habeas record shows that trial counsel's sentencing phase strategy "was to demonstrate [Petitioner's] entire psychosocial history with an eye towards convincing the jury that he was actively psychotic at the time [the crimes] happened and was having a psychotic reaction." (Doc. 41, Attach. 1 at 98-99.) Accordingly, trial counsel moved for and were granted funds to retain Dr. Maish, a psychologist who would "perform a full battery of psychological tests" to assess Petitioner's mental health status and assist with mitigation. (Doc. 39, Attach. 5 at 32-33; Doc. 50, Attach. 1 at 13-14.)

On February 18, 2005, during an ex parte hearing, trial counsel informed the trial judge that Dr. Maish was being investigated for a boundary violation and his license had been suspended. (Doc. 49, Attach. 18 at 109-11.) Trial counsel highlighted that the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases addressed the retention of a member qualified to screen for the "presence of mental or psychological disorders." (Id. at 112.) They represented they were without mitigation evidence regarding "mental health issues" and asked for "a continuance and . . . an opportunity to locate and secure a new or new experts[.]" (Id. at 113.) When discussing rescheduling trial, trial counsel commented that an issue would be finding someone close because of the lack

of "forensic psychologists" willing to get involved in the area. (Id. at 117.)

At that time, Dr. Grant was a psychologist and neuropsychologist. (Doc. 44, Attach. 2 at 133.) During the state habeas proceedings, Petitioner submitted evidence showing that on March 7, 2005, Mr. Beauvais documented that Pam Leonard "advised [him] that Dan Grant, who [was] local, would be an excellent witness in regard to underlying neuropsych matters[,]" he was "very good on prison adaptability issues[,]" he was "very willing to get involved in the case[,] and [he would] do a neuropsychological examination . . . blind to see if he [could] ferret anything out for [them]." (Doc. 39, Attach. 9 at 51.) On April 20, 2005, the trial judge granted trial counsel's motion to appoint Dr. Grant as "an expert in the field of forensic psychology[.]" (Doc. 39, Attach. 5 at 208-09.)

Trial counsel's notes regarding meetings with Dr. Grant reveal that they discussed topics including "prison adaptability," "organics," "fetal alcohol," "incest," "child sexual trauma – assess & testify," "neuropsych battery," and "personality assessment inventory[.]" (Doc. 44, Attach. 6 at 153-54.) Under Dr. Grant's name on one version of a "Chronological Mitigation Witness List" included in the records submitted in the state habeas proceedings, trial counsel crossed out, "Dual diagnosis. PTSD from

75

incident?" and wrote "prison adaptability." (Doc. 44, Attach. 5 at 40.)

When Mr. Edwards was questioned about whether trial counsel had Petitioner evaluated by a psychiatrist or psychologist, he responded affirmatively, indicating they first retained Dr. Maish and "later retained Dan Grant." (Doc. 41, Attach. 1 at 85.) At the state habeas hearing, Mr. Edwards testified that "Dr. Grant's role was to assist generally in helping guide [them] through the mental status questions, . . . but specifically he had expertise in prison adaptability[,] . . . [which] became sort of the central theme of his assistance." (Doc. 38, Attach. 2 at 215.) Mr. Edwards said trial counsel secured "another person with the hopes of sort of filling in the gap that Dr. Maish's departure had caused but [Dr. Grant's] focus wasn't to complete a psychological evaluation . . . ." (Doc. 41, Attach. 1 at 94.) When asked whether trial counsel asked Dr. Grant to only perform a prison adaptability evaluation, however, Mr. Edwards said, "No. We asked Dr. Grant to get involved with the intention of having him provide testimony on [prison adaptability]. I'm - I couldn't say that we limited Dr. Grant from doing anything else but [prison adaptability] was our focus with him[.]" (Id. at 96-97.) Mr. Edwards further averred that he could not explain why they did not specifically retain someone for the purpose of performing a psychiatric evaluation "beyond getting Dr. Grant involved and . . . assuming that would

76

be, on some level, part of the prison adaptability evaluation that
he would do." (Id. at 99.) Mr. Edwards explained that prison
adaptability had become important to their case because "[their]
focus was saving [Petitioner's] life and demonstrating to the jury
that he would adapt to a prison environment, [and] wouldn't be a
threat to others in the prison environment. . . ." (Id. at 97.)
Mr. Beauvais also testified that Dr. Grant was retained to address
prison adaptability issues. (Doc. 38, Attach. 3 at 184.) When asked
whether their request was limited to an evaluation of prison
adaptability, Mr. Beauvais testified that was the case to the best
of his recollection, "assuming [Dr. Maish] had not been taken off
the case at that point." (Doc. 41, Attach. 1 at 269.)

Petitioner offered affidavit testimony from Dr. Grant, who
averred that he was "never given a specific consultation question."
(Doc. 38, Attach. 8 at 114.) As a result, Dr. Grant stated he
conducted his standard battery of psychological tests which screen
for gross neurological and psychological impairments, although he
was ultimately asked to address the issue of prison adaptability
in his report. (Id. at 114, 116.)

Dr. Grant's draft report, which appears to have been faxed on
November 3, 2005, indicated the purpose of his evaluation was to
assess Petitioner's "potential to adapt to a lifetime of prison
incarceration" and that he spent "16 to 18 hours in face to face
psychological testing, clinical interviewing, [and] reviewing test

data and information and another 10 hours reviewing records and documents provided [to him]." (Doc. 39, Attach. 9 at 59.) The report lists the psychological tests, the results of Petitioner's tests, and that his profile was "consistent with a diagnosis of schizoaffective disorder[.]" (Id. at 59-62.) Although Dr. Grant concluded Petitioner could make an adequate adjustment to prison life, he also stated Petitioner's violence potential was "moderate" and he showed "some potential for violent behavior even in a structured protective setting[,]" and his potential for infractions was moderate. (Id. at 61.) Trial counsel concluded Dr. Grant's findings, which they received during trial, would have been "very damaging" and decided against having him testify because it was not going to be helpful. (Doc. 38, Attach. 3 at 119, 187, 208-10.)

Although Petitioner claims that trial counsel neglected to find an expert to investigate Petitioner's mental health, trial counsel discussed mental health issues and forensic psychologists with the trial judge during the ex parte hearing (Doc. 49, Attach. 18 at 113, 117), and the trial judge granted trial counsel's motion to appoint Dr. Grant as "an expert in the field of forensic psychology[.]" (Doc. 39, Attach. 5 at 208-09.) Despite stating that prison adaptability became their focus with Dr. Grant, Mr. Edwards testified they had Petitioner evaluated by a psychologist – first Dr. Maish and then Dr. Grant, they assumed a mental health

assessment would be part of Dr. Grant's evaluation, they did not restrict Dr. Grant's evaluation only to prison adaptability, and Dr. Grant helped guide them through mental status questions. (Doc. 38, Attach. 2 at 215; Doc. 41, Attach. 1 at 85, 96-97, 99.) Moreover, Dr. Grant conducted a battery of psychological tests, the results of which Dr. Fiano, Petitioner's own expert, reviewed. (Doc. 38, Attach. 2 at 161; Doc. 38, Attach. 8 at 114.) Accordingly, however debatable, the state habeas court's factual determinations regarding the reason trial counsel retained Dr. Grant and the scope of his assessment were not unreasonable or clearly and convincingly erroneous. Pye, 50 F.4th at 1043-44 (finding the state habeas court's interpretation of an affidavit was not clearly erroneous even though it was not the "most natural" reading); see also Gissendaner v. Seaboldt, 735 F.3d 1311, 1331 (11th Cir. 2013) (determining state habeas court's factual finding that mental health evaluation extended beyond issues of insanity and intellectual disability even though trial counsel could not recall asking the psychologist to cover other issues was not unreasonable or clearly and convincingly erroneous because the record contained evidence that evaluation went beyond those issues).[14]

---

[14] While the Supreme Court "formerly employed the phrase 'mentally retarded,' [the Court] now 'us[e][s] the term "intellectual disability" to describe the identical phenomenon.' " Brumfield v.

Because the Court rejects Petitioner's arguments about trial counsel's failure to retain a mental health expert, Petitioner's argument about how the state habeas court "unreasonably applied Strickland to conclude that trial counsel's retention of Dr. Grant to conduct a prison adaptability assessment was reasonable[]" also fails. (Doc. 109 at 62.) In any event, Ferrell, the case Petitioner relies on to support his argument that trial counsel performed deficiently by neglecting to retain an adequate expert to conduct a complete evaluation, is distinguishable.[15] (Id. at 61.)

In Ferrell, according to Petitioner, the Eleventh Circuit concluded that trial counsel performed deficiently despite retaining a mental health expert because the expert's evaluation was too circumscribed. (Id. at 61-62.) In Eric Ferrell's state habeas proceedings, his habeas counsel submitted new evidence that he suffered from organic brain damage, mental illness, an epileptic or seizure disorder, and was on the borderline for an intellectual disability. Ferrell, 640 F.3d at 1213. In contrast, during the sentencing phase of Ferrell's trial, the jury heard nothing about his "disabling mental health problems and diseases including

---

Cain, 576 U.S. 305, 308 n.1, 135 S. Ct. 2269, 2274 n.1, 192 L. Ed. 2d 356 (2015) (quotation omitted).

[15] While decisions of federal circuit courts are not clearly established federal law, they can be helpful "to the extent that the decisions demonstrate that the Supreme Court's pre-existing, clearly established law compelled the circuit courts . . . to decide in a definite way. . . ." Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003).

organic brain damage to the frontal lobe, bipolar disorder, and temporal lobe epilepsy" or the effects of these mental health issues in the 26 minutes that the mitigation witnesses testified at trial. Id. at 1203, 1206.

In preparing for trial, trial counsel requested a report on Ferrell's "mental capacity by a mental health expert," but it was limited to whether he was intellectually disabled and suffered from problems that would impact his waiver of Miranda rights. Id. at 1211. In the mental health expert's report, he "noted that he had met with Ferrell only 'for the purpose of reviewing his academic records and administering intelligence/cognitive and achievement tests.' " Id. (emphasis omitted). The expert also "averred that he had not been asked to look for brain damage, that he was provided with no material from counsel other than school records, and that he was not asked to perform any clinical interview, or do anything else for that matter, for use in mitigation." Id. at 1213 (emphasis omitted). Despite this, the state habeas court concluded Ferrell's trial counsel "performed reasonably by obtaining expert assistance in investigating the few issues regarding Ferrell's mental functioning that would have seemed of possible concern to a non-expert. . . ." Id. at 1226.

In concluding the state habeas court unreasonably found that Ferrell's trial counsel's performance was not deficient, the Eleventh Circuit explained trial counsel's request that the expert

81

only evaluate whether Ferrell was intellectually disabled and his ability to interact with police was "unreasonably constricted" given the red flags that had been raised about Ferrell's mental health. Id. at 1227. The expert had not been asked to look for evidence of brain damage, was provided no material other than school records, and was not asked to perform a clinical interview. Id. The Eleventh Circuit also highlighted other deficiencies in trial counsel's performance, including the failure to ask Ferrell's family about any topics related to his mental health. Id. at 1228.

In this case, while Petitioner takes issue with the fact that Dr. Grant was allegedly only retained to conduct a prison adaptability assessment, the tests Dr. Grant performed and the information provided to Dr. Grant were far more substantial. As the state habeas court highlighted, Dr. Grant met with Petitioner multiple times for many hours to conduct extensive psychological tests. (Doc. 52, Attach. 8 at 94; Doc. 48, Attach. 1 at 14.) Dr. Grant conducted his standard battery of psychological tests which screen for gross neurological and psychological impairments (Doc. 38, Attach. 8 at 114), which revealed Petitioner's profile was "consistent with a diagnosis of Schizoaffective disorder." (Doc. 39, Attach. 9 at 61.) In fact, Petitioner points out that Dr. Grant found evidence of organic brain dysfunction when he evaluated Petitioner. (Doc. 112 at 7 n.1.) Additionally, as the state habeas

court found, the record reveals trial counsel provided Dr. Grant
with many of the materials Petitioner contends a mental health
expert would have found evidenced his psychiatric crisis around
the time of the crimes (Doc. 52, Attach. 8 at 94), including
Petitioner's records from Candler Hospital and Memorial Medical
Center (Doc. 48, Attach. 11 at 9-36, 44-70).[16] The record also
reveals Dr. Grant possessed at least some of Petitioner's jail
records regarding his suicide attempts and mental health
treatment. (E.g., Doc. 48, Attachs. 2-8.) Beyond that, Dr. Grant's
file contains notes regarding "CAT, MRI," "Memorial," and "Urban
Health Records," which are the records Petitioner contends showed
his somatic complaints and were evidence of his decompensation.
(Doc. 48, Attach. 1 at 29; Doc. 109 at 64-65.)

Additionally, unlike Ferrell, this is not a case where the
jury heard nothing about Petitioner's mental health problems due
to a circumscribed mental health investigation and evaluation. The
jury still heard multiple mental health professionals discuss
Petitioner's mental health issues over the years along with several
other witnesses who were able to comment generally on Petitioner's
mental health challenges. For these reasons, Ferrell is
distinguishable. Based on the foregoing, the Court concludes the

---

[16] Dr. Grant's introductory letter explained he enclosed "a copy
of [his] file on [Petitioner] which contains a complete copy of
everything [he] was able to locate on him." (Doc. 48, Attach. 1 at
2.)

state habeas court reasonably determined that trial counsel's performance was not deficient for failing to retain a mental health expert to replace Dr. Maish.

### ii. Prejudice

Even assuming trial counsel performed deficiently, the state habeas court reasonably determined Petitioner was not prejudiced by trial counsel's decision to replace Dr. Maish with Dr. Grant and to not call Dr. Grant as a witness. (Doc. 52, Attach. 8 at 98, 100.)[17] The state habeas court based its decision, in part, on the

---

[17] Petitioner argues the state habeas court acted contrary to and unreasonably applied Strickland's prejudice prong because it used a "truncated" approach and failed to consider the "totality of the available mitigation evidence" in its analysis. (Doc. 109 at 76, 148-49.) As the Eleventh Circuit recently explained, "[a] state court's conclusion that there was no sentencing-phase prejudice is reasonable and entitled to deference if its prejudice determinations with respect to each alleged deficiency, and with respect to the deficiencies cumulatively, were reasonable." Pye, 50 F.4th at 1042; see also Stinski v. Ford, No. 4:18-CV-66, 2021 WL 5921386, at *29 n.9 (S.D. Ga. Dec. 15, 2021) ("[T]he Eleventh Circuit explained . . . that '[t]he existence of item-by-item analysis . . . is not inconsistent with a cumulative analysis,' as the 'only way to evaluate the cumulative effect is to first examine each piece standing alone.' "). In its order, the state habeas court explained that it "ha[d] considered all of the evidence presented during this proceeding by both Petitioner and Respondent and the evidence presented at trial and [found] there [was] no reasonable probability of a different outcome at either the guilt or sentencing phase had trial counsel presented the collateral evidence." (Doc. 52, Attach. 8 at 134.) Considering the state habeas court recited the correct standard and the presumption is that state courts know and follow the law, Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002), the state habeas court's analysis was neither contrary to nor an unreasonable application of Strickland, even though it did separate its analysis at times for clarity.

fact that the State could have elicited aggravating facts from Dr. Grant. (Id. at 99.) As a result, the state habeas court concluded Petitioner failed to demonstrate a reasonable probability of a different outcome at trial had trial counsel presented a qualified mental health expert such as Dr. Grant. (Id. at 100.)

Petitioner argues the state habeas court "unreasonably discounted all of the expert testimony to irrelevance" because it would have opened the door to aggravating evidence. (Doc. 109 at 84 (citing Doc. 52, Attach. 8 at 99-100).) In Petitioner's view, the fact that the evidence could have been damaging was irrelevant because it was already before the jury in the form of Mr. Bowen's testimony and Petitioner's letter. (Id. at 85.)

"Both the Supreme Court and [the Eleventh Circuit] have consistently 'rejected [the] prejudice argument [ ] where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence.' " Dallas v. Warden, 964 F.3d 1285, 1310-11 (11th Cir. 2020) (quoting Ponticelli v. Sec'y, Fla. Dep't of Corr., 690 F.3d 1271, 1296 (11th Cir. 2012)). The fact that a jury already heard harmful information about a petitioner does not defeat this consideration. See Raulerson, 928 F.3d at 999 ("We also disagree with [petitioner] that, because the jury had already heard harmful information about him, presenting mitigating evidence would not be counterproductive.").

85

The record amply supports the state habeas court's finding that Petitioner had revealed his sexual propensities to Dr. Grant. (Doc. 48, Attach. 1 at 45, 53, 63.) Therefore, in light of the potentially damaging effect of Dr. Grant's testimony, the state habeas court reasonably determined the additional evidence could have opened the door to damaging evidence, which negates a finding of prejudice. Additionally, as detailed more fully in the following sections, when the mitigating evidence at trial and the mitigating evidence presented at the state habeas proceedings are placed side-by-side, the postconviction evidence was largely cumulative of that presented at the sentencing phase. Finally, the extent of the aggravating facts present in this case further negates a finding of prejudice.

Based on the foregoing, the Court concludes the state habeas court reasonably determined that trial counsel's performance was not deficient for failing to retain a mental health expert to replace Dr. Maish. Further, even if trial counsel had performed deficiently, the state habeas court reasonably concluded that Petitioner failed to show prejudice. Accordingly, the state habeas court's determination regarding trial counsel's decision to retain Dr. Grant was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

b.   <u>Two-Year Gap</u>

i.   <u>Deficiency</u>

The state habeas court also rejected Petitioner's argument that trial counsel were ineffective in the investigation of Petitioner's life during the two-year period preceding the crimes. (Doc. 52, Attach. 8 at 105-06.) Instead, the state habeas court found "trial counsel conducted a reasonable investigation into the two year time period leading up to the crime[s], but they were unable to develop any significant evidence to present to the jury." (<u>Id.</u> at 51, 106.)

Petitioner asserts the state habeas court unreasonably applied <u>Strickland</u> to conclude that trial counsel's investigation into Petitioner's mental health in the two years leading up to the crimes was reasonable. (Doc. 109 at 63-64.) Similar to his argument about Dr. Grant above, Petitioner maintains the state habeas court only considered trial counsel's record collection efforts and "failed entirely to account for the most glaring deficiency in counsel's investigation: the failure to obtain an appropriate expert to evaluate [Petitioner] and testify about his lifelong mental illness and its effect on him during the crime." (Doc. 109 at 63-64; Doc. 112 at 13.) Petitioner further contends that the state habeas court's "conclusion that trial counsel could not obtain any records documenting [Petitioner's] mental health around the time of the crime is also an unreasonable factual

87

determination. . . ." (Doc. 109 at 64.) Petitioner contends the state habeas court made this determination based solely on trial counsel's failure to find records of psychiatric hospitalizations during this period and ignored Petitioner's jail records, emergency room hospital records, and accounts from his neighbors and friends. (Id. at 63-66.)

As explained above, the Court has now rejected Petitioner's argument that trial counsel failed to retain a mental health expert. Thus, Petitioner's argument that the state habeas court unreasonably applied Strickland for failing to consider the fact that trial counsel did not retain a mental health expert fails.

As for the records trial counsel uncovered, Petitioner has not shown the state habeas court's factual finding was unreasonable or incorrect through clear and convincing evidence. Mr. Beauvais testified, and the state habeas court noted, that there was a gap in time when Petitioner "didn't really have any problems. There [were] no hospitalizations, no nothing." (Doc. 41, Attach. 1 at 265; Doc. 52, Attach. 8 at 51.) The state habeas court summarized the extensive efforts trial counsel took to investigate the two years leading up to the crimes, including but not limited to, talking to former employers, reviewing vocational applications and related evaluations, and obtaining non-psychiatric medical records. (Doc. 52, Attach. 8 at 52-53.) The state habeas court particularly noted test results obtained during some of

88

Petitioner's medical visits and evaluations. (Id.) The evidence
that trial counsel uncovered, and the state habeas court
considered, included a "negative CT scan of [the] brain in 2000"
at Candler Hospital after Petitioner complained of chest pain,
irregular heartbeat, and passing out (Doc. 41, Attach. 5 at 112,
124); an MRI of the brain in 2001 at Memorial Medical Center which
resulted in a "negative exam" and no significant findings after he
complained of drop attacks (Doc. 41, Attach. 6 at 12-13); and a
psychological evaluation performed a month before the crimes
occurred in 2002 in which Petitioner's hygiene and dress were
described as "appropriate" (Doc. 44, Attach. 3 at 49). (Doc. 52,
Attach. 8 at 52-53.)

   The Court must note the state habeas court found "trial
counsel conducted a reasonable investigation into the two year
time period leading up to the crime, but they were unable to
develop any significant evidence to present to the jury." (Id. at
51 (emphasis added).) Comparing the striking evidence of multiple
acute psychiatric hospitalizations before 1999 with the evidence
counsel uncovered in the two-year period, the Court does not find
that the state habeas court's determination that trial counsel
were unable to develop any significant evidence of Petitioner's
deteriorating mental health was unreasonable or clearly and
convincingly erroneous. Moreover, the existence of Petitioner's
jail records after the crimes, regardless of whether they

89

documented Petitioner's "ongoing" mental state, does not render the state habeas court's factual determination that trial counsel found no significant evidence in the two-year period leading up to the crimes unreasonable. Again, the state habeas court reasonably determined that trial counsel's investigation of the two-year gap was not deficient.

ii.  Prejudice

Even assuming trial counsel performed deficiently, the state habeas court reasonably determined Petitioner was not prejudiced by trial counsel's investigation of the two-year gap. In addition to finding that Petitioner was not prejudiced by trial counsel's decision to replace Dr. Maish with Dr. Grant, the state habeas court also found that Petitioner failed to establish he was prejudiced by trial counsel's reasonable investigation into the two-year gap. (Doc. 52, Attach. 8 at 106.) In making this determination, the state habeas court found that Dr. Schwartz-Watts's and Dr. Cunningham's testimony was largely speculative. (Id. at 107-08.) In particular, the state habeas court considered that their opinions were based on the accounts of unreliable lay witnesses, information that was "cumulative" or similar to that available at the time of trial, and Petitioner's self-reporting. (Id. at 114-15, 117-22.) The state habeas court also found their testimony to be largely cumulative or aggravating. (Id. at 114, 117, 118, 124.) Finally, the state habeas court also considered

90

"the truly heinous nature of Petitioner's crimes." (Id. at 106.) As a result, the state habeas court found Petitioner failed to demonstrate a reasonable probability of a different outcome at trial had trial counsel presented this new information. (Id. at 108, 114.)

Unreasonably Discounting Evidence

Petitioner contends the state habeas court acted contrary to and unreasonably applied Strickland because it "discounted to irrelevance" the entirety of his expert's testimony. (Doc. 109 at 77, 79.) Petitioner raised general arguments about the state habeas court discounting his experts' testimony because they relied on unreliable lay witnesses, documents that were available at the time of trial, and Petitioner's self-reporting.[18] (Id. at 78, 80-81.)

Petitioner argues the state habeas court acted contrary to and unreasonably applied clearly established federal law because it employed reasoning the Supreme Court condemned in Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009). (Id. at 77, 79.) In Porter, the Supreme Court held a state court

---

[18] Petitioner also argues that the state habeas court unreasonably applied Strickland "to the extent" it found the lay witness testimony to be unreliable because it was submitted in affidavit form. (Doc. 109 at 79.) Petitioner, however, fails to cite to any instance in which the state habeas court unreasonably discounted affidavit evidence in this way. Accordingly, the Court finds Petitioner's argument is without merit.

unreasonably applied clearly established federal law "when it 'either did not consider or unreasonably discounted the [mental health] mitigation evidence [that Porter] adduced in the postconviction hearing.' " Sochor v. Sec'y Dep't of Corr., 685 F.3d 1016, 1029 (11th Cir. 2012) (citation omitted). The Supreme Court also found "that it was unreasonable for the [state court] to 'discount entirely' the impact that the testimony of Porter's neuropsychologist might have had on the sentencing judge and jury based on the fact that the experts offered by the state disagreed with the conclusions of Porter's expert." Id.

Although not directly addressed by Petitioner, embedded in the state habeas court's analysis are also credibility-based determinations that are findings of fact. Whatley v. Warden, Ga. Diagnostic & Classification Ctr., 927 F.3d 1150, 1173, 1177 (11th Cir. 2019) (explaining the state habeas court's finding that expert opinions were "speculative, at best" and not credible because they were based on unreliable facts was a finding of fact). While a state court can run afoul of clearly established federal law by unreasonably discounting evidence, it is also true that "[i]n the absence of clear and convincing evidence, [a court has] no power on federal habeas review to revisit the state court's credibility determinations." Jenkins v. Comm'r, Ala. Dep't of Corr., 963 F.3d 1248, 1272 (11th Cir. 2020) (quoting Bishop v. Warden, GDCP, 726 F.3d 1243, 1259 (11th Cir. 2013)).

As previously mentioned, when evaluating whether Petitioner was prejudiced by trial counsel's investigation into the two-year gap, the state habeas court found the expert testimony was largely speculative because they relied upon unreliable lay witness testimony. (Doc. 52, Attach. 8 at 107-08.) As to the unreliable lay witness testimony, Dr. Schwartz-Watts and Dr. Cunningham both emphasized Ginger's testimony, who the state habeas court found to be unreliable. (Id. at 114-15, 119.) Petitioner contends the state habeas court concluded "all of the lay witness testimony relied upon by the experts was unreliable[]" because of Ginger's criminal history and drug use, and that the state habeas court's "wholesale dismissal" of Petitioner's expert testimony on this ground was unreasonable and contrary to Strickland. (Doc. 109 at 79 (emphasis in original).)

Considering the evidence upon which they based their opinions, the Court does not find that the state habeas court made unreasonable credibility-based determinations of fact in weighing the opinions of Dr. Schwartz-Watts and Dr. Cunningham. Despite Petitioner's claim to the contrary, there is no evidence that the state habeas court concluded all of the lay witness's testimony was unreliable and discounted the expert's testimony solely because of Ginger's credibility. And while the state habeas court may have discounted the testimony of Dr. Schwartz-Watts and Dr. Cunningham because they relied on information from Ginger, it did

93

not do so unreasonably since her account figured prominently in both of their evaluations. Dr. Schwartz-Watts testified that Ginger told her "the two things that [were] most important" in developing her opinion that Petitioner was decompensating in the years between late 1999 and 2002 because she described two episodes that were indicative of Petitioner's paranoid ideation. (Doc. 38, Attach. 1 at 254.) The state habeas court also highlighted the impact of Ginger's testimony on Dr. Cunningham's opinion (Doc. 52, Attach. 8 at 119), examples of which are littered throughout his testimony (Doc. 38, Attach. 4 at 107-09, 116-17). And, importantly, Petitioner does not challenge the state habeas court's finding that Ginger was a not a credible witness.

The state habeas court also concluded Petitioner's expert testimony was largely speculative because they relied upon documentation that was "cumulative," or available at the time of trial, without Dr. Grant reaching the same conclusion. (Doc. 52, Attach. 8 at 107-08, 115.) Regarding Dr. Schwartz-Watts, the state habeas court found her testimony surrounding Petitioner's mental health deterioration between his treatment at Charter in 1998 and the crimes largely speculative because, despite having similar evidence of Petitioner's emergency room visits, there was no evidence that Dr. Grant concurred with Dr. Schwartz-Watts's opinion that "perhaps" Petitioner was decompensating. (Id. at 115.)

In Petitioner's view, it is irrelevant that medical records relied upon by the state habeas experts were cumulative of that available at trial because trial counsel failed to utilize a mental health expert. (Doc. 109 at 80-81.) Since Petitioner insists Dr. Grant only conducted a prison adaptability evaluation, Petitioner argues it was legally and factually unreasonable to decide Dr. Schwartz-Watts's findings were speculative because Dr. Grant did not find Petitioner was deteriorating in the years leading up to the crimes. (Id.) Again, the Court has already rejected Petitioner's argument that trial counsel did not retain a mental health expert. See Analysis Section I.D.1.a.i, supra. Thus, Petitioner's attempt to challenge the state habeas court's findings on this ground is not persuasive.

The fact that the experts relied on Petitioner's own reports of information that he had not revealed to trial counsel or Dr. Grant also factored into the state habeas court's calculation. (Doc. 52, Attach. 8 at 117-18, 120-21.) Petitioner similarly argues it was unreasonable for the state habeas court to discredit the experts' opinions because Petitioner did not report his symptoms to trial counsel or Dr. Grant because Dr. Grant's evaluation was limited to prison adaptability. (Doc. 109 at 81.)

Even if the Court had not already rejected this argument, Petitioner does not challenge the state habeas court's finding that Petitioner did not inform trial counsel or Dr. Grant of much

of the information Petitioner conveyed to the state habeas experts that they relied on to develop their opinions. See Dallas, 964 F.3d at 1311 (noting petitioner gave his attorneys no indication abuse occurred when evaluating whether he was prejudiced by trial counsel's failure to introduce such evidence). While Petitioner claims the state habeas court failed to acknowledge the bulk of his experts' opinions came from medical records and their evaluations of Petitioner (Doc. 109 at 80), the focus is on the ultimate legal conclusion, not "whether the state court considered and discussed every angle of the evidence[.]" Pye, 50 F.4th at 1051 n.20. Moreover, Petitioner omits critical parts of the experts' testimony on this issue. Dr. Schwartz-Watts's full testimony on the matter was that the "main information [came] from [her] clinical evaluation of [Petitioner] and the things that he told me he was thinking around that period of time." (Doc. 38, Attach. 1 at 260.) Dr. Cunningham similarly relied on Petitioner's reporting. (Doc. 38, Attach. 4 at 49, 80-81, 84, 227.) Both experts confirmed, however, that Petitioner reported many issues to them for the first time. (Doc. 38, Attach. 1 at 279; Doc. 38, Attach. 4 at 227.)

All in all, it was not unreasonable for the state habeas court to discount the experts' testimony to some degree based on these credibility concerns when conducting its prejudice analysis.

96

Cumulative Evidence

The state habeas court found the documentation of Petitioner's mental health in the time leading up to the crimes and Dr. Schwartz-Watts's and Dr. Cunningham's expert testimony on Petitioner's mental health problems were largely cumulative of that presented at trial. (Doc. 52, Attach. 8 at 107, 114, 118, 123-24.) Petitioner counters that the state habeas court failed to recognize the distinction between the evidence presented at trial of his psychiatric hospitalizations as a teenager and the evidence he presented at the state habeas proceedings through expert witnesses about his mental health decline leading up to the crimes. (Doc. 109 at 65-66, 83-84.) According to Petitioner, the failure to appreciate these distinctions renders the state habeas court's cumulative conclusion factually and legally unreasonable. (Id. at 66, 83-84.)

"When reweighing the aggravating circumstances against the totality of the mitigating evidence - again, what was introduced at his original trial and what [Petitioner] presented in his postconviction proceedings - [courts] consider the cumulative nature of the evidence." Dallas, 964 F.3d at 1308. "[A] petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial." Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 649 (11th Cir. 2016) (quotation omitted).

That is because where " 'new' evidence largely duplicate[s] the mitigation evidence at trial[]" there "is no reasonable probability that the additional evidence [the petitioner] presented in his state habeas proceedings would have changed the jury's verdict." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 200, 131 S. Ct. 1388, 1409, 179 L. Ed. 2d 557 (2011).

To determine whether a state habeas court's cumulative conclusion was unreasonable, a court will "compare the trial evidence with the evidence presented during the state postconviction proceedings." <u>Holsey v. Warden, Ga. Diagnostic Prison</u>, 694 F.3d 1230, 1260 (11th Cir. 2012). In doing so, the Court shall

> keep in mind that the United States Supreme Court, [the Eleventh Circuit], and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is "cumulative" or "largely cumulative" to or "duplicative" of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.

<u>Id.</u> at 1260-61 (citations omitted); <u>see also</u> <u>Wong</u>, 558 U.S. at 22-23, 130 S. Ct. at 387-88 (holding that "[s]ome of the [additional mitigating] evidence was merely cumulative of the humanizing evidence [the petitioner] actually presented" because "[t]he sentencing jury was . . . 'well acquainted' with [the petitioner's] background and potential humanizing features"); <u>Boyd v. Allen</u>, 592 F.3d 1274, 1297-98 (11th Cir. 2010) (finding that much of the

evidence presented by the petitioner during post-conviction proceedings "was in some measure cumulative" of the trial evidence because "much (although not all) of the 'new' testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial"). Evaluating Supreme Court precedent, the Eleventh Circuit has also found evidence cumulative "where it 'substantiate[s],' 'support[s],' or 'explain[s]' more general testimony provided at trial." Raheem, 995 F.3d at 925-26 (quoting Cullen, 563 U.S. at 200-01, 131 S. Ct. at 1409-10).

As the Court has detailed, Petitioner's trial counsel presented substantial evidence about Petitioner's mental health. To overcome this barrier, Petitioner presented the live testimony of Dr. Schwartz-Watts, Dr. Cunningham, Dr. Fiano, and the affidavit testimony of several neighbors and friends at the state habeas proceeding. Dr. Schwartz-Watts opined at the state habeas proceedings that Petitioner suffered from schizoaffective disorder, bipolar type and explained that he might have received different diagnoses at various times depending on how his symptoms presented. (Doc. 38, Attach. 1 at 229-30.) Dr. Cunningham similarly testified at the state habeas proceedings that Petitioner suffered from schizoaffective disorder and explained that his symptoms presented differently because it had different elements. (Doc. 38, Attach. 4 at 59-60.) On the same note, however, Dr. Negrin testified at trial that Petitioner's diagnosis at discharge from

Charter in November 1996 was bipolar disorder mixed. (Doc. 34, Attach. 1 at 19.) Dr. Nagelberg testified at trial that Petitioner displayed prodromal symptoms of schizophrenia when he evaluated Petitioner in 1998. (Doc. 34, Attach. 3 at 9-10.)

Next, Dr. Schwartz-Watts testified at the state habeas proceedings that Petitioner's history was "replete" with symptoms of a psychotic disorder, including disorganized thinking, delusions, hallucinations, and deterioration in functioning. (Doc. 38, Attach. 1 at 231.) At trial, Dr. Negrin testified about how Petitioner was psychotic, meaning he was delusional, hallucinating, feared someone was after him, and his thought processes were off during one of his hospitalizations. (Doc. 34, Attach. 1 at 11, 29.) Dr. Nagelberg also testified he felt Petitioner was suffering from a psychotic disorder and showed evidence of a delusional disorder. (Doc. 34, Attach. 3 at 9-10.)

In particular, both Dr. Schwartz-Watts and Dr. Cunningham described Petitioner's auditory hallucinations, including the names of the voices Petitioner described as well as the different personalities. (Doc. 38, Attach. 1 at 234; Doc. 38, Attach. 4 at 104, 110-11.) As detailed above, in his trial testimony, Dr. Nagelburg described some of the exact same names and personalities. (Doc. 34, Attach. 3 at 4-5.)

Concerning Dr. Ackerman's report, Dr. Schwartz-Watts and Dr. Cunningham both discounted the significance of Dr. Ackerman's

100

evaluation of Petitioner as cursory and explained how it failed to fully address Petitioner's mental illness. (Doc. 38, Attach. 1 at 249; Doc. 38, Attach. 4 at 151-54.) Trial counsel similarly challenged the State's arguments about Dr. Ackerman's report using Dr. Nagelberg's testimony. Dr. Nagelberg testified he would have been "surprised" to learn that Petitioner received a clean bill of mental health in 1999. (Doc. 34, Attach. 3 at 14.) Dr. Nagelburg further averred: "[I]f there was a clean bill of health a year after I had seen him, that either there was some sort of divine intervention or he was not fully assessed." (Id. at 15.)

At the state habeas proceeding, Petitioner also presented through live and affidavit testimony some of Petitioner's bizarre behavior in the months leading up to the crimes. Ms. Dahlquist testified that in late 2001, Petitioner carried on conversations with people who were not there. (Doc. 38, Attach. 8 at 77.) Ms. Chappell recalled Petitioner squatting in the front yard days in a row for long periods of time weeks or months before the crimes. (Id. at 64-65.) Ginger testified during the state habeas proceedings that Petitioner stored opened food in his pockets, he ate food that had been sitting out for several days, he insisted she take animal pictures down before he entered her home, and his hygiene declined. (Doc. 38, Attach. 2 at 109-12.) Dr. Schwartz-Watts and Dr. Cunningham commented on these incidents. (Doc. 38, Attach. 1 at 254; Doc. 38, Attach. 4 at 107, 108, 109.) At trial,

however, the jury also heard examples of Petitioner's bizarre behavior. For instance, Dr. Negrin testified that Petitioner was admitted to Charter Hospital in February 1997 after being found wandering in the woods and that he feared someone was after him. (Doc. 34, Attach. 1 at 20, 29.) Trial counsel also highlighted the fact that Petitioner created his insanity party countdown during the time leading up to the crimes. (Doc. 32, Attach. 1 at 67-70; Doc. 32, Attach. 2 at 4, 23-24.)

After a thorough review of the record, the Court is convinced that, all in all, the evidence in the state habeas proceedings addressing Petitioner's mental health was largely cumulative of the evidence presented at trial.[19] Because Petitioner provides nothing other than a conclusory argument that his state habeas experts' testimony would be more mitigating than the testimony from the medical professionals that testified at trial, the Court rejects this argument. Additionally, the Court also recognizes here that Petitioner introduced evidence specifically addressing the period after Petitioner left Coastal Georgia (e.g., Doc. 38, Attach. 1 at 252-53; Doc. 38, Attach. 4 at 103-07) and Dr. Fiano's testimony that Petitioner had deficits in executive functioning, including working memory, attention and concentration, and verbal

---

[19] Petitioner's argument that the state habeas court unreasonably found that trial counsel's sentencing phase presentation was reasonable because the evidence was cumulative fails for the same reasons. (Doc. 52, Attach. 8 at 58-59, 65-66.)

fluency (Doc. 38, Attach. 2 at 164, 177). Even if this Court were to consider this testimony "new" mental health evidence that did not reach the jury, the Court believes it constitutes either additional evidence amplifying the theme that Petitioner had serious mental health issues or more detailed evidence that substantiated, supported, or explained his mental health issues. Raheem, 995 F.3d at 925-26; see also Pye, 50 F.4th at 1054 (finding "[f]urther evidence from corrections officers as to [petitioner's] nonviolent nature [presented at the state habeas proceeding] would have been at least partially cumulative[]" of his family members' testimony that he was not violent and kind). While the evidence in the state habeas proceedings might have told a more detailed story of Petitioner's mental health issues, it was not a substantially different story than the one presented at trial. Holsey, 694 F.3d at 1267 (explaining that in cases where a "cumulative" finding was unreasonable, evidence presented in the state habeas proceedings did not tell the same story as the evidence presented at trial). Consequently, the state habeas court was not unreasonable in its determination that Petitioner's experts' testimony and the documentary postconviction evidence on Petitioner's mental health was largely cumulative of that presented at trial and is not sufficient to establish prejudice.

Finally, as to this purportedly new evidence, this Court notes that the "circumstances surrounding the crimes [Petitioner]

committed . . . would have undermined the probative value of this additional evidence." Raheem, 995 F.3d at 926 (concluding the state habeas court did not unreasonably weigh evidence of the petitioner's brain damage against the aggravating evidence introduced which showed calculation, planning, and efforts to conceal the crimes). Against Petitioner's experts' testimony that he lacked sound judgment, good decision-making skills, and healthy impulse control (Doc. 38, Attach. 1 at 264; see also Doc. 38, Attach. 2 at 164, 173-74, 177), the record reveals that Petitioner had "extensive opportunities to consider his actions" as over several hours he and Mr. Stinski broke into multiple cars and another home, tortured and murdered Ms. Pittman and Kimberly, and burned down the Pittman residence, destroying evidence of their crimes in the process. Raheem, 995 F.3d at 926.

Opening the Door to Damaging Evidence

As for Dr. Schwartz-Watts, the state habeas court found that her testimony was also "aggravating." (Doc. 52, Attach. 8 at 118.) In particular, the state habeas court noted that Dr. Schwartz-Watts testified Petitioner was under the delusion he was a serial killer. (Doc. 52, Attach. 8 at 117; Doc. 38, Attach. 1 at 277.) The state habeas court also highlighted that Dr. Schwartz-Watts confirmed that there was "no question" Petitioner "[knew] right from wrong." (Doc. 52, Attach. 8 at 117; Doc. 38, Attach. 1 at 261-62.) Going further, this Court notes that Dr. Schwartz-Watts

testified that Petitioner told her that his hallucinations had "nothing to do with this crime[,]" and that they did not tell him to do it. (Doc. 38, Attach. 1 at 278.)

As previously mentioned, Petitioner argued it was unreasonable for the state habeas court to discount all of the expert testimony because it would have opened the door to "aggravating evidence." (Doc. 109 at 84.) Petitioner specifically takes issue with the state habeas court and Respondent taking Dr. Schwartz-Watts's comment about Petitioner believing he was a serial killer out of context. (Id. at 85 n.27.)

Again, "[b]oth the Supreme Court and [the Eleventh Circuit] have consistently 'rejected [the] prejudice argument [ ] where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence.'" Dallas, 964 F.3d at 1310-11 (citation omitted). In fact, "in addition to there being no per se rule of prejudice based on unpresented mental-health evidence, '[the Eleventh Circuit has] held that "the indication of brain damage . . . can often hurt the defense as much or more than it can help."'" Pye, 50 F.4th at 1052 (citations omitted). Thus, it was not unreasonable for the state habeas court to consider how Dr. Schwartz-Watts's testimony could have been damaging or used as a two-edged sword.[20] In the Court's opinion, it is particularly

---

[20] This Court notes that neither Dr. Cunningham's nor Ginger's testimony was devoid of similarly injurious testimony. For

incredible for Petitioner to suggest he was prejudiced by trial counsel's failure to rebut the State's argument that Petitioner "knew right from wrong" and "was not psychotic" due to trial counsel's failure to retain a mental health expert and investigate the two-year gap when his own mental health expert testified to the same effect at the state habeas proceeding. (Doc. 109 at 71.)

Aggravating Factors

Finally, when evaluating whether Petitioner was prejudiced by trial counsel's investigation into the two-year gap, the state habeas court noted that Petitioner failed to show a reasonable probability of a different outcome when weighing "the truly heinous nature of Petitioner's crimes" against the newly acquired evidence presented in the state habeas proceedings and that presented at trial. (Doc. 52, Attach. 8 at 106.) This conclusion was not unreasonable.

---

example, Dr. Cunningham testified Petitioner suffered from polysubstance abuse and dependence and that his drinking and drug use intensified in the months leading up to the crimes. (Doc. 38, Attach. 4 at 66, 79.) Dr. Cunningham recounted that Petitioner reported "drink[ing] until he was on the ground, puking, and then would drink some more, until there wasn't any left. He was smoking marijuana . . . one to three times monthly, sometimes laced with opium[.]" (Id. at 79.) Ginger also testified to her drug use with Petitioner. (Doc. 38, Attach. 2 at 142-43.) The Eleventh Circuit has been clear that "evidence of drug and alcohol use is often a 'two-edged sword,' that provides an independent basis for moral judgment by the jury." Sochor, 685 F.3d at 1032 (quoting Suggs v. McNeil, 609 F.3d 1218, 1231 (11th Cir. 2010)).

"In a case challenging a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1353 (11th Cir. 2011) (quoting Strickland, 466 U.S. at 695, 104 S. Ct. at 2069). When assessing prejudice, a court must reweigh the evidence in aggravation against the totality of the available mitigation evidence presented at trial and in the habeas proceeding, including the good and the bad. Holsey, 694 F.3d at 1268; Dallas, 964 F.3d at 1306. The Eleventh Circuit has "repeatedly held that even extensive mitigating evidence wouldn't have been reasonably likely to change the outcome of sentencing in light of a particularly heinous crime and significant aggravating factors." Pye, 50 F.4th at 1049.

Here, the evidence of Petitioner's guilt was overwhelming and highly aggravating. As the Court set forth at the beginning of this order, the Georgia Supreme Court thoroughly described the actions of Petitioner and Mr. Stinski. Setting aside the disputed evidence introduced in Petitioner's letter to Mr. Bowen, the jury heard Petitioner's statement to police where he described cutting the power to the victims' residence before burglarizing it; beating and stabbing Ms. Pittman by flashlight for about an hour as she pleaded "Why? Why?" all while her thirteen-year-old daughter

Kimberly was guarded by Mr. Stinski in the next room; and binding, stabbing, beating, and throwing bricks at Kimberly before setting the residence on fire and leaving her to burn alive. O'Kelley, 284 Ga. at 770-71, 670 S.E.2d at 399-400. "With crimes like this one, that are 'carefully planned, or accompanied by torture, rape or kidnapping,' [the Eleventh Circuit has] often held 'that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence.' " Boyd, 592 F.3d at 1297 (citations omitted). In summary, "[n]either the court's weighing of these factors nor its ultimate prejudice determination was contrary to or based on an unreasonable application of federal law, or based on an unreasonable determination of the facts." Pye, 50 F.4th at 1043.

Based on the foregoing, the Court concludes the state habeas court reasonably determined that Petitioner failed to show that his trial counsel's investigation of the two-year gap was deficient. Moreover, the state habeas court reasonably concluded Petitioner failed to show he was prejudiced. Accordingly, the state habeas court's decision regarding trial counsel's investigation into the two-year gap was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

c.   Jail Records

i.   Deficiency

The state habeas court determined that trial counsel reasonably decided against presenting Petitioner's jail records as evidence of his mental state because they included evidence that contradicted trial counsel's prison adaptability strategy. (Doc. 52, Attach. 8 at 124-25.) Petitioner contends the state habeas court "unreasonably applied Strickland" to conclude trial counsel's failure to introduce these records "was part of a reasonable tactical decision" because trial counsel abandoned their prison adaptability strategy, showing the state habeas court's reasoning was merely post-hoc rationalization. (Doc. 109 at 66-67.) Petitioner asserts trial counsel admitted the jail records would have been useful and consistent with their penalty phase strategy. (Id. at 66-67, 67 n.21 (citing Doc. 38, Attach. 3 at 110-11).)

As an initial matter, "[t]he question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." Fotopoulos v. Sec'y, Dep't of Corr., 516 F.3d 1229, 1233 (11th Cir. 2008). Therefore, rather than being an unreasonable application of Strickland, Petitioner's argument seems to address whether the

109

state habeas court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

The state habeas court's finding that part of trial counsel's strategy was to show Petitioner could adapt to a prison environment was not unreasonable or clearly and convincingly erroneous. While trial counsel may have decided against presenting Dr. Grant's testimony regarding prison adaptability, there is no evidence in the record that trial counsel abandoned its strategy to show that Petitioner could make an adequate adjustment to prison life. In the Court's opinion, trial counsel's decision to forgo Dr. Grant's testimony shows the opposite is true; trial counsel aimed to refrain from introducing any evidence that showed the jury could not safely put Petitioner in prison for the rest of his life. (Doc. 38, Attach. 3 at 209-10). In fact, Mr. Edwards confirmed during the state habeas proceedings that he mentioned Petitioner's status at Coastal Georgia during his closing argument to emphasize that Petitioner could be stabilized if he was in a highly structured environment and that he did not want to introduce evidence of Petitioner's violent behavior. (Id. at 93, 120.)

Having found prison adaptability was part of trial counsel's strategy, Petitioner has not rebutted the state habeas court's finding that trial counsel's decision against introducing Petitioner's aggravating jail records was to avoid introducing evidence that would contradict their strategy. Accordingly, the

110

state habeas court reasonably concluded that trial counsel's strategic decision was not unreasonable, and the state habeas court's decision was not based on an unreasonable determination of facts. See Rhode, 582 F.3d at 1286 ("Counsel's decision not to introduce [petitioner's] [adolescent hospital records] and juvenile probation records at trial was strategically reasonable because the jury could have seen them as aggravating and inconsistent with counsel's argument that [petitioner] could adapt to prison.").

ii. Prejudice

For similar reasons, even if trial counsel had performed deficiently, Petitioner was not prejudiced by trial counsel not introducing evidence of his mental health issues through his jail records. Along similar lines, the state habeas court found Petitioner failed to demonstrate he was prejudiced by trial counsel not presenting his jail records as they were aggravating and could have opened the door to evidence that contradicted the prison adaptability strategy. (Doc. 52, Attach. 8 at 125-27.) Petitioner again argues it was "completely unreasonable" for the state habeas court to conclude Petitioner was not prejudiced by trial counsel's failure to introduce his jail records because they abandoned prison adaptability as a strategy. (Doc. 109 at 86.)

The Court has already explained that there is no evidence that trial counsel abandoned its prison adaptability strategy, and

111

evidence that Petitioner had been cited for infractions like fighting, possessing drugs, and destroying state property could certainly have been used as a two-edged sword. (Doc. 52, Attach. 8 at 124-26.) Therefore, the state habeas court reasonably determined the jail records could have opened the door to damaging evidence, and Petitioner was not prejudiced by the failure to introduce such evidence.

Based on the foregoing, the Court concludes the state habeas court reasonably determined that trial counsel were not deficient for failing to present his jail records. Further, even if trial counsel had performed deficiently, the state habeas court reasonably concluded that Petitioner failed to show prejudice. Accordingly, the state habeas court's decision regarding presenting Petitioner's jail records was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

    d.   <u>Neuropsychological Impairments</u>

Petitioner maintains his arguments were that "trial counsel were ineffective for failing to investigate and present evidence of [Petitioner's] mental illness[,]" that "[t]rial counsel acted unreasonably in hiring Dr. Grant because they narrowed his frame of inquiry to prison adaptability[,]" and that trial counsel "should have presented an expert to testify on [Petitioner's] neuropsychological impairments, as Dr. Fiano did at state habeas."

112

(Doc. 109 at 68, 69, 70.) As a result, Petitioner argues that the state habeas court's findings regarding trial counsel's decision against having Dr. Grant testify or to hire Dr. Grant instead of Dr. Fiano or Dr. Cunningham are irrelevant. (Id. at 68-70.) In the Court's view, the state habeas court addressed Petitioner's claims that "[t]rial counsel unreasonably failed to replace Dr. James Maish with a mental health expert" and unreasonably failed to present a neuropsychologist who could explain the "indications in Dr. Grant's neuropsychological testing of significant organic brain impairment. . . ." (Doc. 51, Attach. 20 at 30, 32-33.) The state habeas court merely rejected Petitioner's claim that trial counsel failed to hire a mental health expert replacement and explained why trial counsel's ultimate decision to not have him testify was reasonable. (Doc. 52, Attach. 8 at 88.) Notwithstanding, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," the Court need not address both prongs. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. Accordingly, even though, as explained above, the Court found Petitioner did not successfully rebut the state habeas court's factual finding that trial counsel retained Dr. Grant as a mental health expert, the Court finds that the state habeas court reasonably determined that Petitioner was not prejudiced by the omission of Dr. Fiano's findings about

Petitioner's neuropsychological impairments. (Doc. 52, Attach. 8 at 102.)

When the state habeas court evaluated whether Petitioner was prejudiced by trial counsel's failure to present Dr. Fiano's findings, the state habeas court indicated that Dr. Fiano did not communicate with Dr. Grant when considering her evaluation of Dr. Grant's testing and notations. (Id. at 103.) Further, while Dr. Grant purportedly did not assess some aspects of frontal lobe executive functioning like concept formation and hypothesis generation, the state habeas court noted that Dr. Fiano's own testing revealed Petitioner "performed quite well on tasks assessing hypothesis generation, problem solving, and cognitive flexibility[.]" (Id. at 103-04.) The state habeas court also found Dr. Fiano's conclusions regarding Petitioner's working memory and cognitive process conflicted with evaluations Petitioner received over the years indicating his memory was good and his cognitive process was intact. (Id. at 104-05.) Given the conflicting nature of her findings regarding Petitioner's executive functioning, the state habeas court concluded there was no reasonable probability the result of the proceeding would have been different. (Id. at 105.) The state habeas court also noted that there was no indication trial counsel would have called Dr. Fiano to testify given her exposure to the same aggravating facts to which Dr. Grant was privy. (Id.)

114

Like Dr. Schwartz-Watts and Dr. Cunningham, Petitioner argues the state habeas court unreasonably applied Strickland because it "unreasonably discounted Dr. Fiano's testimony to conclude that [Petitioner] was not prejudiced by trial counsel's failure to present evidence of organic brain dysfunction." (Doc. 109 at 81-82.) According to Petitioner, the Court should reject the state habeas court's assessment of Dr. Fiano's testimony because the state habeas court made an erroneous factual determination regarding Dr. Fiano's communication with Dr. Grant about his evaluation. (Id. at 82.) Also, Petitioner maintains it was unreasonable for the state habeas court to consider other provider's cursory mental status exams "conflicting" with Dr. Fiano's neuropsychological tests because they are not comparable tests, and it was unreasonable to discount her findings about his executive functioning on this ground. (Id.) Petitioner again argues the state habeas court unreasonably discounted Dr. Fiano's testimony because it would have opened the door to aggravating evidence. (Id. at 84 (citing Doc. 52, Attach. 8 at 105).)

Petitioner is correct that Dr. Fiano eventually discussed Dr. Grant's evaluations with him. (Doc. 41, Attach. 2 at 266-67.) Despite the state habeas court's misstatement regarding Dr. Fiano's contact with Dr. Grant, the Court will not ignore the state habeas court's assessment of Dr. Fiano's testimony. Pye, 50 F.4th at 1035 ("[E]ven if a petitioner successfully carries his burden

under § 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under § 2254(d)(2)[.]"). The state habeas court's mistake regarding Dr. Fiano's communication with Dr. Grant was just one aspect of the state habeas court's assessment.

As for the state habeas court's consideration of the findings regarding Petitioner's memory and cognitive functioning, the state habeas court heard Dr. Fiano's explanation of the differences between the memory tests. (Doc. 38, Attach. 2 at 191-93.) When questioned about why her findings did not conflict with earlier findings that Petitioner's memory and cognition were intact, Dr. Fiano explained that it was because those tests were conducted in a matter of minutes compared to her neuropsychological evaluation looking at a longer period of time. (Id.) Having heard Dr. Fiano's explanation, the state habeas court still found that there was some conflict between her findings and Petitioner's earlier medical records. (Doc. 52, Attach. 8 at 104-05.) While Petitioner may disagree with the state habeas court's assessment on the importance of this matter, he has not shown the factual finding that Dr. Fiano's results conflicted with earlier results was unreasonable or clearly and convincingly erroneous. Pye, 50 F. 4th at 1050 ("[I]t was not clearly and convincingly erroneous (or unreasonable more generally) for the state court to view the

116

evidence of Pye's alleged brain damage as conflicting and to question the severity of the condition it reflected."). Thus, as previously discussed in Analysis Section I.D.1.b.ii., it was not unreasonable for the state habeas court to give some weight in its prejudice determination to the fact that Dr. Fiano's findings on Petitioner's executive functioning conflicted with other evidence in the record. Id. at 1045. Moreover, even if this assessment was unreasonable, Petitioner does not dispute that Dr. Fiano was exposed to some of the same aggravating information as Dr. Grant, and as explained in Analysis Section I.D.1.a.ii, this, along with the extensive aggravating facts in this case, further negate a finding of prejudice.

      2.   <u>Childhood and Background</u>

          a.   <u>Incest and Sexual Trauma Expert</u>

              i.   <u>Deficiency</u>

Petitioner argues that trial counsel unreasonably failed to investigate and present evidence that he was the victim of incest at the hands of his mother. (Doc. 109 at 87–89.) Petitioner contends they could have delivered this information if they had taken "the necessary steps." (Id. at 89.) Had trial counsel sufficiently investigated evidence of incest, Petitioner contends trial counsel would have discovered additional witnesses willing to testify about the inappropriate behavior they had witnessed between Petitioner and his mother and records revealing that

Petitioner's mother reported a history of incest in their family. (<u>Id.</u> at 90-91.)

Regarding both incest by his mother and sexual abuse by his stepfather, Petitioner also contends trial counsel performed deficiently because they neglected to hire an expert to investigate, confirm, and explain the incest and other sexual abuse. (<u>Id.</u> at 91, 100.) As a result, Petitioner argues trial counsel presented no evidence of incest and only lay witness testimony of sexual abuse. (<u>Id.</u> at 103.) Petitioner recounts in detail the testimony experts like Dr. Cunningham and Dr. Hodges could have offered. In summary, an expert could have testified that Petitioner's mother sexually assaulted him from a young age and increased her efforts in the months leading up to the crimes, which was a "long way" from what the jury heard about emotional incest, and about the effects it had on him. (<u>Id.</u> at 92-93, 105-07.) Trial counsel could have also presented a convincing expert's explanation for Petitioner's inappropriate, and sometimes violent, behavior and why it corroborated allegations of sexual abuse. (<u>Id.</u> at 104-05.)

As part of its overarching finding that trial counsel conducted a reasonable mitigation investigation, the state habeas court considered that "trial counsel attempted to locate a sexual trauma expert" and determined that "trial counsel conducted a thorough investigation into the possibility that Petitioner had an

incestuous relationship with his mother." (Doc. 52, Attach. 8 at 31, 49, 51, 53 ("As the above findings establish, trial counsel conducted an extensive and thorough mitigation investigation" that "was reasonable.").)[21] Regarding a sexual trauma expert, the state habeas court determined that trial counsel attempted to locate an expert to assist in the case by emailing individuals and obtaining recommendations from Ms. Leonard, but they were never able to locate anyone willing to work on the case. (Id. at 48-49.) The state habeas court noted, and Mr. Beauvais testified, that trial counsel tried "very hard to find somebody," but "[a]nybody [he] talked to indicated they just weren't taking new cases and weren't willing to be involved." (Doc. 52, Attach. 8 at 50; Doc. 38, Attach. 3 at 206.) As for incest, the state habeas court found trial counsel lacked a strong enough factual basis to go to the trial judge for funds for an expert. (Doc. 52, Attach. 8 at 50.) Trial counsel had investigated the issue and uncovered several troubling interactions, but they were "never able to develop any

---

[21] While Petitioner raised two separate claims, the state habeas court evaluated the findings Petitioner complains about in relation to its finding that trial counsel conducted a reasonable mitigation investigation. (See Doc. 109 at 133 (citing Doc. 52, Attach. 8 at 50-51)); Wilson, 138 S. Ct. at 1191-92 ("Deciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims[.]' ").

concrete evidence of an incestuous relationship" because "they were unable to get Petitioner or his mother to admit to having an incestuous relationship." (Id. at 50-51.)

Petitioner contends the state habeas court's findings regarding incest reflect an unreasonable determination of fact and an unreasonable application of law under Strickland. (Doc. 109 at 133.) Petitioner argues the state habeas court's finding that there was no concrete evidence or acknowledgement of incest by Petitioner or his mother is belied by the record and an unreasonable factual determination. (Doc. 109 at 87-88, 133-34; Doc. 112 at 26.) Petitioner further argues the state habeas court's finding that trial counsel's investigation was "thorough" was "legally and factually" unreasonable because "they failed to take the necessary steps-like retaining an expert-to deliver that information to the jury." (Doc. 109 at 135.)

Petitioner points to several pieces of evidence to dispute the state habeas court's finding that trial counsel were unable to elicit an admission from Petitioner or his mother about incest. First, Petitioner points to an email exchange between trial counsel on December 22, 2003, where Mr. Beauvais wrote:

Guys —

I met with Dorian today and told him about the success of our trip to Texas.

I followed up on our suspicions concerning his relationship with his mother. He confirmed that we were

right. It stretches back to at least when they were
living in Lancaster and I think around the time of the
Parkland admission.

He gave me a lead on a very strange incident which if we
can confirm will give us some very solid evidence of
this inappropriate relationship. We need to keep this
very close to our chests until we have gotten everything
we can from Carolyn.

(Doc. 44, Attach. 5 at 57.) Petitioner also relies on trial

counsel's notes from the same day - December 22, 2003 - in which

the following was noted: "kissing on you," "open mouth kiss," "oral

sex > both ways," "sex intercourse → 2x-3x total," "intimidated

by her," and "she can be totally different people changes very

quickly." (Doc. 44, Attach. 6 at 201.) Petitioner further points

to notes from a meeting with Dr. Grant where he wrote: "wife

thought he was f[ ]ing mom - he and mom had sex accendental [sic]

- when 15/16 both drunk high - [indecipherable] drink drunk -

French kiss." (Doc. 44, Attach. 5 at 150.) In his reply, Petitioner

also points out that trial counsel wrote, "[w]hen in Texas, got $

to move, because she was sexually abusing Dorian," in notes from

their interview with Petitioner's father on October 4, 2005. (Doc.

112 at 30 (citing Doc. 44, Attach. 6 at 9).) Finally, Petitioner

relies on Petitioner's mother's comments about incest to mental

health providers and Petitioner's wife's report that Petitioner

and his mother shared a bed. (Doc. 109 at 88.)

On the other hand, during the state habeas evidentiary

hearing, Mr. Edwards testified trial counsel investigated the

issue of an incestuous relationship between Petitioner and his mother, but they were never able to get Petitioner or his mother to admit it. (Doc. 38, Attach. 3 at 53.) Mr. Edwards explained that they communicated with Petitioner and his mother to see if either would speak about it and researched areas of medicine and psychology to see if they could link symptoms Petitioner experienced to incest. (Id. at 53-54.) Since they could not establish physical incest, Mr. Edwards explained they wanted to explore emotional incest as part of their mitigation presentation. (Id. at 54.) Mr. Edwards noted they were still able to present this theory along with circumstantial evidence of incest for the jury's consideration. (Id. at 78.) This included testimony from Mr. Goldsmith, Dr. Negrin, and Ms. Collins. (Id. at 79-81.)

Mr. Beauvais echoed Mr. Edwards's sentiments that they had circumstantial evidence but lacked hard evidence. Mr. Beauvais emphasized: "We could not break [Petitioner] to give us that information. We couldn't get any other witnesses other than to tell us some very bizarre and inappropriate situations." (Doc. 41, Attach. 1 at 263.) "[W]e could not come up with, through family members, through client, through our client's mother, anybody that was willing to make an admission." (Doc. 38, Attach. 3 at 207.) He explained that "although [they] had very significant suspicions regarding . . . [incest,] . . . [they] were never able to get a

strong enough factual basis to make those claims to go to the Court to get money." (Id. at 206.)

Further, during the state habeas proceeding, Dr. Cunningham confirmed his understanding was that "Petitioner never reported having sex with his mother until [the] habeas proceeding[,]" and Dr. Cunningham did not attempt to verify whether this occurred with Petitioner's mother or his brother. (Doc. 38, Attach. 4 at 223-24, 227.) Respondent also introduced evidence of trial counsel's assessment of Petitioner's case on February 3, 2005, during a death penalty seminar. (Doc. 45, Attach. 4 at 125.) In the letter, which is dated after the email Petitioner describes as the "most striking confirmation" of his disclosure (Doc. 112 at 29), trial counsel indicated they believed Petitioner was the victim of an incestuous relationship with his mother, although they were unable to prove it. (Doc. 45, Attach. 4 at 127.)

Trial counsel's notes and correspondence clearly document suspicion of an inappropriate relationship that trial counsel testified to, but they do not document an admission of incest by Petitioner or his mother. Furthermore, the additional "concrete" evidence Petitioner refers to, including Petitioner's mother's comment about incest to mental health care providers and Petitioner's wife's report that Petitioner and his mother shared a bed, contained no evidence of actual sexual conduct between Petitioner and his mother. Considering this evidence and trial

123

counsel's definitive testimony that they could not obtain an admission about the abuse, reasonable minds could certainly disagree about the state habeas court's factfinding in question, Brumfield v. Cain, 576 U.S. 305, 314, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015), and the Court rejects Petitioner's argument that the state habeas court's factual finding was unreasonable or clearly and convincingly erroneous. See Raheem, 995 F.3d at 928-29 (finding petitioner had not clearly and convincingly rebutted state habeas court's factual finding that mental health expert did not tell trial counsel that the petitioner was incompetent considering trial counsel's unequivocal testimony to that effect).

Having addressed the factual determination above, the Court concludes the state habeas court's decision regarding trial counsel's investigation of incest was not based on an unreasonable determination of facts. Nor was it an unreasonable application of clearly established federal law. "[T]he scope of the duty to investigate mitigation evidence is substantially affected by the [Petitioner's] actions, statements, and instructions." Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1357 (11th Cir. 2009). Trial counsel could not have been expected to continue investigating an incestuous relationship and present evidence of it when Petitioner did not confirm such abuse with them. See Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999) ("An attorney does not render ineffective assistance by failing to

discover and develop evidence of childhood abuse that his client does not mention to him."); Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1215 (11th Cir. 2007) ("[Trial counsel's] failure to present evidence of [the petitioner's] alleged abuse was not deficient because [petitioner] did not inform [trial counsel] of this abuse."). As previously mentioned, Petitioner also argues it was unreasonable to conclude trial counsel's investigation into incest was thorough because they failed to retain a sexual trauma expert. For the reasons explained below, this argument also fails.

Rather than explaining why the state habeas court's decision regarding a sexual trauma expert was an unreasonable application of Strickland or based on an unreasonable determination of facts, Petitioner primarily repeats his arguments about why trial counsel's performance was deficient. Nevertheless, although unclear, the Court discerns that Petitioner contends the state habeas court's conclusions were unreasonable because trial counsel's search was cursory and they did not follow up with the suggested experts. (Doc. 109 at 100-02, 102-03 n.33.) Petitioner also seemingly argues that the state habeas court's finding that trial counsel did not believe they had a sufficient basis to go to the trial judge for funds to secure an expert was unreasonable because trial counsel simply needed an expert to confirm the factual basis they already had and the trial judge was generous in providing expert funds. (Id. at 102-03 n.33.)

125

On February 18, 2005, Mr. Beauvais emailed Kathy Wayland explaining trial counsel were searching for an expert to do "not only the 'standard' evaluation[,] but [someone who] is also very versed in sexual abuse and its effects." (Doc. 39, Attach. 9 at 48.) On March 4, 2005, Mr. Beauvais emailed Connie Best seeking input on where he could find an appropriate expert after alerting her about the sexual abuse concerns in the case. (Id. at 49.) Ms. Best declined but suggested Dr. Ted Villeponteau. (Id.) On March 7, 2005, Mr. Beauvais noted that Ms. Leonard recommended Charles Woods, a psychiatrist on staff at Morehouse Medical School, as a source and potential expert. (Id. at 51.) She also advised John Briere was an expert in sexual trauma and its effects and would be an excellent point for references, although he would not do the case. (Id.) Mr. Beauvais had apparently already contacted Dr. Briere on March 4, 2005, advising him they were seeking an expert on sexual trauma and inquiring whether he could offer any assistance or referrals. (Doc. 44, Attach. 5 at 72-73.) Dr. Briere responded that he was not available but suggested Dr. Catherine Ehrlich. (Id. at 72.)

Mr. Beauvais testified about contacting Ms. Wayland, Dr. Best, Dr. Villeponteau, Dr. Brierre, and Dr. Ehrlich. (Doc. 38, Attach. 3 at 203-06.) Mr. Beauvais confirmed that Dr. Best and Dr. Briere declined, and he could not recall whether he contacted or received a response from Ms. Wayland, Dr. Villeponteau, or Dr.

Ehrlich. (Id.) Regarding Dr. Ehrlich, Mr. Beauvais testified that he suspected that he contacted her because they were "trying very hard to find somebody[.]" (Id. at 206.) He also "recal[led] in general being frustrated that [he] was never able to find anybody that [he] could get to work on the case. Anybody [he] talked to indicated they just weren't taking new cases and weren't willing to be involved." (Id.) With respect to suspicions of incest, Mr. Beauvais further explained that "although [they] had very significant suspicions regarding . . . [incest,] . . . [they] were never able to get a strong enough factual basis to make those claims to go to the Court to get money." (Id.)

While Petitioner claims there is no evidence trial counsel followed up with several experts, the record, at most, is ambiguous as to whether trial counsel followed up on the numerous inquiries they made. "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, 'where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.' " Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (citations omitted); see also Gissendaner, 735 F.3d at 1331 ("[Petitioner], who has the burden of proof and persuasion, cannot benefit from . . . trial counsel's lack of recollection years after the fact."). Facing multiple

rejections and, in particular, considering Petitioner's failure to substantiate suspicions of incest, some fair-minded jurists could conclude that trial counsel's efforts fell within the wide range of reasonable professional assistance. Holsey, 694 F.3d at 1257. Additionally, while trial counsel may have suspected an incestuous relationship existed and the trial judge was generous in providing expert funds (Doc. 38, Attach. 2 at 204), it remains true that trial counsel reasonably tried but failed to find a sexual abuse expert warranting a request for funds.

All in all, neither the state habeas court's findings about the incest investigation or retaining a sexual trauma expert nor its ultimate findings with respect to trial counsel's reasonable mitigation investigation was unreasonable. Consequently, Petitioner's arguments that trial counsel were ineffective by failing to investigate and present evidence that Petitioner was the victim of incest and failing to retain a sexual trauma expert must fail.

ii. Prejudice

The state habeas court did not address the prejudice component when determining that trial counsel's mitigation investigation was reasonable or when determining that trial counsel attempted to investigate allegations of incest and retain a sexual trauma expert. E.g., Ferrell, 640 F.3d at 1226 ("[The Georgia Supreme Court's] analysis stopped after determining only that the [] lawyer

128

performed reasonably."). And while a court need not address both components of an ineffective assistance claim if the petitioner makes an insufficient showing on one, Reaves v. Sec'y, Fla. Dep't of Corr., 872 F.3d 1137, 1151 (11th Cir. 2017) (quoting Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)), the Court finds that even if trial counsel's mitigation investigation were not reasonable and they had performed deficiently by failing to investigate and present evidence of incest and by failing to retain a sexual trauma expert, Petitioner has not shown he was prejudiced by these errors. Id. ("[W]hen a state court's decision on an ineffective assistance claim clearly rests on only one prong of the Strickland test, we conduct a plenary [de novo] review of the other one, if necessary." (first citing Johnson v. Sec'y, DOC, 643 F.3d 907, 930 (11th Cir. 2011); and then citing Rompilla v. Beard, 545 U.S. 374, 390, 125 S. Ct. 2456, 2467, 162 L. Ed. 2d 360 (2005))).

This evidence was at least partially cumulative.[22] Pye, 50 F.4th at 1054 (finding "[f]urther evidence from corrections

---

[22] Petitioner argues the state habeas court's finding that the evidence elicited in the state habeas proceedings was largely cumulative is unreasonable because there is no comparison between "emotional incest" and "rape at the hands of a child's mother[.]" (Doc. 109 at 143, 144-45, 147.) However, the state habeas court was not evaluating whether Petitioner was prejudiced by trial counsel's failure to investigate and present evidence of incest or their failure to retain a sexual abuse expert or whether evidence of incest was largely cumulative on the pages Petitioner references. (Id. at 146 (citing Doc. 52, Attach. 8 at 59, 87).)

officers as to [petitioner's] nonviolent nature [presented at the state habeas proceeding] would have been at least partially cumulative[]" of his family members' testimony that he was not violent and kind). As detailed above, Dr. Cunningham presented evidence at the state habeas proceedings about the timeline and extent of Petitioner's mother's sexual abuse. (Doc. 38, Attach. 4 at 79, 84-88.) Ginger also testified that she observed Petitioner's mother ask Petitioner to massage her and that Petitioner reported to her that his mother tried to kiss him. (Doc. 38, Attach. 2 at 98-99.)

Along similar lines, trial counsel presented circumstantial evidence of incest. Mr. Goldsmith testified at trial about emotional incest between Petitioner and his mother and the partnering dynamic he observed between them. (Doc. 33, Attach. 12 at 13-15.) Ms. Collins, who had family counseling sessions with Petitioner and his mother, recounted when Petitioner put his mother's head in his hands and another time when Petitioner kissed his mother on the mouth. (Doc. 34, Attach. 3 at 24-26.)

During the state habeas proceedings, Dr. Cunningham also presented evidence about the impact of sexual abuse on an individual and why Petitioner's reports were credible. (Doc. 38, Attach. 4 at 86-88, 139-41.) Dr. Hodges further testified that documentation from the Family Place that Petitioner had a limited understanding of boundaries, evidenced by grabbing the buttocks of

staff, kissing his peers, and goosing his peers, indicated "some inappropriate sexual behaviors ha[d] gone on" and that he had been taught offensive behavior was playful. (Doc. 38, Attach. 2 at 17, 28-30, 32.) She also testified that victims of childhood sexual abuse often suffer from insomnia, like Petitioner, and low self-esteem. (Id. at 42-43.)

At trial, the jury also heard about why Petitioner's reports were to be believed and how sexual abuse can affect a person emotionally. Ms. Richardson read from the same letter from The Family Place that Dr. Hodges referenced and indicated that staff believed "he'd been sexually abused because of some of the sexual touching that he was doing." (Doc. 33, Attach. 8 at 24-26.) Mr. Nabors also touched on the fact that victims of sexual abuse commonly wait to report sexual abuse due to guilt and shame. (Doc. 33, Attach. 11 at 68.)

Accordingly, there was evidence that Petitioner and his mother had an inappropriate relationship and some of the consequences of childhood sexual trauma. And, as explained in more detail below, trial counsel introduced evidence that Petitioner was sexually abused as a child by his stepfather, which Dr. Hodges, Petitioner's own expert, actually classified as incest. (Doc. 38, Attach. 2 at 39.) Although Petitioner's evidence of his mother's sexual abuse is unquestionably disturbing, this is not a case in which the jury was not aware that Petitioner had an inappropriate

131

relationship with his mother or was otherwise the victim of sexual abuse. Thus, to some extent, evidence that Petitioner's mother sexually abused him constitutes additional evidence supporting the "theme" that Petitioner was a victim of childhood sexual abuse and provided "more or better examples" of the sexual abuse that Petitioner faced. Holsey, 694 F.3d at 1260-61.

Even if this type of evidence were entirely "new," the "aggravating factors were overwhelming, and adding the allegation of sexual abuse would not have sufficiently changed the balance of those factors or given rise to a reasonable probability that the outcome would have changed." See Dallas, 964 F.3d at 1311. Accordingly, Petitioner has not shown prejudice resulted from the omission of evidence that his mother sexually abused him and other expert evidence about the consequences of childhood sexual trauma. Because the state habeas court reasonably determined that trial counsel performed adequately and now because he failed to show that he was prejudiced, Petitioner's claims that trial counsel were ineffective by failing to investigate and present evidence of incest and retain a sexual trauma expert fail.

b.   Sexual Abuse by Stepfather

Petitioner argues trial counsel planned to use Sharon Obregon, an employee at The Family Place who interacted with Petitioner and his family, to present corroborating evidence that Petitioner's stepfather sexually abused him, but they unreasonably

failed to replace her and present this testimony after she had a medical emergency that left her incapacitated. (Doc. 109 at 93-95, 139.) Petitioner contends a mitigation investigator could have assisted in this effort. (Id. at 95 n.31.) According to Petitioner, Mr. Ryter, a play therapist at The Family Place while Petitioner's family resided there, could have testified that Petitioner's mother reported to him that Petitioner was a victim of sexual abuse and that Petitioner's behavior was consistent with a child who had experienced sexual abuse. (Doc. 109 at 96; Doc. 38, Attach. 8 at 100, 103-04.) Additionally, Petitioner contends that Dr. Hodges, a social worker at The Family Place who was not on staff while Petitioner's family were residents, could have substantiated the abuse Petitioner suffered at the hands of his stepfather that was documented in a letter from The Family Place and commented on the effects of sexual abuse.[23] (Doc. 109 at 96-97; Doc. 38, Attach. 2 at 16-18.)

---

[23] Petitioner also argues trial counsel performed deficiently by undermining reports that Petitioner was sexually abused by his stepfather. (Doc. 109 at 97-100.) First, Petitioner faults trial counsel for presenting Ms. McLeod's testimony about Gilbert's improvements after living with his father - the man who allegedly abused Petitioner. (Id. at 98.) Second, Petitioner critiques trial counsel questioning the importance of whether the abuse actually occurred in their closing argument. (Id. at 99.) Comparing Petitioner's brief in the state habeas court (Doc. 51, Attach. 20), Petitioner's Application for Certificate of Probable Cause to Appeal (Doc. 53, Attach. 2), Petitioner's petition in this court (Doc. 1), and this Court's order on procedural default, cause and prejudice, and the fundamental miscarriage of justice (Doc. 104 at

Although Petitioner argues trial counsel performed deficiently because they failed to "reliably present evidence of sexual abuse," (Doc. 112 at 34 (emphasis omitted)), his arguments about why the state habeas court's decision was unreasonable concern the state habeas court's assessment of whether trial counsel were ineffective for failing to utilize mitigation specialists (Doc. 109 at 139-40 (citing Doc. 52, Attach. 8 at 65)). Regardless of which Petitioner intended to dispute, neither of the state habeas court's decisions was unreasonable.

As for finding a replacement for Ms. Obregon, the state habeas court considered and rejected Petitioner's claim that a mitigation specialist could have located Dr. Hodges. (Doc. 51, Attach. 20 at 25; Doc. 52, Attach. 8 at 64-65.) The state habeas court noted that Dr. Hodges lacked firsthand knowledge of Petitioner and, having only learned of Ms. Obregon's incapacity during voir dire, trial counsel did not have the time to locate another witness to replace her. (Doc. 52, Attach. 8 at 65.) The state habeas court also found Petitioner had failed to establish prejudice because Dr. Hodges's testimony would have been largely cumulative. (Id.)

According to Petitioner, the state habeas court determined "that it was not deficient not to find a replacement for" Ms. Obregon because Dr. Hodges lacked firsthand knowledge and trial

---

31-35), the Court concludes Petitioner failed to raise this claim and was not permitted to brief this issue.

counsel lacked time to replace Ms. Obregon. (Doc. 109 at 139-40 (citing Doc. 52, Attach. 8 at 65).) Petitioner maintains that these determinations are unreasonable because the state habeas court overlooked the fact that Mr. Ryter, who personally interacted with Petitioner, was available as a replacement for Ms. Obregon and the weeks that trial counsel delayed seeking to find a replacement after hearing no response from Ms. Obregon. (Id. at 140-41.)

The record supports the state habeas court's finding that trial counsel did not have time to find a replacement once they learned of Ms. Obregon's incapacity, and the Court finds that the state habeas court's decision that trial counsel did not perform deficiently was not unreasonable. On August 25, 2005, trial counsel filed a petition to secure Ms. Obregon's attendance as an out of state witness. (Doc. 50, Attach. 1 at 174-77.) On September 19, 2005, trial counsel sent Ms. Obregon a letter informing her that her testimony was "crucial to [their] efforts to save [Petitioner] from a death sentence." (Doc. 39, Attach. 9 at 35-36.) On October 14, 2005, trial counsel faxed a letter to the general counsel for The Family Place stating that they had "diligently and repeatedly" attempted to speak with Ms. Obregon, including leaving two messages and going by her apartment in Dallas, Texas, "earlier this week." (Id. at 41.) On October 21, 2005, the same day initial juror qualification began, trial counsel learned that Ms. Obregon had suffered a serious medical issue that left her unable to testify.

(Doc. 44, Attach. 2 at 82; Doc. 24, Attach. 23 at 1-3.) Mr. Edwards recalled "a lot of panic" when Ms. Obregon became unavailable but no effort to replace her. (Doc. 38, Attach. 2 at 224.)

Less than two months had passed between the time trial counsel sought to secure Ms. Obregon's attendance at trial and the date they learned she was incapacitated. Throughout this period, trial counsel regularly attempted to communicate with Ms. Obregon, by sending her a letter, making phone calls, and even going by her apartment in an entirely different state. (Doc. 39, Attach. 9 at 35-36, 41.) During his deposition, Mr. Beauvais testified that trial counsel had encountered witnesses that did not want to be involved, "especially in regard to some of the people out in Texas." (Doc. 41, Attach. 1 at 263-64.) Given trial counsel's experience with witnesses in the case, a reasonable attorney would not necessarily assume the worst and begin to look for a replacement, and it was not objectively unreasonable to persist in efforts to secure Ms. Obregon's attendance. Because courts are not required to assess "whether the state court considered and discussed every angle of the evidence," Pye, 50 F.4th at 1051 n.20, the state habeas court's decision was also not unreasonable merely because it failed to address Mr. Ryter as a replacement witness.[24]

---

[24] Beyond that, it is unclear why the state habeas court would have considered Mr. Ryter as a replacement witness when the only person Petitioner suggested as a replacement for Ms. Obregon in his brief was Dr. Hodges, and the only reference to Mr. Ryter was to the

Even if trial counsel had performed deficiently by failing to secure a mitigation expert who could have located Dr. Hodges or Mr. Ryter, the state habeas court reasonably determined Petitioner failed to show he was prejudiced because, for reasons similar to those explained in Analysis Section I.D.2.a.ii, supra, the evidence was largely cumulative. Petitioner asserts the state habeas court "unreasonably determined in multiple places that evidence introduced in the state habeas proceedings was 'largely cumulative of that presented at trial[.]' " (Doc. 109 at 146.) Because trial counsel undisputedly presented evidence that Petitioner was the victim of his stepfather's sexual abuse, Petitioner narrowly argues the state habeas court's determination was unreasonable because the jury did not hear substantiated evidence of his stepfather's sexual abuse and the impact of that abuse. (Id. at 142.)

Because Dr. Hodges had not interacted with Petitioner during his stay at The Family Place, she could only testify about reports that Petitioner's stepfather sexually abused him. (Doc. 38, Attach. 2 at 30, 39-40.) As previously mentioned, she also testified that documentation from The Family Place that Petitioner had a limited understanding of boundaries, evidenced by grabbing

---

fact that school records introduced at trial did not contain information regarding Mr. Varian's conversations with him. (Doc. 51, Attach. 20 at 26, 27-28.)

the buttocks of staff, kissing his peers, and goosing his peers, indicated "some inappropriate sexual behaviors ha[d] gone on" and that he had been taught offensive behavior was playful. (Id. at 17, 28-30, 32.) Dr. Hodges further presented evidence about how victims of childhood abuse often suffer from insomnia, like Petitioner, and low self-esteem. (Id. at 41-43.) Mr. Ryter submitted an affidavit confirming that Petitioner's mother reported to him that Petitioner was sexually abused and his behavior was consistent with a child who had experienced sexual abuse. (Doc. 38, Attach. 8 at 103-04.)

At trial, Ms. Connelly and Dr. Nagelberg both testified that Petitioner's stepfather sexually abused him by performing anal penetration on him, and Mr. Nabors testified that Petitioner reported that he had been sexually abused by his stepfather. (Doc. 33, Attach. 10 at 32; Doc. 33, Attach. 11 at 52-53; Doc. 34, Attach. 3 at 5-6.) Ms. Richardson read from the same letter from The Family Place that Dr. Hodges referenced and indicated that staff believed "he'd been sexually abused because of some of the sexual touching that he was doing." (Doc. 33, Attach. 8 at 24-26.) Adding additional credibility to Petitioner's allegations, Mr. Nabors, a social worker like Dr. Hodges, testified there were times when Petitioner expressed guilt and shame for being abused and explained it was "very common" for young victims of abuse to wait to report it until later in life because "[t]hey're usually so

riddled with guilt, feeling ashamed, they don't know who to turn to[.]" (Doc. 38, Attach. 2 at 10; Doc. 33, Attach. 11 at 41, 68.) Thus, the jury not only heard evidence that Petitioner was sexually abused from multiple sources, including Petitioner's mental health treatment providers, but they also heard about why Petitioner's reports were to be believed and some evidence of the impact of sexual abuse later in life.

Based on the foregoing, the Court concludes the state habeas court reasonably determined that trial counsel were not deficient by failing to secure a mitigation expert who could have located Dr. Hodges as a replacement for Ms. Obregon. Further, even if trial counsel had performed deficiently, the state habeas court reasonably concluded that Petitioner failed to show prejudice. Accordingly, the state habeas court's decision was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

Apart from the state habeas court's determination about mitigation specialists, it determined trial counsel were not deficient in their investigation and presentation of Petitioner's history of sexual abuse because they presented extensive evidence about the abuse and evidence that The Family Place's staff suspected Petitioner had been sexually abused because of his behavior. (Doc. 52, Attach. 8 at 69, 70-71.) The state habeas court also rejected Petitioner's argument that he was prejudiced because

Dr. Hodges was not a suitable replacement with firsthand knowledge like Ms. Obregon and her testimony was largely cumulative. (<u>Id.</u> at 72-73, 77-78.) The state habeas court further found it was not unreasonable to present this information through lay witnesses instead of an expert. (<u>Id.</u> at 79.)

As the Court previously noted, Petitioner's arguments regarding why the state habeas court's decision was unreasonable go to its decision about mitigation specialists. Even so, the Court notes that trial counsel were able to present much of the corroborating evidence that Petitioner contends was missing, as detailed above. After reviewing the evidence presented at trial and the state habeas hearing, this Court agrees with the state habeas court's determination that trial counsel's investigation and presentation of Petitioner's history of sexual abuse, even without Ms. Obregon's or another witness's corroborating testimony, was reasonable. <u>See</u> <u>Pittman v. Sec'y, Fla. Dep't of Corr.</u>, 871 F.3d 1231, 1252 (11th Cir. 2017) (rejecting petitioner's argument that trial counsel performed deficiently by "fail[ing] to uncover and present [] additional corroborating evidence" because "counsel is not required to track down every lead. And sexual abuse is no different.").

Again, even if trial counsel had performed deficiently by failing to present corroborating testimony, the state habeas court reasonably determined Petitioner failed to show he was prejudiced

because, for the reasons explained above, the evidence was largely cumulative. It also was not clearly and convincingly erroneous for the state court to find that Dr. Hodges had no personal knowledge of Petitioner, nor was it unreasonable for the state habeas court to give some consideration to the effect Dr. Hodges's testimony would have when evaluating whether Petitioner was prejudiced by trial counsel's failure to present her testimony. Finally, because Petitioner provides nothing other than a conclusory argument that Dr. Hodges's or Mr. Ryter's testimony would be more mitigating than the testimony from the professionals who testified at trial, the Court rejects this argument.

In conclusion, the state habeas court reasonably decided that trial counsel were not deficient in their investigation and presentation of Petitioner's history of sexual abuse and that he was not prejudiced. Petitioner failed to show that the state habeas court's decision was contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of facts.

      c.  <u>Physical and Emotional Abuse and Neglect by Petitioner's Mother</u>

      i.  <u>Deficiency</u>

Petitioner further argues trial counsel unreasonably failed to investigate and present a complete picture of his upbringing, which included physical and emotional abuse and neglect by

141

Petitioner's mother and evidence of her mental illness. (Doc. 109
at 108, 115.) Petitioner contends trial counsel failed to
meaningfully interview Gilbert, Petitioner's father, and Ginger
(id. at 116, 117 n.40); interview other witnesses like Ms. Chappell
and Mr. Ryter (id. at 120); follow up on records of Petitioner's
mother's mental health (id. at 114-15); present his friends as
witnesses (id. at 120); and elicit important information from
Gilbert on the stand (id. at 117, 119).[25] In his brief, Petitioner
recounts in detail the evidence he believes the jury did not hear
about Petitioner's mother's physical and emotional abuse, physical
neglect, drug use, bizarre and sexually inappropriate behavior,
and her own history of mental illness due to trial counsel's
deficient performance. (Id. at 108-15.)

The state habeas court's bottom line ruling was that trial
counsel reasonably investigated and presented evidence of the
dysfunctional, abusive, and neglectful environment in which
Petitioner and his brothers were raised and symptoms of
Petitioner's mother's mental illness. (Doc. 52, Attach. 8 at 80.)
Regarding trial counsel's investigation, the state habeas court

---

[25] To the extent Petitioner contends trial counsel performed
deficiently by failing to adequately prepare Gilbert or any other
defense witness to testify (Doc. 109 at 117-18), the Court found
Petitioner's claim that "[c]ounsel failed to adequately prepare
defense witnesses for their testimony . . ." should be dismissed
and informed him that he would not be permitted to brief this claim
because it was insufficiently pled. (Doc. 104 at 28-29, 29 n.5.)

credited the fact that trial counsel obtained CPS records from Texas and Georgia, interviewed individuals regarding the neglect of Petitioner's mother, and conducted a thorough investigation into Petitioner's mother. (Id.) When doing so, the state habeas court referenced its earlier findings that trial counsel's mitigation investigation was reasonable. (Id. ("As this Court previously detailed . . . .").)

As part of its overarching decision that trial counsel conducted a reasonable mitigation investigation into Petitioner's background, the state habeas court noted, among other considerations, that trial counsel attempted to locate and interview numerous witnesses who knew Petitioner and thoroughly investigated Petitioner's mother. (Id. at 31, 34-36, 38-39.) With respect to interviews, the state habeas court noted trial counsel met with and interviewed Petitioner's wife, brothers, father, and mother, who was trial counsel's "primary contact" and "provided extensive background information regarding Petitioner." (Id. at 35-36.) Regarding Petitioner's brothers, the state habeas court recognized that the information trial counsel sought from them was "on a much more limited level" because they were young. (Id. at 35.) The state habeas court further noted that trial counsel "conducted interviews with Amy and Ginger Norman and obtained some information relevant to the case," but did not find them to possess valuable information or be forthcoming. (Id. at 36.)

As for investigating Petitioner's mother, the state habeas court recognized that trial counsel researched but found no hospital or arrest records. (Id. at 39, 80.) The state habeas court also credited trial counsel for speaking with Dr. Andrew Brylowski and Lynorra Ratliff, some of her mental health providers; obtaining articles Dr. Brylowski authored about Petitioner's mother's treatment; and obtaining Petitioner's mother's mental health records following Petitioner's arrest. (Id. at 39, 39 n.13, 81.)

The state habeas court further ruled that trial counsel's selection of sentencing phase witnesses was reasonable. (Id. at 53.) The state habeas court determined that trial counsel decided against presenting Amy and Ginger Norman given their concerns about how they would react and come across to the jury. (Id. at 54.)

On review of trial counsel's presentation of Petitioner's background, the state habeas court recognized that they presented evidence that Petitioner's mother left him in a hot car as a child. (Id. at 81-82.) Through Ms. Connelly's and Ms. Griffin's testimony about CPS investigations, trial counsel presented evidence of the physical neglect and deplorable housing conditions that Petitioner and his brothers endured. (Id. at 82-83.) The state habeas court underscored trial counsel's presentation of Petitioner's mother's instability and abusive behavior through Gilbert and testimony about how she treated him. (Id. at 83-84, 85.) The state habeas court also noted that trial counsel presented information about

144

Petitioner's mother's mental health, including that she was depressed and anxious, made poor choices, had limited coping skills, and was barely able to take care of herself. (Id. at 85.) Further, the jury heard that Petitioner was his brothers' caretaker. (Id. at 84-85.)

Investigation

"Counsel representing a capital defendant must conduct an adequate background investigation, but it need not be exhaustive." Raulerson, 928 F.3d at 997 (citation omitted). "To determine whether 'trial counsel should have done something more' in their investigation, 'we first look at what the lawyer[s] did in fact.' " Id. (quotation omitted). However, "[t]he mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (quotation omitted). And "[c]ounsel is not required to pursue every path until it bears fruit or until all hope withers." DeYoung v. Schofield, 609 F.3d 1260, 1284 (11th Cir. 2010) (quotation omitted).

Accordingly, the Court first looks to trial counsel's efforts apart from conducting interviews and investigating Petitioner's mother, which included utilizing Ms. Richardson, collecting numerous school and CPS records, and collectively traveling three times to Texas and once to the Atlanta, Georgia, area. (Doc. 52, Attach. 8 at 31-33, 36-38.) From this research, trial counsel

145

created detailed timelines of Petitioner's life showing that he
"never had a chance from the beginning." (E.g., Doc. 44, Attach.
3 at 87, 87-103.)

As for interviews, Petitioner argues the state habeas court's
determination that trial counsel adequately investigated
Petitioner's background was unreasonable because the state habeas
court concluded trial counsel relied on Petitioner's mother, one
of Petitioner's abusers, as the chief source of information. (Doc.
109 at 135-36.) The Court disagrees. Petitioner's mother provided
trial counsel with a "detailed narrative" of Petitioner's
background and friends (Doc. 44, Attach. 3 at 215, 216-35), and
trial counsel's notes of their interviews with her are scattered
throughout the record (e.g., Doc. 44, Attach. 4 at 168, 170). And
while Mr. Edwards first said their contact with Petitioner's family
was principally with his mother (Doc. 41, Attach. 1 at 51-52), he
later clarified that they did not get information "principally
from her," and they uncovered much of the information they found
on their own (Doc. 38, Attach. 3 at 9-10). Regardless, Mr. Edwards
explained trial counsel were "able to follow up on a lot of
information that [they] received from her[,]" although "there were
other things that [they] couldn't necessarily learn from
her . . . [.]" (Doc. 41, Attach. 1 at 51-52.) Considering the
information that Petitioner's mother provided to trial counsel
that they used as a starting point for further investigation, it

146

was not unreasonable for the state habeas court to find trial counsel's investigation was not deficient based in part on the information Petitioner's mother provided to them, regardless of whether she was one of Petitioner's abusers or not.

Petitioner further argues that the state habeas court unreasonably determined the investigation was sufficient because trial counsel met with various individuals. (Doc. 109 at 136.) Petitioner asserts that merely meeting witnesses without asking "relevant and probing questions" is not enough to show an investigation was reasonable. (Id.) This argument is flatly contradicted by the record, which reveals that trial counsel either thoroughly interviewed witnesses or limited interviews for strategic reasons.

First, with respect to Petitioner's brother Gilbert, Mr. Edwards testified, and the state habeas court found, that they interviewed Petitioner's brothers, "but on a much more limited level because they were both young, one[] quite young[.]" (Doc. 41, Attach. 1 at 52; Doc. 52, Attach. 8 at 35.) Mr. Daly testified that he met with Gilbert at least once with his mother and once in Atlanta without his mother, although he only recalled some information he gathered from the interviews. (Doc. 38, Attach. 3 at 172-73.) Mr. Edwards testified that he spoke with Gilbert several times and that Gilbert even stayed at his home during Petitioner's trial. (Id. at 16-17.) Gilbert conveyed to Mr. Edwards

147

that "his mother was very disturbed[,]" although he did not know why as he was 16 or 17 at the time, and that she "behaved in irrational, inappropriate manners over the years." (Id. at 17.) Mr. Edwards also recalled Gilbert describing the hockey stick incident and Petitioner serving as a father figure and caretaker.[26] (Id. at 17-18.)

Although not entirely clear, Petitioner appears to question the reasonableness of trial counsel's strategic decision to limit their investigation, arguing that "speculation that eighteen-year-old Gilbert (his age at the time of trial) would not have testified identically to twenty-five-year-old Gilbert (his age at the time of state habeas) does not excuse trial counsel's inactions." (Doc. 112 at 43-44.) On the contrary, the fact that Gilbert was able to give detailed testimony at 25 does not show trial counsel's

---

[26] Although Gilbert did not recall Petitioner receiving medical treatment from the incident that occurred when he was approximately six years old (Doc. 38, Attach. 1 at 133-34), trial counsel's notes from meetings with Petitioner reveal that Petitioner informed them about the alleged incident and that he went to Parkland Hospital. (Doc. 44, Attach. 5 at 98, 104.) During his deposition, Mr. Edwards testified this led to them requesting and obtaining the records from Parkland Hospital, though he did not recall whether records evidenced the incident. (Doc. 41, Attach. 1 at 73-74.) During the state habeas proceeding, Respondent introduced trial counsel's letter to Parkland Hospital requesting "all records of treatment rendered while he was under your care[.]" (Doc. 41, Attach. 5 at 82.) These records contain no reference to a hospital visit with injuries consistent with a physical attack (id. at 82-94), and Petitioner has not otherwise cited to any. Thus, trial counsel did investigate the incident, but it appears their research failed to confirm the event as Petitioner described it.

assessment of his ability at the time of the investigation and the extent to which they could utilize him was incorrect. Gilbert was only nine years old when the family left Texas (Doc. 38, Attach. 1 at 201-02), and only "very vaguely" remembered living there (Doc. 34, Attach. 4 at 18). He was just 15 years old when Petitioner committed the crimes. (Doc. 38, Attach. 1 at 207.) Furthermore, the Court notes that even during the state habeas proceeding, 25-year-old Gilbert testified that he was nervous and, at times, got his "timeline backwards." (Id. at 148.) Dr. Cunningham, Petitioner's own expert, also testified that he did not "probe [Gilbert] very much" during his interview because "he was tense, pressured, anxious, [and] fragile[.]" (Doc. 38, Attach. 4 at 228.) Accordingly, the Court concludes that the record supports the state habeas court's finding that trial counsel limited the scope of the information they sought from Gilbert due to his age. Fotopoulos, 516 F.3d at 1233 ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct."); Williams, 185 F.3d at 1237 ("[A] decision to limit investigation is accorded a strong presumption of reasonableness."); White v. Singletary, 972 F.2d 1218, 1220 (11th Cir. 1992) ("Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight.").

Petitioner vastly underrepresents the extent of trial counsel's interviews with his father. Although Petitioner's father claimed that trial counsel "only asked [him] very little" about Petitioner's mother and Petitioner (Doc. 38, Attach. 8 at 73-74), trial counsel's notes from a two-hour meeting with Petitioner's father reveal the range of topics trial counsel explored (Doc. 44, Attach. 3 at 192). In fact, trial counsel's notes reference many of the topics that Petitioner's father covered in his affidavit, including that their two years of marriage were horrendous or torture, Petitioner's mother bought him a dog bowl, and Petitioner's mother never allowed visitation. (Compare Doc. 38, Attach. 8 at 68, 71, 73, with Doc. 44, Attach. 3 at 192-94.) On the other hand, Petitioner's father also revealed harmful information that Petitioner "attracted the worst of the neighborhood" when he lived with him and that if Petitioner had stayed with him, "it would have happened to [the] people across the street." (Doc. 44, Attach. 3 at 193.)

Finally, trial counsel's interview with Ginger was not as limited as Petitioner depicts. Ginger testified that she met with Mr. Daly once for 20 minutes and no one contacted her afterwards. (Doc. 38, Attach. 2 at 121-22.) Ginger recalled that Mr. Daly only asked her about the truthfulness of a witness's testimony and did not ask her any questions about her friendship with Petitioner, his life, or "any questions about [their] other friends, Amy or

Trent or anyone else[.]" (Id.) While Mr. Daly corroborated the brevity of the interview, he testified that he talked to her about Petitioner's wife, Ginger's sister Amy, Ms. Dahlquist, Mr. Gray, and a $10,000.00 reward related to the case. (Doc. 38, Attach. 3 at 156-58.) Mr. Daly did not recall conveying his impressions about Ginger to Mr. Edwards but testified that he might have. (Id. at 171.) Mr. Edwards remembered Mr. Daly's assessment of his interview with Ginger, explaining "we didn't find the information that [Mr. Daly] was getting from either [Ginger or Amy] to be valuable and they were not very . . . didn't seem to be very forthcoming." (Id. at 48.)

As the Court has now detailed, this is not a case in which trial counsel failed to "ask relevant and probing questions" or lacked a reason for limiting their inquiry. Therefore, it was not unreasonable for the state habeas court to consider the fact that trial counsel interviewed many witnesses when determining trial counsel's investigation was not deficient.

Petitioner also faults trial counsel for failing to interview Ms. Chappell, who possessed information about the neglect Petitioner endured, and Mr. Ryter, who could have substantiated allegations of sexual abuse. (Doc. 109 at 120.) This is essentially an argument that trial counsel should have done more. The Court has already detailed trial counsel's efforts in investigating Petitioner's background but further highlights the considerable

151

contacts trial counsel made in Texas and Georgia that Petitioner fails to acknowledge. In Texas, trial counsel interviewed 8-16 witnesses and talked to more than 30 people overall. (Doc. 41, Attach. 1 at 64-66, 260; Doc. 41, Attach. 2 at 17.) In addition to Petitioner's mother, father, brothers, wife, and Ginger, trial counsel also interviewed Amy and received information about Tony Kennedy, who were in Petitioner's friend group. (Doc. 44, Attach. 3 at 173-78, 189-90, 238-39.)

The Supreme Court has explained trial counsel need not interview every conceivable witness because there comes a point at which evidence "can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." Bobby v. Van Hook, 558 U.S. 4, 11, 130 S. Ct. 13, 19, 175 L. Ed. 2d 255 (2009). Trial counsel had already uncovered considerable information about the neglect Petitioner endured through CPS records and evidence that corroborated allegations of Petitioner's stepfather's sexual abuse through the letter from The Family Place and the mental health professionals who treated Petitioner. (E.g., Doc. 33, Attach. 8 at 19-21, 26; Doc. 33, Attach. 10 at 32-33, 35-36; Doc. 33, Attach. 11 at 3-4, 11-12, 14-15, 20, 31, 68.) This is a case where trial counsel's " 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.' " Bobby, 558 U.S. at 11-12, 130 S. Ct. at

152

19 (quotation omitted). "[T]hat more investigation could have been performed [by interviewing these individuals] does not mean [Petitioner's] counsel's investigation was inadequate." Raulerson, 928 F.3d at 997 (finding that state habeas court reasonably concluded trial counsel conducted an adequate investigation even though the petitioner presented affidavits of individuals that could have been interviewed).

It is unclear whether Petitioner contends trial counsel's investigation of Petitioner's mother's mental health was deficient because trial counsel failed to follow up with Dr. Brylowski to secure articles regarding Petitioner's mother's treatment or he is merely pointing out additional evidence the jury might have heard. (Doc. 109 at 114-15.) If he did, this argument fails.

As previously mentioned, the state habeas court found trial counsel conducted a thorough investigation of Petitioner's mother. (Doc. 52, Attach. 8 at 38-39, 80-81.) The state habeas court's determination was not unreasonable. First, regardless of whether trial counsel retrieved the articles, it is undisputed that trial counsel spoke with Dr. Brylowski about Petitioner's mother's mental health and the articles. (Doc. 38, Attach. 3 at 138-39; Doc. 39, Attach. 10 at 14.) While Petitioner suggests there is no indication Mr. Daly followed up on his August 17, 2005, request for the articles (Doc. 109 at 115), records from October 4, 2005, reveal trial counsel again noted to call Dr. Brylowski (Doc. 44,

153

Attach. 3 at 192-93), and the Court has already explained that it presumes an attorney exercised reasonable professional judgment where the record is incomplete or ambiguous. <u>Chandler</u>, 218 F.3d at 1314 n.15.

Based on the foregoing, the Court finds that the state habeas court reasonably decided that trial counsel were not deficient in their investigation of the dysfunctional, abusive, and neglectful environment Petitioner endured. <u>See</u> <u>Pittman</u>, 871 F.3d at 1251 (rejecting the petitioner's argument that trial counsel performed deficiently for failing to "obtain records, . . . properly interview family members, and locate and interview those familiar with [the petitioner] and his history.").

Selection of Witnesses

With respect to trial counsel's selection of witnesses, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [the Court] will seldom, if ever, second guess." <u>Rhode</u>, 582 F.3d at 1284 (quotation omitted). Petitioner argues it was unreasonable for trial counsel to decide Petitioner's friends would be unhelpful witnesses without asking relevant questions and speaking to many of them. (Doc. 109 at 120-21.)

As previously mentioned, Ginger was not the only one of Petitioner's friends that trial counsel interviewed; they also spoke to Amy and received information about Mr. Kennedy. After

154

interviewing Ginger and Amy, Mr. Edwards recalled that Mr. Daly "wasn't very comfortable about calling them to the witness stand because he wasn't completely sure what they would say, how they would react, [and] he did not think they came across well[.]" (Doc. 38, Attach. 3 at 48.) As for other members of Petitioner's group, Mr. Edwards testified "there wasn't information that [they] had received that seemed to be of adequate sufficient value benefit to the defense's case to offset the possibility of the witnesses deciding to share something that they'd not bothered to share with us, coming across rather peculiarly, not connecting with the jury[.]" (Id. at 49.)

While Petitioner faults trial counsel for making their determination without interviewing several witnesses, Petitioner fails to acknowledge trial counsel received information about Petitioner's peers from Petitioner himself and other members of the group, like Amy, Ginger, and Mr. Kennedy. (Doc. 44, Attach. 3 at 173-78, 189-90; Doc. 44, Attach. 4 at 156-62.) In fact, Mr. Daly had expressed similar concerns that Mr. Kennedy was not much help and "could probably only hurt." (Doc. 44, Attach. 4 at 170.) For these reasons, the state habeas court's decision that trial counsel were not deficient in their selection of witnesses was not unreasonable.

Presentation

Even though Petitioner identifies some additional evidence the jury did not hear, "[t]he mere fact . . . that other testimony might have been elicited from those [witnesses] who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters, 46 F.3d at 1514 (quotation omitted).

> It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the right questions. This case is no exception. But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance. . . . That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.

Id. at 1513-14.

The state habeas court reasonably determined that trial counsel's presentation of evidence of the dysfunctional, abusive, and neglectful environment in which Petitioner was raised was not deficient. Indeed, as the state habeas court found and this Court recounted in detail, trial counsel utilized Ms. Richardson, Ms. Connelly, Ms. Griffin, Ms. McLeod, Gilbert, and others to detail Petitioner's troubled upbringing, which included evidence of Petitioner's mother slapping Gilbert and calling him terrible names, Petitioner's mother's failure to provide for her children's

basic needs, the unsanitary and dangerous housing conditions, and Petitioner's role as his brothers' caretaker. See Background Sections V.A-E, supra. The state habeas court also noted that trial counsel presented testimony that Petitioner's mother was depressed and anxious, made poor choices, had limited coping skills, and was barely able to take care of herself along with evidence of her bizarre interactions with Gilbert and the police. (Doc. 52, Attach. 8 at 84-85.)

Moreover, "[c]onsidering the realities of the courtroom, more is not always better. The type of more-evidence-is-better approach advocated by [Petitioner] might seem appealing—after all, what is there to lose? But there can be a lot to lose." Raulerson, 928 F.3d at 998 (internal citations and quotation marks omitted). For example, Petitioner takes issue with trial counsel's failure to introduce evidence that Petitioner's mother interfered with his efforts to obtain a GED and that Petitioner sought advice from a former teacher about obtaining a job in the months leading up to the crimes. (Doc. 109 at 112, 112 n.36.) Petitioner, however, fails to realize that this evidence could have backfired against other aspects of trial counsel's mental health strategy, showing instead that he was functioning normally in the time leading up to the crimes by having the foresight to pursue these endeavors. Additionally, as discussed below, there were also several other risks associated with eliciting further information from Gilbert.

*See* Analysis Section I.D.2.c.ii, *infra*. The state habeas court's decision that trial counsel were not deficient in their presentation of the dysfunctional, abusive, and neglectful environment was reasonable.

In summary, the Court concludes the state habeas court reasonably determined that Petitioner failed to show that his trial counsel acted deficiently in investigating and presenting evidence of the dysfunctional, abusive, and neglectful environment.

### ii.  Prejudice

The state habeas court also reasonably determined that Petitioner failed to establish that he was prejudiced by trial counsel's investigation and presentation of Petitioner's mother's abusive, neglectful behavior and symptoms of mental illness. (Doc. 52, Attach. 8 at 80, 86-87.) The state habeas court reached this conclusion by determining further evidence that Gilbert could have provided of the abusive and neglectful environment and his mother's mental health was largely cumulative to that presented to the jury, and there was no reasonable probability of a different outcome. (*Id.* at 86-87.) The state habeas court was not unreasonable in its determination that this evidence, as well as other evidence about Petitioner's abusive childhood, was largely cumulative.

As mentioned before, Petitioner contends the state habeas court's cumulative conclusions were legally and factually unreasonable. (Doc. 109 at 146-47.) Petitioner argues the jury did

not learn about the full extent of the abuse and neglect he suffered, which included physical abuse and exposure to his mother's mental illness and bizarre behavior. (Id. at 142-144.) Since trial counsel presented "zero" evidence of physical abuse by his mother, Petitioner argues the state habeas court's cumulative conclusions were unreasonable. (Id. at 146-47.) Had the jury heard the mitigating evidence presented during the state habeas proceedings, Petitioner contends there is a reasonable probability that the jury would have recommended a life sentence. (Id. at 146.)

At the state habeas proceeding, Petitioner presented evidence that Petitioner's mother neglected her children, used Petitioner as his brothers' caretaker, and disregarded his mental health care treatment. During his testimony, Dr. Cunningham referenced the time that Petitioner's mother left him in a hot car for several hours when he was 20 months old. (Doc. 38, Attach. 4 at 177.) For his part, Gilbert testified that his mother left him and Petitioner to take care of themselves, and he described how his mother would either be away from the home or lock herself in her room. (Doc. 38, Attach. 1 at 137, 142.) Gilbert discussed the ways that Petitioner was his primary caretaker, including how Petitioner made him breakfast, made sure he got to school, and cleaned the house. (Id. at 141, 154, 185.) Ginger echoed Gilbert's account that Petitioner took care of his brothers by cooking and cleaning. (Doc. 38, Attach. 2 at 97.) Dr. Cunningham and Dr. Schwartz-Watts

both testified that Petitioner's mother sacrificed Petitioner's well-being, including his medication regimen and school attendance, so that he could serve her babysitting needs. (Doc. 38, Attach. 1 at 242; Doc. 38, Attach. 4 at 174.)

At trial, Ms. Richardson described the same incident when Petitioner's mother left him in a hot car at 20 months old. (Doc. 33, Attach. 8 at 11-12.) Trial counsel also presented evidence about how Petitioner's mother left him and his brother alone to the extent that they were able to regularly break into an abandoned building. (Doc. 33, Attach. 10 at 45-46.) At trial, Gilbert testified that Petitioner was the man of the house, doing most of the cooking and cleaning, and Simon added that Petitioner was "like [his] father." (Doc. 34, Attach. 4 at 20-21, 29.) Ms. Connelly, the CPS worker from Texas, described how Gilbert told her that Petitioner was the one in the household who had to do "everything." (Doc. 33, Attach. 10 at 45.) Mr. Albertson testified that Petitioner's mother kept him out of school to take care of his younger brothers (Doc. 34, Attach. 2 at 21), and Ms. Dane-Kellogg testified about how Petitioner's mother did not ensure Petitioner regularly took his medication (Doc. 34, Attach. 3 at 46-47).

Petitioner also argues he presented new evidence that his mother was emotionally abusive during the state habeas proceeding. Ms. Chappell testified by affidavit that she could hear Petitioner's mother screaming and cursing at the children from

"two houses away." (Doc. 38, Attach. 8 at 63.) Petitioner's father also testified by affidavit about how they fought constantly and described ways she was verbally abusive. (Id. at 69-71.) At trial, however, the jury heard from Ms. McLeod that Petitioner's mother referred to Gilbert as a "fat bastard." (Doc. 34, Attach. 4 at 6.)

Another theme Petitioner presented in the state habeas proceedings was the impoverished condition of Petitioner's home, including their lack of basic necessities and hygiene problems. Gilbert recounted that everything in their house was broken and that nothing was ever repaired. (Doc. 38, Attach. 1 at 154-56.) Ms. Chappell also described cleaning the filthy house after Petitioner's arrest. (Doc. 38, Attach. 8 at 65.) Both Gilbert and Ms. Chappell testified during the state habeas proceedings about the family's lack of food and water. (Doc. 38, Attach. 1 at 138, 158; Doc. 38, Attach. 8 at 62, 64.) Petitioner highlighted Ms. Chappell's recollection of the family asking her for food and money. (Doc. 38, Attach. 8 at 62.)

Contrary to Petitioner's abbreviated description, trial counsel presented extensive evidence about the state of Petitioner's home from CPS workers and Gilbert. Ms. Connelly recounted Gilbert's report on multiple occasions that their home was filthy and had no electricity, and there was rotten food in the refrigerator and freezer. (Doc. 33, Attach. 10 at 34, 45.) Ms. Connelly testified that Gilbert would arrive to school without

lunch or money, and his mother failed to complete forms to obtain
free lunch for him. (Id. at 35-36.) Ms. Connelly described Gilbert
as being dirty and documented that he had hygiene problems. (Id.
at 35, 40.) Ms. Griffin testified about how Petitioner's family
was still facing chronic neglect years later. The jury heard that
Gilbert was kicked out of school for hygiene issues, and Simon had
issues with lice. (Doc. 33, Attach. 11 at 4, 6.) Simon reported to
Ms. Griffin that they could not sleep in the beds in their home
because they were infested with fleas. (Id. at 3, 17.) Trial
counsel used Ms. Griffin to introduce pictures she had taken during
her inspection so the jury could see the condition of the home.
(Id. at 10-21.)

Based on the foregoing, Petitioner clearly presented evidence
during the state habeas proceedings about neglect by his mother,
emotional abuse by his mother, and the impoverished condition of
their home that was largely cumulative of the evidence at trial.
Whether postconviction evidence about physical abuse by
Petitioner's mother and her mental illness was largely cumulative
requires additional discussion.

In the state habeas proceeding, Petitioner highlighted
evidence that he and his brother were physically abused by his
mother. In particular, Petitioner highlighted that Gilbert
described a time when Petitioner's mother attacked Petitioner with
a hockey stick, leaving him bleeding and unconscious. (Doc. 38,

162

Attach. 1 at 133-34.) Gilbert also testified about a time where his mother hit him with a fly swatter when he answered homework questions incorrectly. (Id. at 140.) Petitioner goes so far as to say that "zero" evidence of his mother's physical abuse was introduced at trial. (Doc. 109 at 143.)

While the jury may not have heard these specific examples, Gilbert testified at trial that his mother was "very abusive," and Ms. McLeod also testified that Gilbert's mother slapped and hit Gilbert. (Doc. 34, Attach. 4 at 6, 22.) Thus, evidence at the state habeas proceedings amplified the theme and provided better examples of Petitioner's mother's physical abuse. Moreover, trial counsel presented evidence that Petitioner was physically abused by his stepfather, further suggesting the jury heard the theme that Petitioner was subjected to physical abuse as a child. Ms. Richardson recounted that Petitioner's stepfather "used ridicule and over-disciplined" Petitioner, "spanked him several times daily, sometimes shook him, [and] deliberately stepped on his hands with [leather] shoes when he was playing." (Doc. 33, Attach. 8 at 24.)

Petitioner also introduced evidence during the state habeas proceedings of Petitioner's mother's mental health issues, the history of mental illness in her family, and her bizarre behavior. Dr. Cunningham testified that Petitioner's mother was mentally ill and discussed what it was like to grow up in a home with a mentally

ill parent. (Doc. 38, Attach. 4 at 168-71.) Ms. Chappell discussed in her affidavit how members of Petitioner's mother's family also experienced mental health issues. (Doc. 38, Attach. 8 at 67.) As for her behavior, Gilbert, Ginger, and Petitioner's father described how Petitioner's mother was unpredictable and paranoid. (Doc. 38, Attach. 1 at 172, 182; Doc. 38, Attach. 2 at 99-100; Doc. 38, Attach. 8 at 69-71.) Examples of Petitioner's mother's odd behavior included the circumstances surrounding Mr. Varian's attendance at Petitioner's birthday party, the fact that she believed she had been probed by aliens, and Ms. Chappell's recollection of her frequent calls to the police for non-legitimate reasons. (Doc. 38, Attach. 1 at 109-13, 177; Doc. 38, Attach. 8 at 63.) Gilbert and Ginger testified that Petitioner's mother abused alcohol and drugs with Gilbert and other people who were her children's age. (Doc. 38, Attach. 1 at 158-59; Doc. 38, Attach. 2 at 100.) Gilbert also testified about his mother's inappropriate sexual boundaries, including that it was "not uncommon" for them to find his mother having sex with someone. (Doc. 38, Attach. 1 at 165.) Ginger and Ms. Dahlquist elaborated that Petitioner's mother was sexually involved with Petitioner's friends. (Doc. 38, Attach. 2 at 103; Doc. 38, Attach. 8 at 76.)

At trial, Ms. Richardson testified that Petitioner's mother suffered from depression and anxiety and was on an antidepressant. (Doc. 33, Attach. 8 at 30.) Ms. Eaton also testified Petitioner's

mother reported that she had difficulty "growing up and coping[,]"
and her father was an alcoholic. (Doc. 34, Attach. 1 at 72; Doc.
34, Attach. 2 at 1.) Ms. Eaton testified Petitioner's mother "had
a pretty difficult life, had made poor choices probably as a child,
which continued even more so after she became an adult, and that
she was probably barely able to take care of herself, and certainly
not much able to take care of an ailing parent or three children."
(Doc. 34, Attach. 2 at 7.) As Mr. Edwards explained, trial counsel
utilized Ms. McLeod's testimony to "suggest that . . .
[Petitioner's] mother had noticeable, profound psychological
issues herself" and that "something was wrong with her behavior,
in her thinking, that went merely beyond the fact that she was
just neglectful." (Doc. 38, Attach. 3 at 98-99.) Ms. McLeod
reported that Petitioner's mother called the police on Gilbert on
several occasions and she intercepted Gilbert's mail from his
father. (Doc. 34, Attach. 4 at 6-7.) Trial counsel also utilized
Mr. Grimm's testimony to share how Petitioner's mother behaved
bizarrely during her divorce proceedings by focusing on
insignificant issues relative to the dissolution of her family.
(Doc. 38, Attach. 3 at 100.) Although the evidence presented in
the state habeas proceedings was unquestionably disturbing and
"amplif[ied] the theme of growing up with a mentally ill mother,"
this comparison reveals that the jury heard that Petitioner's
mother suffered from mental health issues and engaged in strange

165

behavior. Dallas, 964 F.3d at 1308; see also Boyd, 592 F.3d at 1297-98 (concluding that evidence about the petitioner's father was "in some measure cumulative" even though the jury did not learn about his violent behavior because it heard that he was an "absentee father[,] a criminal who embarrassed the family, and that [the petitioner's] relationship with his father was on bad terms and with ill feelings, leading [the petitioner] to feel hurt and lonely[]").

Even if some of the more specific examples of Petitioner's mother's physical abuse, mental illness, drug use, and lack of sexual boundaries were not cumulative, this Court finds that the evidence was not without risk to Petitioner. The Eleventh Circuit has repeatedly emphasized how evidence that a sibling endured similar hardship and emerged as a law-abiding citizen can pose as much harm as good. Boyd, 592 F.3d at 1301 ("[T]he additional mitigating evidence emphasizing physical abuse, neglect, and poverty would have highlighted that [petitioner's] sister [] grew up in the same environment, had probably been beaten more frequently, and still emerged as a successfully employed, law-abiding citizen."); see also Sochor, 685 F.3d at 1032-33 (explaining the fact that the petitioner's brother "suffered poverty and hunger during childhood, [but] he did not become a rapist and murderer as an adult[]" posed as much harm as good). Here, because Gilbert suffered the same neglect and physical abuse

166

and endured his mother's bizarre behavior as a child, his testimony could have posed as much harm as good. Sochor, 685 F.3d at 1032-33. This, along with the extent of the aggravating factors present in this case discussed above, further negates a finding of prejudice.

Based on the foregoing, the Court concludes the state habeas court reasonably determined that trial counsel were not deficient for investigating and presenting evidence of the dysfunctional, abusive, and neglectful environment in which Petitioner was raised. Further, even if trial counsel had performed deficiently, the state habeas court reasonably concluded that Petitioner failed to show prejudice. Accordingly, the state habeas court's decision regarding trial counsel's investigation and presentation of evidence of the dysfunctional, abusive, and neglectful environment in which Petitioner was raised was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

d.   Experienced Mental Health Professionals

Petitioner argues trial counsel performed deficiently by failing to utilize experienced capital mitigation professionals Jeff Yungman and Paige Tarr or any comparable replacement, even though trial counsel had funds to hire them and recognized they were not qualified to conduct the investigation on their own. (Doc. 109 at 122, 126-27.) Petitioner contends Ms. Richardson, a social

worker, had no capital experience and was "incompetent in her role" because she never interviewed Petitioner, his family, or friends; failed to identify helpful experts; and was ultimately a "disastrous" witness.[27] (Id. at 127-28, 129.) Additionally, Petitioner points out that Mr. Daly, the volunteer attorney on Petitioner's case that Mr. Edwards and Mr. Beauvais had appointed as an investigator, had no capital experience. (Id. at 128-29.) Because trial counsel retained no experienced mitigation professional, Petitioner also contends trial counsel performed deficiently by failing to interview a wide range of lay witnesses multiple times. (Id. at 130-32.)

On review, the state habeas court rejected Petitioner's argument that trial counsel were ineffective for failing to utilize Mr. Yungman and Ms. Tarr. (Doc. 52, Attach. 8 at 59, 63.) Instead, the state habeas court found trial counsel's decision not to retain a mitigation specialist was reasonable because they conducted an extensive mitigation investigation utilizing all three attorneys and an experienced social worker. (Id. at 59, 68.)

As for trial counsel, the state habeas court found that trial counsel decided not to utilize a mitigation specialist because

---

[27] Again, Petitioner references trial counsel's preparation of Ms. Richardson. (Doc. 109 at 130.) As previously explained, the Court found Petitioner's claim that "[c]ounsel failed to adequately prepare defense witnesses for their testimony . . ." should be dismissed and he would not be permitted to brief this claim because it was insufficiently pled. (Doc. 104 at 28-29, 29 n.5.)

their preference was to conduct the investigation themselves in order to talk to witnesses and develop relationships. (Id. at 60.) The state habeas court noted that all three attorneys were highly experienced and participated in the investigation; that Mr. Edwards and Mr. Beauvais had death penalty experience and experience conducting mitigation investigations; and that they provided Mr. Daly with direction when he was appointed investigator.[28] (Id. at 59-61.) The state habeas court recognized the extensive mitigation investigation trial counsel performed, which included interviewing Petitioner, obtaining records, interviewing Petitioner's family and friends, traveling to Texas, investigating the two-year gap, and utilizing Ms. Richardson to locate records and interview witnesses. (Id. at 61-62.)

The state habeas court considered that trial counsel substituted Ms. Richardson, an experienced social worker, for Mr. Yungman and Ms. Tarr because they were "very, very busy," and "just really didn't have the time." (Id. at 60.) Regarding Ms. Richardson's contribution to the investigation, the state habeas

---

[28] The state habeas court recognized Petitioner was represented by three experienced trial attorneys and two of them had experience in capital cases. (Doc. 52, Attach. 8 at 22-24.) Mr. Edwards had worked on 12 murder cases and four capital cases, including one where he served as lead counsel, and Mr. Beauvais had handled 15 murder cases and one death penalty case in which he was responsible for mitigation evidence. (Id. at 23.) Mr. Daly had handled about 30 murder cases, the majority of which he served as first chair. (Id. at 24.)

court credited trial counsel's assessment that she did a "fabulous job finding people, interviewing them and gathering information for [them]." (Id. at 62.) Relevant to Petitioner's arguments, the state habeas court rejected Petitioner's claim that trial counsel were ineffective in utilizing Ms. Richardson because she never spoke to Petitioner or his family. (Id. at 63.) The state habeas court found that trial counsel had a "reasonable strategic reason" for not having Ms. Richardson meet with Petitioner, which was to convey objectivity and limit the nature of cross-examination. (Id. at 64.) It was also unnecessary for Ms. Richardson to meet with his family and other witnesses because trial counsel did. (Id. at 63.)

Even though trial counsel ultimately decided to pull Ms. Richardson from the stand, the state habeas court rejected Petitioner's argument that trial counsel were ineffective for presenting her and found they reasonably decided to use her. (Id. at 66.) Because trial counsel had thoroughly prepared her, they could not be faulted for her "pitiful" testimony and failure to perform. (Id.) In any event, the state habeas court found she provided significant information. (Id.)

Petitioner contends the state habeas court unreasonably determined facts and unreasonably applied Strickland to find trial counsel's failure to hire Ms. Tarr and Mr. Yungman was reasonable. (Doc. 109 at 138.) According to Petitioner, the state habeas court

based its decision on the fact that trial counsel made a "reasonable decision to conduct their own mitigation investigation in the case utilizing the skills and resources of all three attorneys" and "retained the services of an experienced social worker to assist in the mitigation investigation." (Id. at 137.) In Petitioner's view, these findings ignore trial counsel's representations that mitigation professionals were necessary and that ABA guidelines mandated the use of a professional investigator and mitigation specialist. (Id.) Petitioner further asserts that Mr. Beauvais's representation that trial counsel decided against using Mr. Yungman and Ms. Tarr due to lack of availability is "belied by the record" because trial counsel waited two years to substitute Ms. Richardson, and any lack of availability was due to their deficient performance. (Id. at 137-38 n.52.) Finally, Petitioner challenges the reasonableness of the state habeas court's finding about Ms. Richardson's presentation because the state habeas court failed to acknowledge that trial counsel admitted they prepared her "poorly" and that her presentation was "harmful." (Id. at 139.)

The parties presented evidence that on October 8, 2002, trial counsel moved for funds for the expert assistance of Mr. Yungman, a "social worker/mitigation specialist," and Ms. Tarr, a "mitigation specialist." (Doc. 49, Attach. 18 at 188, 195.) During

an ex parte hearing on November 7, 2002, the trial judge authorized Mr. Yungman's and Ms. Tarr's services. (Id. at 10.)

Trial counsel revisited the issue during an ex parte hearing on November 17, 2004, and requested that the trial judge appoint Mr. Daly to assist them in the investigation. (Id. at 91-92.) Mr. Edwards informed the trial judge it was his preference and practice to conduct investigations himself because he liked to see, talk, and develop relationships with people, and while they had already spent 80 hours on pure investigation on the case, additional help was needed so they could turn to more of the legal issues. (Id.) Trial counsel requested that the trial judge appoint Mr. Daly because he knew the case intimately and had started developing relationships with the people involved. (Id. at 96.) During the same hearing, trial counsel also asked to substitute Ms. Richardson for Ms. Tarr. (Id. at 97.) Mr. Edwards explained that Ms. Richardson "could provide the exact same services and more," she was local, and she was available. (Id.) On December 23, 2004, the trial judge granted the motion to appoint Mr. Daly as an investigator based on the nature of and his familiarity with the case and the motion to substitute Ms. Richardson for Mr. Yungman and Ms. Tarr "predicated upon [her] expertise as well as her increased availability due to her residing in the local area." (Doc. 50, Attach. 1 at 123-24, 126.)

172

Mr. Edwards's testimony during the state habeas hearing echoed his statements to the trial court that trial counsel decided they wanted to do the investigation on their own and believed they had the resources to do so. (Doc. 38, Attach. 2 at 209.) He also testified it was his preference to do his own investigation, and he had conducted his own investigation in other capital cases. (Doc. 38, Attach. 3 at 30-31.) Mr. Beauvais further recalled that trial counsel decided against utilizing Mr. Yungman and Ms. Tarr because they were busy and did not have the time. (Id. at 188.) Although Mr. Daly had not conducted a mitigation investigation in a capital case, he testified that he had done investigations in his own non-capital cases, and he acted at Mr. Edwards and Mr. Beauvais's direction in this case. (Id. at 132.)

Regarding Ms. Richardson, Mr. Edwards explained that Ms. Richardson had spent a "professional lifetime working in . . . social work, dependency investigations . . . and was very knowledgeable about the inner workings of family, human service organizations and agencies . . . ." (Doc. 41, Attach. 1 at 70.) Mr. Beauvais explained he was primarily responsible for working with her, and she tracked people down, did initial interviews, and recorded information for them. (Id. at 250-51.) Mr. Beauvais testified Ms. Richardson "did a fabulous job finding people, interviewing them, and gathering information for [them]." (Id. at 280-81.) After she interviewed people, Mr. Beauvais explained that

173

that he then "reinterviewed them." (Id. at 282.) Mr. Edwards explained they decided against having Ms. Richardson meet with Petitioner in order "to convey to the jury the objective nature of the information that Ms. Richardson was providing and also to limit the nature of the cross-examination that she may be confronted with following her direct testimony." (Doc. 38, Attach. 3 at 62.) Reflecting on the case years later, Mr. Edwards testified that he did not think he appreciated the significance of the role of a mitigation investigator to get information from lay witnesses, and he did not think they, "as lawyers," were adequate to perform the role. (Id. at 113.) Mr. Beauvais also commented that trying to find people by themselves was "a mistake [they] made in the case[.]" (Id. at 189.)

As for Ms. Richardson's testimony, when questioned about whether trial counsel prepared Ms. Richardson to testify, Mr. Edwards responded: "Poorly, apparently, but yes." (Id. at 55.) Commenting further, however, Mr. Edwards explained that they prepared her "[a] great deal[,]" that it was not a "one-time, sit-down 30 minute session[,]" and they "worked with her over time." (Id.) Mr. Beauvais explained that trial counsel were surprised by her performance because she had testified in court in her work frequently. (Doc. 41, Attach. 1 at 281.)

The Court concludes that the state habeas court reasonably determined that Petitioner failed to show that his trial counsel's

174

performance was deficient for failing to utilize Mr. Yungman and Ms. Tarr or presenting Ms. Richardson as a witness. At the outset, there is no general requirement that counsel retain a mitigation specialist, social worker, or other expert to be effective. See Morrow v. Warden, 886 F.3d 1138, 1150 (11th Cir. 2018) (quotation omitted) (explaining that the failure to hire a social worker is not per se ineffective); see also Waldrop v. Thomas, No. 3:08-CV-515-WKW, 2014 WL 1328138, at *62 (M.D. Ala. Mar. 31, 2014) ("[W]hile counsel is certainly obligated to undertake a reasonable investigation of mitigating evidence in preparation for the penalty phase, there is no general requirement that counsel retain a social worker or any other expert for the penalty phase, even if doing so is a sensible and widely accepted practice."). In fact, "strategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness." See Dunn v. Reeves, --- U.S. ----, 141 S. Ct. 2405, 2410, 210 L. Ed. 2d 812 (2021).

Additionally, Petitioner's attempts to demonstrate the state habeas court's decision and findings were unreasonable are unavailing. First, the Supreme Court has been clear that "[t]he ABA Guidelines do not establish independent standards for counsel; rather, they are merely guides to be considered in determining whether an attorney's conduct was reasonable." Anderson v. Sec'y, Fla. Dep't of Corr., 752 F.3d 881, 904 (11th Cir. 2014) (citing

175

_Strickland_, 466 U.S. at 688, 104 S. Ct. at 2065); _see also Bobby_, 558 U.S. at 8, 130 S. Ct. at 17 (rejecting the treatment of ABA Guidelines as "inexorable commands with which all capital defense counsel must fully comply" (internal quotation marks omitted)). Thus, the state habeas court's decision was not automatically unreasonable because of ABA guidelines about what professionals should be included on a mitigation team.

Additionally, not even trial counsel's own evaluations or misgivings about their decisions dictate whether trial counsel performed deficiently. See _Grayson v. Thompson_, 257 F.3d 1194, 1222 (11th Cir. 2001) ("[E]ven counsel's own hindsight regarding what might have influenced the jury cannot support a finding of deficient performance."); _Chandler_, 218 F.3d at 1315 ("The reasonableness of a counsel's performance is an objective inquiry."); _King v. Warden, Ga. Diagnostic Prison_, No. CV 2:12-119, 2020 WL 423344, at *15 (S.D. Ga. Jan. 24, 2020) ("[B]ecause ineffectiveness is a question which we must decide, admissions of deficient performance by attorneys are not decisive." (quoting _Harris v. Dugger_, 874 F.2d 756, 761 n.4 (11th Cir. 1989))). As a result, neither the fact that trial counsel at one time believed Mr. Yungman and Ms. Tarr were necessary nor that trial counsel subsequently thought it was a mistake to do the mitigation investigation themselves proves the state habeas court's decision was unreasonable.

Petitioner further disputes Mr. Beauvais's representation that trial counsel decided against using Mr. Yungman and Ms. Tarr due to lack of availability because trial counsel waited two years to substitute Ms. Richardson and any lack of availability was due to their deficient performance. (Doc. 109 at 137-38 n.52.) Other than conclusory assertions, however, Petitioner has not produced any evidence to rebut Mr. Beauvais's recollection or that these specialists were any more available at the time trial counsel obtained funds, which is the core factual basis of his argument. As the Court previously explained, "[a]n ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]." Chandler, 218 F.3d at 1314 n.15.

Petitioner also criticizes Ms. Richardson's failure to interview Petitioner and trial counsel's failure to interview a wide variety of witnesses multiple times. First, the state habeas court's determination that trial counsel had a "reasonable strategic reason" for not having Ms. Richardson interview Petitioner was not an unreasonable determination of facts in light of the evidence presented, nor has Petitioner shown by clear and convincing evidence that this factual determination was incorrect. Fotopoulos, 516 F.3d at 1233 ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact . . . ."). Notably, Petitioner did not even challenge the state habeas court's

177

underlying factual findings regarding objectivity and cross examination as the reasons for trial counsel's decision. Nor could he, since that is exactly what Mr. Edwards testified to as his reasoning. (Doc. 38, Attach. 3 at 62.) As for trial counsel's failure to conduct a series of wide-ranging interviews, Petitioner is mistaken on this ground as well. Ms. Richardson testified she interviewed 31 different people – 11 of them twice. (Doc. 33, Attach. 8 at 4.) Mr. Beauvais confirmed that he then reinterviewed the individuals. (Doc. 41, Attach. 1 at 282.)

Regarding trial counsel's presentation of Ms. Richardson, Petitioner claims the state habeas court unreasonably found trial counsel were not ineffective because trial counsel admitted they prepared her "poorly" and the state habeas court failed to acknowledge her testimony was harmful. (Doc. 109 at 139.) As noted above, it is Petitioner who misrepresents the record. When questioned about whether trial counsel prepared Ms. Richardson to testify, Mr. Edwards responded: "Poorly, apparently, but yes." (Doc. 38, Attach. 3 at 55.) Trial counsel explained their efforts to prepare her and their surprise when she did not perform as they expected. (Doc. 38, Attach. 3 at 55; Doc. 41, Attach. 1 at 281.) In the Court's opinion, Mr. Edwards was merely stating that given her performance, with the benefit of hindsight, they should have prepared Ms. Richardson more. These after-the-fact statements are not enough to establish deficient performance. See Grayson, 257

178

F.3d at 1222. Additionally, while the state habeas court might not have used the word "harmful," it acknowledged that trial counsel believed Ms. Richardson's testimony as a witness was "pitiful," which was not unreasonable given trial counsel's explanation of Ms. Richardson's shortcomings. (Doc. 52, Attach. 8 at 66 (citing Doc. 38, Attach. 2 at 238-39).) During his deposition, Mr. Beauvais expounded on what trial counsel meant. They believed Ms. Richardson's testimony to be problematic because she "froze on the stand and just couldn't answer questions, couldn't convey the information she possessed to the jury." (Doc. 41, Attach. 1 at 281.) The problem was not, however, that the information was not presented, as much as that it was disjointed. (Id.) Ultimately, trial counsel strategically decided against having Ms. Richardson take the stand again because they decided her "presentation was harmful." (Doc. 38, Attach. 2 at 239; Doc. 38, Attach. 3 at 62-63.) The Court cannot say the state habeas court's finding that trial counsel were not deficient for presenting Ms. Richardson was unreasonable.

Based on the foregoing, Petitioner failed to show the state habeas court's decision regarding trial counsel's failure to use experienced mitigation specialists was contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. The state habeas court also found Petitioner was not prejudiced by trial

counsel's reasonable decision not to retain mitigation specialists or present Ms. Richardson as a witness. (Doc. 52, Attach. 8 at 63, 66, 68-69.) While Petitioner claims the state habeas court made some unreasonable determinations with respect to this component of the Strickland analysis (Doc. 109 at 147-48), Petitioner fails to identify any specific evidence that trial counsel could have discovered had they retained Mr. Yungman or Ms. Tarr. Likewise, other than some conclusory allegations that trial counsel intended to utilize Ms. Richardson to present more information and that she conceded to the State on cross examination, Petitioner fails to offer any evidence that trial counsel should have elicited from Ms. Richardson that was not presented through other witnesses. Considering this omission, and the fact that Petitioner's failure to show trial counsel performed deficiently by failing to utilize mitigation specialists is fatal to his ineffective assistance claim, Reaves, 872 F.3d at 1151, the Court does not reach the prejudice prong of the Strickland analysis on this claim. See Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320, 1340 (11th Cir. 2012) (concluding petitioner failed to establish prejudice when he failed to say what mitigation expert could have done with additional time or explain how he was prejudiced by the failure to have more time to prepare); cf. Williams v. Sellers, No. CV412-106, 2021 WL 3871928, at *17 n.12 (S.D. Ga. Aug. 30, 2021) (rejecting argument that trial counsel performed deficiently by

failing to use Paige Tarr after trial counsel received funds to hire her because petitioner failed to "offer any evidence that trial counsel could have discovered had they retained Ms. Tarr[]").

In conclusion, the Court finds that the state habeas court reasonably determined that Petitioner failed to show that trial counsel acted deficiently by failing to retain a replacement mental health expert; investigate the two-year gap; present Petitioner's jail records; investigate and present evidence that Petitioner was the victim of incest by his mother; retain a sexual trauma expert; reliably present evidence that Petitioner was sexually abused by his stepfather; investigate and present evidence of the dysfunctional, abusive, and neglectful environment Petitioner endured; and utilize experienced mitigation professionals. Additionally, even if Petitioner carried his burden to show trial counsel performed deficiently, including if they performed deficiently by failing to present evidence of his neuropsychological impairments, the Court finds that the state habeas court reasonably determined that Petitioner failed to show that these deficiencies prejudiced his defense. The Court agrees with the state habeas court that Petitioner failed to show a reasonable probability that absent these deficiencies, considered individually and cumulatively, that the result of the proceeding would have been different. Pye, 50 F.4th at 1041-42. This is true considering the extensive aggravating factors present in this

case, the cumulative nature of the additional mitigating evidence, and the risk of opening the door to additional damaging evidence. Petitioner failed to show that the state habeas court's decision resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable determination of facts in light of the evidence presented.

## II.  COMPETENCE TO STAND TRIAL

### A.  Legal Standard

The Due Process Clause of the Fourteenth Amendment "prohibit[s] states from trying and convicting a mentally incompetent defendant." James v. Singletary, 957 F.2d 1562, 1569 (11th Cir. 1992) (first citing Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960); then citing Pate v. Robinson, 383 U.S. 375, 384-86, 86 S. Ct. 836, 841-42, 15 L. Ed. 2d 815 (1966); and then citing Fallada v. Dugger, 819 F.2d 1564, 1568 (11th Cir. 1987)). The test established for determining whether a defendant is competent to stand trial requires courts to consider (1) whether "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) whether "he has a rational as well as factual understanding of the proceedings against him." Dusky, 362 U.S. at 402, 80 S. Ct. at 789. Petitioner has raised a substantive competency claim, which both parties agree cannot be procedurally defaulted, that his due

process rights were violated because he was actually incompetent at the time of his trial. (Doc. 109 at 174; Doc. 111 at 105); Raheem, 995 F.3d at 929 (citing Lawrence v. Sec'y, Fla. Dep't of Corr., 700 F.3d 464, 481 (11th Cir. 2012)). Since the state habeas court did not make a ruling on Petitioner's substantive due process claim, the "Court is permitted to address the merits outside of the framework of § 2254(d)." Raheem v. Humphrey, No. 1:11-CV-1694-AT, 2015 WL 13899724, at *18 (N.D. Ga. Sept. 24, 2015) (citing Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1259 (11th Cir. 2002)).

Petitioner bears the burden to establish that he was incompetent to stand trial and entitled to a hearing.

> In advancing his substantive competency claim, [Petitioner] "is entitled to no presumption of incompetency and must demonstrate his . . . incompetency by a preponderance of the evidence." James v. Singletary, 957 F.2d 1562, 1571 (11th Cir. 1992). Relatedly, we have said that in order to be entitled to an evidentiary hearing on a substantive competency claim, which [Petitioner] seeks here, a petitioner must present "clear and convincing evidence" that creates a "real, substantial, and legitimate doubt" as to his competence. Id. at 1573; accord Medina, 59 F.3d at 1106; Card v. Singletary, 981 F.2d 481, 484 (11th Cir. 1992) ("The standard of proof is high. The facts must positively, unequivocally and clearly generate the legitimate doubt." (alterations and quotation marks omitted)).

Lawrence, 700 F.3d at 481.

"The best evidence of [a petitioner's] mental state at the time of trial is the evidence of his behavior around that time,

especially the evidence of how he related to and communicated with others then." <u>Wright</u>, 278 F.3d at 1259. Yet, relevant to this case,

> "[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." <u>Id.</u> at 487-88 (quoting <u>United States ex rel. Foster v. DeRobertis</u>, 741 F.2d 1007, 1012 (7th Cir.), <u>cert. denied</u>, 469 U.S. 1193, 105 S. Ct. 972, 83 L. Ed. 2d 975 (1985)). Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. <u>McCune v. Estelle</u>, 534 F.2d 611, 612 (5th Cir. 1976). The fact that a defendant has been treated with anti-psychotic drugs does not <u>per se</u> render him incompetent to stand trial. <u>Fallada</u>, 819 F.2d at 1569.

<u>Medina v. Singletary</u>, 59 F.3d 1095, 1107 (11th Cir. 1995). Moreover, "[t]he contemporaneous assessment of trial counsel is particularly probative because competency is 'primarily a function of defendant's role in assisting counsel in conducting the defense' and the defendant's counsel is thus 'in the best position to determine whether the defendant's competency is suspect.' " <u>Raheem</u>, 995 F.3d at 930 (quoting <u>Watts v. Singletary</u>, 87 F.3d 1282, 1288 (11th Cir. 1996)).

   B.   <u>Analysis</u>

   Petitioner argues the Court should hold an evidentiary hearing because clear and convincing evidence exists creating a real, substantial, and legitimate doubt that he was incompetent at the time of trial. (Doc. 109 at 178.) In support of his argument, Petitioner points to his history of mental illness which continued

during trial, his suicide attempts before trial and soon after
sentencing, and his fluctuating prescription medication regimen.
(Id. at 165-71, 176, 178.) Additionally, Petitioner argues his
trial counsel's request that he be closely monitored due to
concerns about his mental state and the trial judge's insistence
on multiple evaluations during trial, which revealed that he was
on the verge of a psychotic break, show he was not competent. (Id.
at 158-65, 176-77.) Petitioner contends his breakdown after his
father's testimony and refusal to dress in civilian clothes during
the penalty phase further evidence his diminished mental state.
(Id. at 171-72, 178.)

Respondent counters that none of the mental health experts
that evaluated Petitioner before, during, or after trial found
Petitioner incompetent to stand trial. (Doc. 111 at 108-10.)
Moreover, Petitioner's attorneys raised no competency issue at the
time of trial when questioned by the trial judge, indicating they
had no trouble communicating with him. (Id.)

Considering trial counsel's assessment of Petitioner's mental
state, the trial judge's interactions with and observations of
Petitioner, Petitioner's behavior, and the results of Petitioner's
mental evaluations at the time of trial, this Court concludes that
Petitioner has not established by a preponderance of the evidence
that he was incompetent at the time of trial or by clear and
convincing evidence that he is entitled to an evidentiary hearing.

At trial, Dr. Negrin testified that he had diagnosed Petitioner with bipolar disorder as of 1998. (Doc. 34, Attach. 1 at 33.) Dr. Nagelberg also testified that his 1998 psychological evaluation of Petitioner revealed evidence of prodromal symptoms of schizophrenia and a delusional disorder. (Doc. 34, Attach. 3 at 10-11.) Years later, Dr. Schwartz-Watts opined that Petitioner suffers from schizoaffective disorder, bipolar type, among other conditions. (Doc. 38, Attach. 1 at 229.) Before and during trial, Petitioner was being treated with medication, including, at times, anti-psychotic drugs. (Doc. 26, Attach. 3 at 25-26; Doc. 39, Attach. 6 at 29, 60, 95, 135, 142, 219, 260, 284, 310.) Petitioner also had multiple suicide attempts before the crimes, while he was awaiting trial, and after his sentencing. (E.g., Doc. 14, Attach. 19 at 1; Doc. 39, Attach. 6 at 16-17, 244; Doc. 41, Attach. 7 at 50.) However, Petitioner's history of mental illness and treatment with medication, or lack thereof, did not automatically render him incompetent to stand trial. Medina, 59 F.3d at 1107. Petitioner's history of suicide attempts and his suicide attempt after sentencing are likewise not automatically determinative.[29]

---

[29] Petitioner's suicide attempt after sentencing is particularly unpersuasive given it was after trial and after he received an undoubtedly distressing sentence. See Wright, 278 F.3d at 1259 (indicating the relevant evidence concerns a petitioner's mental state "at the time of trial"). Moreover, after this suicide attempt, trial counsel did not pursue competency challenges during his hearing for a new trial. (Doc. 34, Attach. 8 at 3.)

"[R]ather, the evidence must indicate a present inability to assist counsel or understand the charges." Id. Petitioner fails to make this showing.

Although Petitioner's mental health around the time of trial evidently raised concerns about his competency to stand trial, it appears that trial counsel and the trial judge appreciated these concerns and nevertheless concluded Petitioner was competent to stand trial. See Raheem, 995 F.3d at 930 (explaining trial counsel are "in the best position to determine whether the defendant's competency is suspect[]"). After alerting the trial judge to concerns about Petitioner's mental state during voir dire, the trial judge inquired into whether Petitioner was able to communicate with them and assist in his defense. (Doc. 49, Attach. 18 at 171-72.) Mr. Edwards responded that they had not experienced any difficulty with this. (Id.) Even reflecting on Petitioner's mental state years later during the state habeas proceeding, trial counsel generally remained unconcerned with questions of Petitioner's competency at the time of trial. Although Mr. Edwards testified during the state habeas hearing that there were times when it was challenging to communicate with Petitioner because he was experiencing psychosis, extreme anxiety about the trial, and fear because "[t]he State wanted to kill him[,]" he also testified that Petitioner was "more or less able to appreciate the circumstance he was in and what [they] were trying to do." (Doc.

38, Attach. 3 at 12.) When specifically questioned about Petitioner's competency during his deposition, however, Mr. Edwards averred that "the question of competency was not one that gave [him] pause in [Petitioner's] case." (Doc. 41, Attach. 1 at 100.) Mr. Beauvais similarly testified during his deposition that "nothing in [his] contact with [Petitioner] [] caused [him] to believe that [Petitioner] was not competent to stand trial and that [they] needed to go down that road." (Id. at 271.)

Although brief, there were also several occasions where Petitioner appropriately responded to questioning by the trial judge. For example, Petitioner was sworn in and responded to the trial judge's questions about understanding his decision - after consulting with his trial counsel - against testifying. (Doc. 33, Attach. 2 at 33-34.) Additionally, when the trial judge questioned Petitioner's decision to wear his jail uniform, Petitioner conferred with his trial counsel and responded to the trial judge, indicating he understood he had been convicted and would feel better not dressed in civilian clothing. (Doc. 33, Attach. 6 at 4-6.) In contrast to Petitioner's argument that this interaction shows worrisome behavior, Petitioner's statements create a record of how well he related to and communicated with the trial judge and trial counsel and suggest that he understood the proceedings against him at the time of trial.

Additionally, other than Petitioner's emotional reaction to his father's testimony (Doc. 33, Attach. 12 at 50-52), Petitioner points to no other instance during the multi-day trial when he failed to act appropriately in front of the jury or when his behavior required admonition by the trial judge. See Medina, 59 F.3d at 1111 (denying request for evidentiary hearing even though the defendant misbehaved during the trial and noting he "responded appropriately to the court's reprimands [and] behaved appropriately during much of the trial[]"). The record is similarly devoid of any instances of Petitioner showing an inability to consult with counsel or expressing confusion or a lack of understanding about the proceedings.

Finally, the record provides context for trial counsel's alarm about Petitioner's mental state, the ensuing psychiatric evaluations, and medication adjustments. Petitioner reported increased anxiety to his medical providers as his trial approached. (Doc. 39, Attach. 6 at 284, 310.) Once voir dire began, trial counsel explained that they were exhausted and that Petitioner was "having a difficult time with the process[,]" not accustomed to the pace, and not getting any sleep. (Doc. 30, Attach. 1 at 3.) It was under these circumstances that trial counsel reported they had "grave concerns about [Petitioner's] wellbeing and welfare[]" and asked the trial judge that he be monitored and a psychiatric evaluation be completed. (Doc. 49, Attach. 18 at 153, 158.)

Although the trial judge initially wanted a psychiatrist to conduct the evaluation (id. at 158), Dr. Stockfisch was not immediately available (id. at 167). In light of this delay, the trial judge confirmed that trial counsel only wanted him evaluated "just to be on the safe side[,]" commenting that Petitioner appeared to him to be stable, cooperative, and able to communicate with trial counsel. (Id.) To expedite the process, they agreed that Dr. Grant, who already had a relationship with Petitioner, would evaluate Petitioner. (Id. at 168-69.) After trial counsel reported Dr. Grant's findings and recommendations about a medication to help Petitioner sleep to the trial judge, it was only then, "out of an abundance of caution," that the trial judge decided to have Dr. Tillinger evaluate Petitioner. (Id. at 171-72.) Dr. Tillinger concluded Petitioner was competent to stand trial and also suggested a medication adjustment. (Doc. 50, Attach. 1 at 197.) Regarding the medication adjustment, trial counsel specifically relayed that it had helped Petitioner sleep, but it made him want to continue sleeping, so he "refused the new medication this morning[.]" (Doc. 31, Attach. 11 at 5.) Trial counsel were in agreement with Petitioner's decision because they did not want him sleeping during trial and were concerned that he be clear-minded and able to "appreciate and understand [what was] going on." (Id. at 5-6.)

Whatever issue Petitioner may take with the scope of the evaluations by Dr. Grant and Dr. Tillinger, both evaluated Petitioner, and neither alerted trial counsel or the Court to a competency issue or that further evaluation was needed to make a reliable assessment. This remains true even considering the information Dr. Grant conveyed regarding Petitioner's status to trial counsel. (Doc. 39, Attach. 9 at 52.) Additionally, Petitioner argues Dr. Tillinger's report was done in haste without sufficient background information (Doc. 109 at 163), but Dr. Tillinger's evaluation was conducted "out of an abundance of caution" after Dr. Grant, who was familiar with Petitioner's background, assessed Petitioner. Further, Petitioner's speculation that a more comprehensive psychological evaluation could have found that he was incompetent to stand trial does not constitute positive, unequivocal facts that generate a legitimate doubt that Petitioner was incompetent to stand trial. Card v. Singletary, 981 F.2d 481, 484 (11th Cir. 1992). Moreover, trial counsel informed the Court that they approved of Petitioner's refusal of the medication, specifically referring to concerns regarding Petitioner's ability to understand the trial proceedings. (Doc. 31, Attach. 11 at 5-6.)

In summary, the record shows that Petitioner effectively consulted with his counsel during trial and had an understanding of the proceedings. Accordingly, because Petitioner failed to

carry his heavy burden of establishing a legitimate doubt as to his competency at trial, the Court **DENIES** Petitioner's challenge based on a claim of substantive incompetency and request for an evidentiary hearing.

III. Certificate of Appealability

Federal Rule of Appellate Procedure 22(b)(1) states in part: "In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, . . . the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Pursuant to 28 U.S.C. § 2253(c)(2), a district judge should issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." The United States Supreme Court has stated that "[t]he COA inquiry . . . is not coextensive with a merits analysis." Buck v. Davis, 580 U.S. 100, 115, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017). Rather, "[a]t the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " Id. (quoting Miller-El v. Cockrell, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034, 154 L. Ed. 2d 931 (2003)).

In this case, Petitioner has failed to make a substantial showing of the denial of a constitutional right with respect to his ineffective assistance of counsel claims or competency claim. The Court finds that no jurists could disagree with the Court's conclusions on the issues presented in any of the claims Petitioner properly raised. Accordingly, Petitioner is **DENIED** a COA for any of his claims.

### CONCLUSION

For the foregoing reasons, Petitioner has failed to establish that he is entitled to relief under 28 U.S.C. § 2254. Accordingly, his petition for a writ of habeas corpus is **DENIED**. The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this *22ᴺᴰ* day of May 2023.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA